F7gdalph

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ALPHA CAPITAL ANSTALT,

4                    Plaintiff,                New York, N.Y.

5            v.                                15 Civ. 5443 (VM)

6   OXYSURE SYSTEMS, INC., ADAR
    BAYS LLC, UNION CAPITAL LLC,
7   JSJ INVESTMENTS, LLC, GROUP 10
    HOLDINGS, LLC and MACALLAN
8   PARTNERS, LLC,

9                    Defendants.

10  ------------------------------x

11                                             July 16, 2015
                                               10:19 a.m.
12
    Before:
13
                       HON. VICTOR MARRERO,
14
                                               District Judge
15
                           APPEARANCES
16
    LAW OFFICES OF KENNETH ZITTER
17       Attorneys for Plaintiff
    BY:  KENNETH ZITTER
18
    STECKLER LLP
19       Attorneys for Defendant Oxysure Systems, Inc.
    BY:  MAZIN A. SBAITI
20
    GARSON, SEGAL, STEINMETZ, FLADGATE LLP
21       Attorneys for Defendants Adar Bars LLC and
         Union Capital LLC
22  BY:  MICHAEL M. STEINMETZ
         KEVIN KEHRLI
23
    MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
24       Attorneys for Defendant Macallan Partners, LLC
    BY:  BENJAMIN S. FISCHER
25       DEVIN CAIN

F7gdalph

1              THE COURT:  Good morning.  Thank you.  Be seated.

2          This is a proceeding in the matter of Alpha Capital

3    Anstalt versus Oxysure Systems.  The Court scheduled this

4    proceeding as a hearing on the plaintiff's motion pursuant to

5    an order to show cause for preliminary injunctive relief in

6    connection with a transaction between the plaintiff and the

7    defendant Oxysure.

8          Let me just summarize the salient facts so that we

9    don't spend too much time going over matters that are on the

10   record and which the Court has reviewed in the papers, and

11   we'll turn to the specific issues relating to the standard for

12   issuance of injunctive relief.

13         Plaintiff Alpha Capital purchased some shares of

14   defendant Oxysure Series B convertible preferred stock, roughly

15   675 shares, with warrants to purchase another 600,000-plus

16   shares of Oxysure common stock.  According to the stock

17   purchase agreement, or this securities purchase agreement, as

18   plaintiff describes it in the complaint, Oxysure had agreed not

19   to issue any new securities or debt convertible into Oxysure

20   common stock at a variable price, will not issue any stock at a

21   price less than the Series B convertible price and the warrants

22   that were part of the plaintiff's transaction with Oxysure.

23   That price was about $1.20.  And Alpha, the plaintiff, was

24   given the right to participate in the subsequent financing

25   issued by the defendant Oxysure.

F7gdalph

| | |
|---|---|
| 1 | According to the plaintiff, recently Oxysure, the |
| 2 | defendant, issued Series C, D and E convertible preferred stock |
| 3 | and convertible notes to one series of defendants here and |
| 4 | variable rate convertible notes to another group of the |
| 5 | defendants.  According to the plaintiff also, the Series C, D |
| 6 | and E and the notes issued by Oxysure carried a price which |
| 7 | varied from the price of the common shares and could be |
| 8 | acquired for less than $1.20, which Alpha claims violates one |
| 9 | of the terms of the Securities Purchase Agreement between Alpha |
| 10 | and Oxysure.  And according to Alpha, Alpha was not given an |
| 11 | opportunity to purchase any of the Series D and E stock or |
| 12 | notes in that transaction. |
| 13 | So there are two or three questions that the Court |
| 14 | sees as going to the merits of this issue.  It is a contract |
| 15 | dispute, obviously, involving interpretation of the Alpha and |
| 16 | Oxysure Securities Purchase Agreement. |
| 17 | Do the terms of the Alpha Share Purchase Agreement for |
| 18 | Series B stock and warrants extend to prohibit Oxysure's |
| 19 | issuance of Series C, D and E stock and notes, or, conversely, |
| 20 | does Oxysure's transaction with the defendants here regarding |
| 21 | Series C, D and E stock and notes violate the terms of |
| 22 | Oxysure's agreement with Alpha relating to Series B securities? |
| 23 | The second issue of fact relates to the price of the |
| 24 | Series C, D and E preferred shares and notes.  Does that price |
| 25 | constitute a variable price which is lower or could be lower |

F7gdalph

than the $1.20 per share that Alpha claims would violate its

agreement with Oxysure?

Third, did Alpha have a right to participate in the

Series C, D and E transaction with these defendants under the

terms of Alpha's agreement with Oxysure?

Assuming the answers to these three threshold issues

is essentially yes -- in other words, that the terms of the

defendants' agreement for Series C, D and E securities with

Oxysure would be covered and violate the terms of the Series B

transaction between Alpha and Oxysure, and, yes, that the price

of the Series C, D and E preferred shares and notes would or

could be lower than the $1.20 share which Alpha claims the

terms of its agreement sets as a potential violation of the

agreement and, three, that Alpha did have a right to

participate in the Series C, D and E sale under the terms of

its share purchase agreement -- so if all three of those

answers are yes, then the question is what is the irreparable

harm that Alpha would suffer from this transaction that would

entitle it to injunctive relief?

All right.  Now, I understand that three defendants

are represented here -- Oxysure, Macallan Partners, and Adar

Bays.  I understand that defendants JSJ Investments and Group

10 Holdings are not present.  So one question for the plaintiff

to answer is whether these defendants were given notice of this

proceeding and were served properly under the rules and whether

F7gdalph

 1    there is any indication as to why they are not here?

 2         All right.  With that, why don't we then set the

 3    ground rules for the hearing.  I will allow each side roughly

 4    10 or 15 minutes to address the issues, and, again, make every

 5    effort not to repeat anything that is already on paper unless

 6    there is something I said that materially misrepresents your

 7    understanding of the facts.

 8         Mr. Zitter.

 9         MR. ZITTER:  Good morning, your Honor.  Thank you.

10         First, with respect to notification, as I put forth in

11    the letter to your Honor yesterday, even before I started this

12    case, I sent by email all of the papers -- the complaint, the

13    proposed order to show cause, the affirmation, all the exhibits

14    and the memorandum of law -- to all of the defendants on emails

15    that we know are valid.  We showed up in court I believe on

16    Tuesday.  Your Honor decided you didn't want to sign the order

17    to show cause at that time and requested that we set up a

18    discovery schedule and, you know, come back, you know, with

19    dates.

20         My concern -- the reason we're back here, your Honor,

21    because my concern is not so much with the preliminary

22    injunction -- that I have no problem with your Honor's

23    suggestion that we take the -- we agree on a schedule of

24    discovery and agree on a hearing date, my problem was with the

25    temporary restraining order.  And that is the reason we're here

F7gdalph

1    today at least from my perspective, because unless there is a

2    temporary restraining order granted, from our perspective, this

3    entire case will become moot because the holders of the

4    preferred stock, C, D and E, and the convertible notes, both

5    those issued recently and those issued in the first quarter of

6    2015, could simply convert them and there would be no

7    restriction on that and the case would be over.  We wouldn't be

8    able to seek injunctive relief at all.

9            After we appeared -- we called up and we came to your

10   Honor's chambers on Tuesday, I again sent out an email to all

11   of the defendants informing them of the tentative hearing, and

12   everybody we contacted had agreed to this date.  So I have no

13   reason to believe that the emails I sent to everybody weren't

14   in fact received and they've determined not to show up.  That's

15   a factual representation of what I've done, your Honor.

16            THE COURT:  Go ahead.

17            MR. ZITTER:  As I mentioned, your Honor, I think that

18   unless your Honor grants the temporary restraining order at

19   this point, the whole injunctive relief, which I think, as

20   we've argued in our papers and as argued to your Honor now,

21   which is the only effective way -- the only effective remedy to

22   enforce the rights that Alpha Capital bargained for and

23   invested over $1 million in these securities, because it had

24   the assurance from the defendant Oxysure that it would abide by

25   those terms, and, your Honor, I think you can probably set

F7gdalph

1    forth the provisions of the contract.  Obviously, as set forth

2    in our papers, we think those contract provisions are crystal

3    clear and apply.  So I don't see any point in my going over the

4    provisions.

5              I think if defendants' counsel have any issue with

6    that, let them raise it and I will reply to it, because, as far

7    as I can tell, the words of the contract are pretty clear.  If

8    your Honor has a question, I would be happy to respond to it.

9    As far as I can tell, it's pretty clear that Oxysure was not

10   permitted to issue variable rate securities while Alpha Capital

11   still owns preferred stock and warrants, which it does.

12   Oxysure was not permitted to issue stock for less than I think

13   it was $1.25 -- I'm not sure, maybe your Honor is correct,

14   maybe it is $1.20 -- below that price, and that's the price at

15   which Alpha Capital's warrants are currently exercisable and

16   Alpha Capital had a right to participate.

17             The language seems clear to me.  If your Honor has any

18   question about the language, I would be happy to respond.  If

19   not, I will just move on to the irreparable harm aspects of it.

20             THE COURT:  Why don't we move on to the irreparable

21   harm aspect, Mr. Zitter, because I think that that is possibly

22   more critical here.

23             MR. ZITTER:  OK.

24             THE COURT:  And the threshold question is why is not

25   any harm that you suffer here compensable in monetary terms?

F7gdalph

1          MR. ZITTER:  Well, the difficulty, your Honor -- there

2     are a set of difficulties.  First of all -- and we cited case

3     law in our Memorandum of Law -- if you can't with reasonable

4     certainty calculate the damages and come up with a number, then

5     that, many cases have held, in itself is irreparable harm.  How

6     are we going to calculate the damage that we suffer as a result

7     of the conversions?  Now, indeed, I asked the --

8          THE COURT:  Let me interrupt because I think that is a

9     threshold question.

10          Damage is a matter of numbers, and juries sit here and

11     calculate numbers for pain and suffering.  This is hardly pain

12     and suffering or emotional damage; this is stock prices which

13     are based on economic models, and you can probably get one

14     expert that will tell you that the numbers show you are damaged

15     for 1 million and another will come forward and say it is

16     500,000, but those are numbers.

17          MR. ZITTER:  Well, your Honor, it is not so simple to

18     make that calculation.

19          THE COURT:  I am not saying it is simple.  I am saying

20     is it impossible?

21          MR. ZITTER:  I suggest it would be highly difficult to

22     do so.

23          THE COURT:  Highly difficult, but juries make very

24     highly difficult --

25          MR. ZITTER:  OK.  I'll ramp it up.  I'll say virtually

F7gdalph

1    impossible.  OK.  Let me explain why.  Because the harm in

2    these people issuing variable rate securities, OK, is that

3    there is an overhang on the market.  The existence of those

4    securities, the existence of the warrants, OK, mean that there

5    is a potential for these people to sell and therefore the

6    market price goes down.

7          I don't think there is an expert who can go through

8    all of this and say, well, I think the overhang on the market

9    as a result of the securities issued to these people, we don't

10   know when they were going to exercise them, we don't know what

11   price they were going to issue them.  I think it would be

12   virtually impossible for an expert to come up and say, well, I

13   think the market price went down by dollars X as a result of

14   the overhang on the market rather than the company isn't doing

15   well, the company issued an announcement, the company's

16   products aren't as good.  I mean, how does anybody -- how does

17   anybody parse out the factors and say, yeah, this part of the

18   decline in the price is a result of the overhang on the market

19   or, OK, it went up a little bit but it didn't go up as much as

20   it should have as a result of the overhang on the market.  I

21   think -- you know, maybe I'll go further.  I think that's

22   impossible, your Honor.

23         THE COURT:  Mr. Zitter, have you familiarity with the

24   fraud on the market theory and the analysis and the models that

25   accompany that theory?

F7gdalph

1          MR. ZITTER:  Well, I can't say I'm well versed with

2     it.  I am familiar with the fraud on the market theory but I

3     never tried a case on that.

4          THE COURT:  There are Nobel prize winners in economics

5     who have different theories about how those models work, but

6     it's part of the law of the United States in securities, fraud

7     on the market, and as difficult as it is, we're charged to make

8     those difficult decisions, but it is hardly impossible or even

9     virtually impossible.

10         MR. ZITTER:  I can't argue with your Honor.  I'm not

11    familiar with those cases.  But it just seems to me, I've tried

12    a fair number of these kinds of cases, not 10b-5 cases with

13    fraud on the market --

14         THE COURT:  I'm just suggesting that the difficulties

15    that you were citing here is probably a fraction of the

16    difficulty involved in applying fraud on the market theory.

17    That is what I am suggesting.

18         MR. ZITTER:  OK.  Let me move on and perhaps I will

19    come back to that, your Honor.

20         THE COURT:  All right.

21         MR. ZITTER:  The second issue:  They have agreed that

22    we could get equitable relief -- OK -- they have said for

23    violations.  And once they've agreed we could get equitable

24    relief, there are cases we cite which say that's tantamount to

25    an admission that if we apply for it we can get it.  I

F7gdalph

1    understand that doesn't bind the Court.  The Court has to use

2    its discretion and do what it thinks is proper under the

3    circumstances.  That is certainly a factor.  With the fraud on

4    the market cases, I would be surprised to learn there is an

5    agreement saying you can get some kind of equitable relief.

6                THE COURT:  You are right there.

7                MR. ZITTER:  OK.  Thirdly, perhaps equally important,

8    maybe more important, I mean, Oxysure is not -- I used to say

9    "General Motors," I don't say that anymore -- Oxysure is no

10   longer IBM or a major Fortune 500 company.  All of its

11   financial statements, they've done nothing but accrue losses to

12   date.  Their financial statements, they themselves and their

13   accountants have a warning in the financial statements

14   expressing serious reservation about their ability to continue

15   as a going concern.  So they've been able to exist, as far as I

16   can tell, simply by raising more money.  If the spigot got cut

17   off and they couldn't raise more money, the company is going to

18   go under.  There may not be any more Oxysure at the end of the

19   day to respond to any damages that we may be able to prove even

20   if we can come up with this highfalutin theory, for want of a

21   better term.

22               THE COURT:  Let me ask you a question on that.  Let's

23   suppose that Oxysure has your million dollars in the bank and

24   that's essentially the primary source of assets.

25               MR. ZITTER:  Right.

F7gdalph

1      THE COURT:  Then they come and turn to this deal with

2  the defendants in which they sell the securities and they bring

3  in another million dollars, which they have, according to the

4  facts, part of it is already in escrow.

5      MR. ZITTER:  Right.

6      THE COURT:  The other part is subject to possibly what

7  happens here.  In that event, if the transactions go through,

8  they will have $2 million in the bank.

9      MR. ZITTER:  Well, you're assuming it is static, your

10  Honor.  They can spend it.  It keeps going out.  If they were

11  unable to continue to raise money by selling securities, they

12  couldn't stay in business.  They say that.

13      THE COURT:  If they have the $2 million in the bank

14  and for some reason they are prudent people and they know that

15  they have this litigation in which they may be exposed, what

16  are the chances of prudent people, that they are going to go

17  out and have a bash that night and spend the money and then you

18  get a judgment the next day for damages?  On that theory, if

19  they don't spend the money, wouldn't you have more that you

20  could draw on if you get a damage award?

21      MR. ZITTER:  I don't think that is right, your Honor.

22  I mean, they themselves say that they are seriously concerned

23  about them remaining as a viable entity.  OK?  If in the middle

24  of this lawsuit, your Honor, it turns out they can't raise more

25  money, why should we run that risk?  They agree that we could

F7gdalph

get equitable relief.  They agree to these terms to get our
million dollars.  Why should we run -- why should Alpha Capital
run the risk of them going out of business when they agreed we
could do all of this stuff?  That's why we gave them the money.
Without those specific provisions, we wouldn't have given them
the money, your Honor.

So, you know, that relates to another point which we
raise in our memorandum.  I mean, these are securities of a
public company.  OK?  There should be something where if you
buy the securities of a public company, you shouldn't be
relegated to damages theory, you should get enforcement of what
you buy.  That distinguishes it from a fraud on the market
case.  That is not what we are talking about there, your Honor,
because there, you know, people bought stocks and the -- you
know, the company committed whatever fraud and therefore their
stock went down.  Here we have a specific security.  We got
agreements that they wouldn't do certain other things about it.
Why do we have to chase -- I think your Honor would admit it is
a difficult damages calculation.  Why do we have to face that
when we have got clear rights of what they can't do and what we
are entitled to and they violated it?  We should be able to
simply enforce those rights.

It goes somewhat to the integrity of the marketplace,
your Honor.  We shouldn't be required to chase them around
simply because they've agreed to something -- they've foisted

F7gdalph

upon us something.  If we can calculate damages, it is going to

be enormously expensive and enormously difficult, and two

different experts are going to come in with two different

theories of how the marketplace works.  And the marketplace for

the companies involved in cases with fraud on the market, it is

probably not the same as the marketplace for Oxysure

securities, your Honor, I would just venture a bet.

So why can't we get what they agreed to do?  Why can't

we simply get the terms of our securities enforced?  That's all

we're asking to do here, your Honor.

THE COURT:  All right.  Anything else before we turn

to the defendants?

MR. ZITTER:  Well, just one other thing, your Honor.

I mean, although your Honor hasn't mentioned it, there may be

some, quote-unquote, unfairness, for want of a better term.

Let's assume your Honor granted us the temporary restraining

order and preliminary injunction.  There may be some concern,

well, we're affecting the rights of the other people who

invested.  And although we have grounds to believe they knew

about that, let's leave that out -- I don't think that is

relevant for purposes of this discussion -- OK, that will

affect their rights because they may not be able to convert.

But I ask your Honor to just look at this from a position of

fairness.  OK?  We -- you know, if your Honor enforces our

contract, OK, grants equitable relief, all right, we'll be able

F7gdalph

1     to go forward.  We get what we bargained for.  They won't be

2     able to convert, which is what they bargained for.  They will

3     have a claim for damages against the company, because the

4     company clearly here sold them something they weren't entitled

5     to sell.  All right?  It is not quite like stolen property, but

6     the investing defendants got something the company wasn't

7     entitled to sell to them.  OK.

8          Now, the Series D and Series E are still in escrow, so

9     there is no reason why that should go through if it is a clear

10    violation of our rights and that would require some equitable

11    relief from the Court.  OK?

12         But just going back to the arguments I was making, if

13    your Honor gives us equitable relief, we'll get it; they'll be

14    relegated to a damages remedy.  If your Honor denies us

15    equitable relief, they will in a sense be able to continue to

16    be converting their contract in the sense that the terms of

17    their contract will be honored and we'll be left with the

18    damages remedy.

19         Why is that -- I submit to your Honor, that's not

20    fair.  When we did our deals -- we did it twice, once in

21    December 2013, another 400 shares which is roughly $400,000 in

22    December 2014 -- we filed all the papers.  All of these

23    limitations on Oxysure's ability to issue securities were

24    publicly available.  These are not mom-and-pop investors, your

25    Honor; these are sophisticated investment funds.  OK?  And they

F7gdalph

1      know that all this stuff is of record.  We had no idea that

2      these people were doing this deal.

3              The contract itself in a section I didn't cite because

4      I didn't think it was so relevant but we clearly have a right

5      to participate.  OK?  If you go -- I think it is 4.17.  If you

6      go to the subsidiary paragraphs there, your Honor, there is a

7      whole procedure, what Oxysure has to do.  They have to give us

8      written notice about the whole thing.  We get time to respond.

9      All right?  So all of that was a matter of public record.  All

10     right?  We -- they could find out about the limitations.  We

11     couldn't find out about their deals.  So why should we be

12     relegated to the damages remedy?  Let them be relegated to the

13     damages remedy, because they could have found out about it, we

14     couldn't have.  So that to me is an unfairness which I think

15     the Court should remedy or should take into account by granting

16     the equitable relief.

17             THE COURT:  Let me ask one other thing, Mr. Zitter.  I

18     guess I should begin with this.  Have the parties met and

19     conferred to discuss this matter in an attempt to resolve the

20     issue short of the next two years of litigation?

21             MR. ZITTER:  There have been settlement discussions

22     not between the parties; I am aware of that.  I am not aware of

23     the terms, but I know there have been settlement negotiations.

24             THE COURT:  You said not with the parties.  Then with

25     whom?

F7gdalph

1          MR. ZITTER:  No.  No.  The parties have been

2     talking --

3          THE COURT:  The principals, not the lawyers?

4          MR. ZITTER:  The principals.  I'm sorry.  The

5     principals and not the lawyers have been discussing it.

6          THE COURT:  Do you have any notion of whether those

7     talks have been fruitful or promising?

8          MR. ZITTER:  If they came to fruition, I wouldn't be

9     here.  I think there is certainly a good possibility that we

10    can resolve the case.  I'm hopeful.

11         THE COURT:  Let's put a halt there and then let me

12    turn to the defendants.

13         MR. ZITTER:  Thank you, your Honor.

14         THE COURT:  And then I will turn back to you.

15         Yes.

16         MR. SBAITI:  Good morning, your Honor.  My name is

17    Mazin Sbaiti.  I represent Oxysure.  I haven't practiced up

18    here in about four or five years and it is good to be back.

19         Your Honor, I would like to start, if I may, by

20    presenting a big-picture item.  Your Honor went through some

21    facts, and I think the last or next-to-the-last fact that your

22    Honor went through was that Alpha was not given an opportunity

23    to participate, and that's actually not true, your Honor.

24    Right now we are preparing papers to submit to the Court.

25    Included in that paper is going to be a declaration by Julian

F7gdalph

1   Ross, who is the CEO of Oxysure.  And what that declaration

2   will show -- and I'll proffer what discovery will ultimately

3   show -- is that these talks started sometime in May 2015 and

4   they closed June 30, 2015.  And the entire time during before

5   June 30th, during these talks, plaintiff was well aware that

6   the transactions were being contemplated, that they would have

7   an opportunity to participate.

8          They were sent the terms of the deal on or about June

9   the 10th, 20 days before closing, and they never elected to

10  participate.  They asked for the terms of the deal.  They got

11  them.  They never elected to participate.  They got the signed

12  LLIs on June the 25th.  We got emails there.  And at one point

13  they specifically declined to participate.  They said we're not

14  writing you a $3 million check, which is roughly the total

15  amount of consideration under the Series C, D and E

16  transactions.  Then they wait two weeks after the closing,

17  after the hook is set, to try and undo a transaction in the

18  past instead of filing their TRO prior to the closing, which

19  they were well aware of, your Honor.  So that raises the

20  specter of a couple of issues.

21         Number one, the reason they don't cite Section 4.17,

22  which is the participatory right section in the SPA for Series

23  B notes, the plaintiff's Stock Purchase Agreement, is because

24  that's actually the only remedy they really get.  They get to

25  elect to participate, and if they don't elect to affirmatively

F7gdalph

1   participate and show that they are going to participate at some

2   dollar value -- it doesn't have to be the entire amount -- and

3   that they have the cash ready to go to participate, if they are

4   silent or they say no, they have elected not to participate per

5   the terms of that contract, per the terms of that section.

6   That's what they get.  That is their remedy at law.  We don't

7   need to be here anymore because they elected not to

8   participate.

9            What is more is on Monday afternoon or Monday evening,

10  part and parcel of the settlement negotiations, we emailed the

11  principals of plaintiff and said if you want to participate

12  there are still more outstanding issues that we can sell to

13  you, do you want to buy.  Silence.  Nothing.

14           That's two direct and clear indications that they

15  don't want to participate.  So this participation issue is a

16  red herring.  The only question is what they want you to do

17  right now, which is enforce a restrictive covenant to unwind a

18  deal that they could have stopped prospectively.  OK?  And

19  we've talked about the fairness of that restrictive covenant

20  and what the proper construction of that restrictive covenant

21  would actually be, whether it is really a restrictive covenant

22  or whether it is part and parcel of a consent argument that

23  they have.

24           But fundamentally, your Honor, now they want you to

25  unwind the transaction that they should have stopped.  They

F7gdalph

never even objected to the transaction, by the way, your Honor.

There is no email saying don't do this transaction, we're

invoking our rights under Section 4.13.  Never.  Not an email.

Not a letter from a lawyer.  Nothing.  They wait two weeks

until after the transaction is consummated and now want you to

undo the transaction.

          In our papers, your Honor, we cite the case from the

Ninth Circuit that dealt with this exact same fact scenario.

And the Ninth Circuit said, you know, we might have issued a

TRO and actually did reverse the issuance of a TRO that the

district court had issued saying we might have allowed the TRO

had the TRO been done before the consummation of the

transaction and before transfer of the shares.  Because the

logic of that TRO would be to maintain the status quo, which is

really what TROs are for.  You preserve the status quo so that

after trial you don't have to, quote-unquote, unscramble the

egg.  And then the Ninth Circuit realizes the egg is already

scrambled.  It creates more entropy, it creates more

uncertainty and instability to then issue a TRO after the

transaction has happened, after everyone has relied upon it,

after the company has relied upon the money that came in from

that transaction and the consideration.  It does more harm and

damage to issue it then.  So the Ninth Circuit reversed.

          Basically, I think fundamentally, your Honor, the

big-picture issue is they had the chance to participate, they

F7gdalph

1    knew about this transaction for at least eight weeks before it

2    closed, before they filed this TRO, at least six weeks before

3    it closed, and they did nothing.  I would say, your Honor,

4    that, number one, seriously calls into question the veracity

5    and genuineness of their claim that there is imminent

6    irreparable harm.  Where was their remedy when they knew about

7    the transaction?  It never got instituted.  They have conceded

8    it away, I think, or forfeited it conceded it away, by doing

9    nothing for so long.

10            Number two, it also means that I think they've waived

11   the argument outright.  They don't get emergency relief after

12   the fact.  That is what the case law will tell your Honor.

13            THE COURT:  Let me ask --

14            MR. SBAITI:  Yes, your Honor.

15            THE COURT:  -- does the right to participate, in

16   essence, trump the other provisions of the agreement?

17            MR. SBAITI:  I don't think it trumps, your Honor.  I

18   think it has to be read in conjunction with those other

19   provisions.

20            THE COURT:  In other words, let's suppose you gave a

21   notice of a transaction for C, D and E and they chose not to

22   participate because in other respects the transactions violate,

23   in their view, the Purchase Agreement for Series B.  Why would

24   that not be sufficient grounds for them to say, well, we didn't

25   participate because you were going to -- these transactions

F7gdalph

1   violated the agreement in other respects?

2              MR. SBAITI:  I think that is a misreading of the first

3   section that your Honor is referring to, 4.13.  I think that is

4   the reading they want to have.  But it is a categorical bar

5   that they now can categorically bar the company from raising

6   any equity money, OK, when the stock price dips below the

7   strike price of their warrants at $1.20.  That means if the

8   stock price is below $1.20, if you read that provision in the

9   categorical way that they are encouraging you to, that means

10  they now have the option to run the company's finances to say

11  yes or no.  OK?  That's what I was talking about in my opening.

12             Now you have to say, OK, first of all, is that a

13  proper construction of a restrictive covenant?  Is it a proper

14  enforcement of a restrictive covenant?  And two different sets

15  of laws come into play here, your Honor.  Number one is

16  Delaware corporate law.  Oxysure is a Delaware corporation.  It

17  is a non-delegable duty by the company to an outsider to

18  determine essentially the finances and the financial health of

19  the company and the financial structure of the company

20  especially if it happens if the stock price dips below the

21  warrant price.  Well, what if the warrant price gives them a

22  bonus when the stock price rises after their investment?  Now

23  they're using it as a club against Oxysure.  And it is a

24  suicidal club, your Honor, but it is an improvident use of

25  that, and it is a nondelegable duty.  And we cite those

F7gdalph

1    provisions and that case law in our papers as well -- or we

2    will be citing them in our papers, your Honor, that will be

3    filed anytime now.  I myself went to see if they actually got

4    filed, your Honor.

5             So that is the first issue.  The second issue is

6    you've got New York law for the construction of the contract.

7    New York law says you don't enforce restrictive covenants or

8    interpret restrictive covenants if it is going to be oppressive

9    or if it is going to be unreasonable or if it is going to be

10   gratuitous.  What you have to understand is that none of their

11   actual substantive rights are being impaired here.  Their

12   participation rights, not impaired.  They can participate to

13   avoid dilution.  That is what that is there for.  OK?  If they

14   decide not to, they don't get to then tell the company, no, now

15   you don't get to raise any money, especially when you

16   absolutely need the cash in order to fund operations and have

17   debt.  They can't hold the company hostage, and that is the

18   purpose of this TRO.  The TRO is there because they want us --

19   they don't want to participate; they want to hold the company

20   hostage to extract whatever extortionate settlement or

21   concessions they can get.

22             He's actually right about one thing.  This company is

23   a growth-stage company.  It relies on financing in order to

24   grow.  It relies on financing in order to continue.  That

25   doesn't mean it's on the verge of insolvency, but it will be if

F7gdalph

you tell the company they can't spend any of their cash, any of

the proceeds because any money that they raise is going to

violate the restrictive covenant.  What they're suggesting is

the impossible -- that Oxy shouldn't go out and raise money

higher than the dollar-twenty strike price of the warrants, but

the stock price right now is 55 cents or 58 cents.  It

vacillates throughout the day.  The point is it is below $1.20.

That means they absolutely have the right, if you construe

their contract the way they want you, to prevent the company

from ever raising capital.  That can't be the way you read it.

The alternative way to read it, your Honor, is the way

we suggest.  If you read the opening of Section 4.13, it says

you can't have variable rate securities -- you know, they can't

issue variable rate securities without the consent of the

plaintiff, essentially the purchasers of that series, the

plaintiff and I think a couple of other entities.

Then you look at, OK, how do we get consent?  That's

where 4.17 comes in.  That was the whole purpose of it is that

when they do a future equity raise, which is the title of

Section 4.17, they first go to them, and it is like a right of

first refusal.  It doesn't give them a categorical bar because

they could say, you know what, any security sold at less than

our strike price is diluted and bad and, therefore, we get to

stop you.  That's suicidal.  This is like putting a gun to

their head and saying -- no, they're putting it under their own

F7gdalph

1   head and saying, you know what, we don't want you to be able to

2   raise money; stop or I'll shoot.  It doesn't make any sense,

3   your Honor.

4        If they stop any equity raising on any terms subject

5   to those provisions the way they're reading it, Oxysure is

6   going to become insolvent at a certain point because it is

7   going to run out of cash and it is not going to be able to

8   raise cash.

9        THE COURT:  I have a question, Mr. Sbaiti.  Besides

10  the plaintiff, were there other major purchasers of the Series

11  B?

12       MR. SBAITI:  Yes, your Honor.  There was I believe

13  another purchaser whose name escapes me.

14       MR. STEINMETZ:  Osher, O-s-h-e-r.

15       MR. ZITTER:  Osher.  He is an employee of Alpha

16  Capital -- not of Alpha Capital but of a service company that

17  works for Alpha Capital.  It is a related party, your Honor.

18       THE COURT:  Anything else, Mr. Sbaiti?

19       MR. SBAITI:  Yes, your Honor, if I may.  I would like

20  to talk about the irreparable harm.  I think there are a few

21  things that your Honor needs to know about the irreparable harm

22  issue.  Your Honor is absolutely right.  They can sue for

23  damages.  People sue for changes in security prices.  You've

24  got models from everything from fraud on the market theory to

25  option pricing theory that always looks at the but-for world of

F7gdalph

1    the securities price had the market dynamics been somehow

2    different at a given point in time and they are allowed to make

3    those assumptions.  For him to say that it is difficult, but it

4    doesn't have to be easy -- no one said it had to be easy, it

5    can be difficult -- so he backs up to the indication in their

6    contract that their remedy that we somehow admitted that there

7    is irreparable harm if we don't go and abide by the terms of

8    the contract, if you actually read that provision, your Honor,

9    it only has to do with specific performance, it doesn't have to

10   do with injunctive relief.  If you think about it, it makes

11   sense, because the case law that he cites, the Halifax case and

12   the other cases that he cites about irreparable harm in stock

13   purchase agreements, has to do with the delivery of shares or

14   the nondelivery of shares.  So the nondelivery of shares,

15   according to their own case law, is what is irreparable harm.

16   But they've already had all of their shares delivered, and

17   they're not saying their shares aren't going to get delivered.

18           Two ironic points about that, your Honor.  Number one,

19   that actually fits in with their own provision about specific

20   performance.  In other words, we agree; if we don't deliver the

21   shares, that is irreparable harm to them.  They get to go out

22   and get specific performance.  We're past that.  So indication

23   of that provision is completely improper.

24           The second irony, your Honor, goes to the convertible

25   notes.  The convertible notes and the Series C, D and E have

F7gdalph

1    the same irreparable harm provision.  But what he wants to do

2    is stop them from getting their shares.  His own case law says

3    you can't order this TRO, and the reason you can't order it is

4    because you will be creating irreparable harm for the

5    noteholders and for the Series C D and E shareholders.

6           That is the whole problem with them doing this so

7    late.  You have to unwind the transaction that now creates

8    irreparable harm.  And there is the balance of harms.  Your

9    Honor shouldn't be creating more harm and more irreparable harm

10   by doing the TRO.

11          And he's absolutely wrong about the taking -- you

12   know, who takes what subject to what provision.  The

13   convertible notes were disclosed to them on two separate

14   occasions -- before the 2013 SPA that they signed and on the

15   2014 SPA that they signed.  So they knew about the convertible

16   notes.  In fact, convertible notes are an exempt transaction to

17   their right to participate.  They don't get to participate in

18   the issuances of conversions under convertible notes, by

19   definition, in the Series B SPA.  OK?

20          So that raises the specter of, well, why would you

21   then -- you know, where is really the irreparable harm?  They

22   can't identify it.  The only harm that they are saying is

23   dilution.  As your Honor pointed out, they absolutely have a

24   damages remedy for dilution.

25          I would like to turn to the insolvency argument for

F7gdalph

1    just a moment.  You know, he cites the 10-K and the auditor's

2    report.  That is a very disingenuous argument, your Honor, and

3    I will tell you why.  That same disclosure is required by FASB

4    for any company that is not cash-flow positive, for

5    growth-stage companies like Oxysure that keeps having to raise

6    money to meet its cash flow requirements.  That same disclosure

7    was on every quarterly report in 2013.  A year -- every

8    quarterly report for the year prior to the first SPA that they

9    signed, the same disclosure; they bought shares anyway.  It was

10   in every quarterly report in 2014 before they signed the second

11   SPA.  So they've twice bought stock with that disclosure

12   already being made.  So for them to stand up today and say now

13   we're scared that the company is on the verge of insolvency is

14   completely disingenuous and can't be a basis for them arguing

15   irreparable harm.

16          But he's right, if you order the TRO, you are

17   essentially going to choke off financing and cash to the

18   company, which not only hurts them, ironically, and all of the

19   codefendants, it hurts every Oxysure shareholder because shares

20   are the last of these things to get -- it is going to wipe them

21   out of value because Oxysure is going to fold.  He is

22   absolutely right.  If you choke off the money to the company,

23   you hurt every single shareholder.  That is not the way this is

24   supposed to go, which is why I bring back the idea of a

25   nondelegable duty.  It is up to management to decide the proper

F7gdalph

<table>
<tr><td>1</td><td>structure and capital structure of the company.  So that is the</td></tr>
<tr><td>2</td><td>reason not to construe the restrictive covenant in the way that</td></tr>
<tr><td>3</td><td>Mr. Zitter is encouraging you to do.</td></tr>
<tr><td>4</td><td>          I think that covers primarily my arguments, your</td></tr>
<tr><td>5</td><td>Honor.</td></tr>
<tr><td>6</td><td>          THE COURT:  All right.  Do other defendants wish to</td></tr>
<tr><td>7</td><td>address the Court?</td></tr>
<tr><td>8</td><td>          MR. ZITTER:  May I respond for two minutes?  It will</td></tr>
<tr><td>9</td><td>be more efficient.</td></tr>
<tr><td>10</td><td>          THE COURT:  All right.</td></tr>
<tr><td>11</td><td>          MR. ZITTER:  First of all, he is claiming that we knew</td></tr>
<tr><td>12</td><td>about the transaction and he claims that sometime in June that</td></tr>
<tr><td>13</td><td>they told us about some kind of notification.  First of all,</td></tr>
<tr><td>14</td><td>there was a transaction in the first quarter of 2015.  He</td></tr>
<tr><td>15</td><td>doesn't claim he gave us notice of that, because he didn't.</td></tr>
<tr><td>16</td><td>OK?  My clients had no knowledge of that transaction in the</td></tr>
<tr><td>17</td><td>first quarter of 2015, the transaction, until May 18th, when it</td></tr>
<tr><td>18</td><td>was disclosed in their I think it was a 10-Q which was filed</td></tr>
<tr><td>19</td><td>May 18th of this year.</td></tr>
<tr><td>20</td><td>          Secondly, your Honor, if he gave us notice, you know,</td></tr>
<tr><td>21</td><td>this is not complicated.  4.17(b) says at least seven days --</td></tr>
<tr><td>22</td><td>trading days prior to the closing of the subsequent financing,</td></tr>
<tr><td>23</td><td>the company shall deliver to each purchaser a written notice of</td></tr>
<tr><td>24</td><td>its intention to effect the subsequent financing -- OK -- which</td></tr>
<tr><td>25</td><td>prenotice shall ask the purchaser do you want to review the</td></tr>
</table>

F7gdalph

 1  details of such financing.

 2          At least seven days prior to the closing of the

 3  subsequent financing, the company shall deliver to each

 4  purchaser a written notice of its intention to effect the

 5  subsequent financing.  All right?  It is a one-page piece of

 6  paper, your Honor.  He could have brought it to Court if he had

 7  such a piece of paper.  He doesn't have the piece of paper.

 8  There was no such piece of paper of the substance financing.

 9  We may have been aware that they were considering a subsequent

10  financing, but they didn't abide by their own agreement as to

11  what they had to do.  OK?  We didn't know about this until --

12  about the closing until after this closed.  We didn't know

13  about the imminence of the closing until after it closed.

14  That's number one.

15          THE COURT:  Mr. Zitter, is that an issue of fact?  You

16  are saying you were not aware.  They are saying you were.

17          MR. ZITTER:  Well, I don't think -- well, in a sense

18  it is and in a sense it isn't.  I mean, if he sent a notice, it

19  wouldn't be very hard to bring it to court today, your Honor.

20  He could have had that one-page notice or two-page notice.

21  Here it is, your Honor, Zitter doesn't know what he is talking

22  about.  Right?  He doesn't have it.  There is a reason --

23  because it is not there.  OK?

24          Now, he keeps referring to this --

25          THE COURT:  If I heard Mr. Sbaiti correctly, he

F7gdalph

1    claimed they were emails.

2            They were emails, Mr. Sbaiti, is that correct?

3            MR. ZITTER:  Where are the emails --

4            MR. SBAITI:  They were faxes and confirmed by emails,

5    which we will be referencing in our papers, your Honor.  I

6    didn't have a printer at my hotel, that is why.

7            MR. ZITTER:  He keeps referring to this as a

8    restrictive covenant.  This is not a real estate case, your

9    Honor.  There is no restrictive covenant here, your Honor.

10   These are terms they, Oxysure, agreed to to get a million

11   dollars.  They can't say, well, these are tough terms; you

12   know, now that we violated them, you can't enforce them.  Where

13   were they when they agreed to them?  They agreed to them

14   because they get our money, otherwise they wouldn't have gotten

15   the money.  So now when it comes time to enforce the terms and,

16   oh, that's much too tough.  Delaware law requires that we, the

17   company, arrange for the capital structure.  You know, we can't

18   be bound by the agreement we have settled with you, that's much

19   too tough.  Right?

20           So that just makes no sense whatsoever, your Honor.

21   In a sense, we're asking for specific performance.  We have

22   these covenants or these provisions who say that they can't do

23   this and they can't do that.  In effect, by ordering the

24   company to comply with that, that is specific performance of

25   those provisions.

F7gdalph

1          With respect to insolvency, the financial statements

2     are what they are.  The statements are what they've said.  The

3     fact that Alpha Capital knew that it was going into a risky

4     investment, right, we didn't know they were going to violate

5     the terms of their agreement.  We were hopeful that they would

6     comply with the terms of their agreement.  Our stock would

7     become more valuable.  We would be able to convert and make our

8     money.  OK?  That's the risk we took.  We didn't take the risk

9     that, well, we know that if you violate the agreement, we'll

10    never collect.  That is not the risk we took, your Honor.

11          THE COURT:  All right.  Thank you.

12          Any other defendants?

13          MR. STEINMETZ:  Good morning, your Honor.  Michael

14    Steinmetz on behalf of both Adar Bays LLC and Union Capital

15    LLC.  Earlier, Union Capital was not mentioned and so I'm just

16    stating for the record that I'm here on behalf of Union Capital

17    as well.

18          Earlier it was also mentioned that all parties were

19    copied on subsequent notices of court appearances and a letter

20    that was supposedly sent to the Court.  I have no knowledge of

21    that.  We were sent one set of documents initially, which I

22    have today.  It is missing one exhibit, but that's what I've

23    got.

24          We believe counsel for the company has stated the

25    company's position.  We're only here because we were named in

F7gdalph

1   the complaint for two reasons.  Number one, we were named in

2   the complaint as interfering tortiously with this contract.

3          Your Honor, even their complaint, their affirmations,

4   they are deficient on their face.  They don't state a claim for

5   intentional tortious interference with malice, actual knowledge

6   of the contract.  It's simply not there and that's because it

7   is not the case.

8          The company told us that they had the authority to

9   enter into these agreements.  We entered into these agreements

10  to the tune of roughly $3 million, which is substantially

11  greater than they have to lose on that side.

12         And that brings me to the second point, which is why

13  we're here today, and that is simply to preserve our rights.

14  We haven't had time to brief anything.  If the Court should

15  require, we would like an opportunity to brief on the issue of

16  how we would be affected by, as we just heard, the plaintiff

17  waiting simply for this transaction to close while having the

18  opportunity to either prevent it, to join it, still have the

19  opportunity to join it, and now prejudicing our client by

20  running in for a TRO simply, your Honor, we would reiterate, to

21  hold us over a barrel to extract some form of settlement.

22         There is nothing here that they stand to gain by

23  stopping this transaction.  The company that has the cash to

24  continue is a more viable company and a company that is worth

25  more.  The only thing they have to gain is to try to hold the

F7gdalph

1    company over a barrel to say you are going to go out of

2    business if you don't come up with some cash.

3            The irreparable harm on our side is we stand to lose

4    this much greater investment.  We have already been harmed,

5    frankly, your Honor.  We have prior notes that they are well

6    aware of for quite some time in the end of 2014.  The Order to

7    Show Cause requests relief as against any conversions, but the

8    papers themselves don't specifically refer to notes that were

9    issued in November of 2014.  We've attempted to covert under

10   those notes, and we are already having problems converting

11   under those notes because of this threat of litigation.  So

12   we're actually today being harmed already as we speak with

13   notes that weren't even briefed as a result, that they didn't

14   even ask for relief on.

15           Again, your Honor, I simply reiterate the points.  I'm

16   going to take your Honor's words to heart that I shouldn't

17   repeat anything.  So in the absence of any questions, I will

18   take my seat.

19           THE COURT:  All right.  Thank you.

20           MR. SBAITI:  Your Honor, if I could just raise one

21   issue?  If your Honor does or is inclined to grant the TRO, I

22   think we should talk about propriety and the amount of a bond.

23   And the bond amount -- Mr. Zitter actually cites the case, I

24   believe the heading is Alpha Capital Aktiengesellschaft, which

25   I think is a German entity, and even in that case the Court

F7gdalph

1    issued a bond equal to the market value of the outstanding

2    amount of non-delivered shares.  And that's one of the reasons

3    our affidavit is a little bit delayed is because I had Mr. Ross

4    calculate that number, and we will be submitting that but I

5    believe it is somewhere in the neighborhood of 4- to

6    4-and-a-half-million dollars.  And I think a bond absolutely

7    should issue under the case law that Mr. Zitter actually cites

8    himself, because if all of these investors who have relied upon

9    their contracts, who are now vested, because of their delay and

10   lose the value of their investment for nothing because this

11   litigation wipes out the company, then that should be the floor

12   of any bond because that doesn't even cover the other

13   shareholders of the company, it doesn't cover the company's

14   operations, so on and so forth.  At a minimum, there should be

15   that amount.

16            THE COURT:  Anyone else?

17            MR. FISCHER:  Yes, your Honor.  Is it OK to proceed,

18   your Honor?

19            THE COURT:  Yes.

20            MR. FISCHER:  Good morning.  Benjamin Fischer for

21   Macallan Partners, LLC.

22            We are not, your Honor, subject to the injunctive

23   relief that the plaintiff is seeking.  I think the only party

24   that is is Oxysure.  Obviously, you know, we're affected by it,

25   as has been made clear to you today.  I'm going to be very

F7gdalph

brief.  We join in all of Mr. Sbaiti's arguments.  We think

that the relief should be denied for all those reasons.

          Just anecdotally, your Honor, if I could offer one

anecdote?  Even in the plaintiff's own complaint, they mention

that there was disclosure on May 18th in connection with a Form

10-Q of the issuance of variable-rate convertible notes.  That

is in paragraph 10 of their complaint.  They weren't running

into court on May 19th, June 19th.  They waited two months --

more than two months -- to come here.  So it's further

supportive of the fact that there is not irreparable harm here.

Where were they then?

          We join in all their arguments.  In addition, I think

that the plaintiffs should give some serious consideration as

to whether the investor entities should be named in a tortious

interference of a contract claim.  If you look at the case law,

your Honor, the case law is very clear when the allegations for

tortious interference with contract are basically focused on

what entities similarly situated to my clients, what they knew

or should have known about a contract between these two

parties, that that's just plainly insufficient.  So I would ask

them to strongly consider that before they proceed on those

claims.

          Those claims are couched in the most general terms and

it's just insufficient under New York law.

          Thank you, your Honor.

F7gdalph

1           THE COURT:  Thank you.

2           MR. STEINMETZ:  Your Honor, if I may?

3           MR. ZITTER:  May I just speak to it for one moment?

4           THE COURT:  Excuse me.  Yes.  Go ahead.

5           MR. STEINMETZ:  It could be a threshold issue.  I need

6   to bring it before the Court today simply because we need to

7   look into it in further support.  However, Mr. Zitter may have

8   a conflict.  He has previously represented my client, another

9   entity that he has represented on the other side of the table.

10  He has knowledge of my client's trading practices, how that may

11  affect damages.  He has knowledge of perhaps my client's done

12  due diligence, the very allegations that he places in the

13  complaint against my client Adar Bays specifically.  And so

14  we're investigating that more.  We wanted to bring it to the

15  Court's attention to let the Court know that this is something

16  we may bring before the Court on a motion to disqualify --

17          THE COURT:  Mr. Zitter, the last word and then we will

18  proceed.

19          MR. ZITTER:  Just let me go back.

20          I have never represented this entity, your Honor, Adar

21  Bays.  I did represent Mr. Ari Goldstein -- not personally.  He

22  had another investment in a company, if I remember, Tripod

23  Group.  I think that was his investment, I don't recall.  It

24  was several years ago.  It involved I think about $50,000, your

25  Honor.  I have absolutely no personal inside information about

F7gdalph

1    his trading practices.  I wasn't involved in that case.  I have

2    no information which in any way would render it inappropriate

3    for me to continue my representation of Alpha Capital, for whom

4    I have represented for close to 20 years, your Honor.  Indeed,

5    Goldstein got the representation.  He used me from Alpha

6    Capital.  So that would be a little perverse.

7            But I didn't have any knowledge of counsel for Adar

8    Bays.  He said he didn't get notice, he didn't get notice.  I

9    never knew of him until he walked into court today.  I gave the

10   exact same notice to everybody.  I emailed to all of the

11   individuals, all of the defendants.  He obviously got notice

12   otherwise he wouldn't be here.

13           Thank you, your Honor.

14           THE COURT:  All right.  Thank you.

15           If there is nothing else the parties wish to address

16   to the Court, I will close this hearing.

17           On the basis of the submissions that have been made

18   and the hearing this morning, I am not persuaded that the

19   plaintiff has made a sufficient showing of irreparable harm,

20   and on that basis alone I am inclined to deny the preliminary

21   injunctive relief.

22           Mr. Zitter makes reference to the difficulty of

23   establishing damages.  I find that very unconvincing given the

24   difficulty of establishing damages in general in many cases and

25   especially in cases involving economic matters such as are

F7gdalph

1  involved here.  So I believe that if the plaintiff has a

2  meritorious claim under its contract with Oxysure, that that

3  claim can be sufficiently remedied by money damages.

4           There is another threshold question as to whether the

5  plaintiff could prevail on the merits.  On that issue, I

6  believe that the decisive point as to what extent the plaintiff

7  had notice of the transaction and an opportunity to

8  participate, there is I believe a clear factual dispute on that

9  issue.  The defendants have not submitted papers yet, although

10 Mr. Sbaiti indicates that their submission, which is imminent,

11 addresses that point.

12          If in fact the plaintiffs had actual or constructive

13 or some sufficient notice of these transactions that they're

14 objecting to now and chose not to participate in the

15 investment, and therefore create the basis for the subsequent

16 litigation which theoretically they might have been able to

17 prevent, it raises an issue of the equivalent of clean hands in

18 their request for equitable relief, injunctive relief,

19 equitable remedy, and there is a doctrine that says that a

20 plaintiff who seeks equitable relief must have clean hands.

21          In this case, if in fact the plaintiff did have notice

22 and chose not to participate, that I think raises a sufficient

23 question as to whether it's coming to the Court with clean

24 hands by, in effect, contributing to the crisis that it is now

25 objecting to.  I will not make a specific finding on that issue

F7gdalph

1   because I have not seen the documentation that the defendants

2   say they are submitting today.  But if in fact that

3   documentation does establish the plaintiffs had sufficient

4   notice of these transactions and a sufficient opportunity to

5   either participate or to allow the transaction to proceed in

6   other respects without the plaintiffs claiming that they were

7   harmed, then I believe that that would be an additional reason

8   for denial of injunctive relief.

9           I will direct the parties to confer and submit a case

10  management plan for proceeding with the balance of the

11  litigation.

12          Mr. Zitter, I also urge you to examine very closely

13  the objections that have been made by the other defendants,

14  Macallan Partners, Adar Bays and Union, as to whether your

15  claims against them at least on the tortious interference with

16  contractual rights would withstand scrutiny under the

17  applicable standards of those kinds of actions where you have

18  what might appear to be issues of the extent of the knowledge

19  that they had of your client's contract with Oxysure, their

20  tortious intent to interfere with that contractual right and,

21  in other respects, some form of harmful intent.

22          A purchaser in good faith, assuming that these

23  defendants are purchasers in good faith with no knowledge of

24  your transactions with Oxysure, could not be held liable for

25  tortious interference.  Be that as it may, I'm just suggesting

F7gdalph

1    that you examine that theory closely, because to the extent

2    these defendants don't belong in this litigation at least on

3    those claims, it would be more prudent on your side and more

4    efficient in moving this litigation along not to proceed with

5    claims that are not likely to survive either a motion to

6    dismiss or a motion for summary judgment on those grounds.

7             Let us set a date by which the parties will submit the

8    case management plan.  I think that perhaps two weeks is

9    sufficient.  Two weeks from today would be roughly July 30th.

10            And one last question that remains:  Mr. Zitter, what

11   do you do about the defendants who have not appeared?  Do you

12   wish to proceed -- well, you would need to establish that these

13   defendants were served formally and effectively under the rules

14   and then see to what extent they do or do not respond to your

15   complaint within the time allowable under the rules.

16            Anything else?

17            MR. ZITTER:  Yes, your Honor.  I assume that with

18   respect to the defendants who are here today, there is no need

19   to re-serve -- to serve the summons and complaint?

20            THE COURT:  No.  I am only talking about those who did

21   not appear.

22            MR. ZITTER:  I will serve them in the normal way, your

23   Honor.

24            Just one comment.  I appreciated your Honor's comments

25   on the tortious interference case.  I am well aware of the law,

F7gdalph

```
 1    I can tell your Honor, and I am also well aware of pleading

 2    obligations, and the pleading is consistent with all pleading

 3    obligations that are applicable in this court, your Honor.

 4              THE COURT:  Well, pleading obligation is one thing --

 5              MR. ZITTER:  No, I understand, your Honor.

 6              THE COURT:  -- under Rule 8 --

 7              MR. ZITTER:  I just wanted your Honor to understand

 8    that it was not done in violation of any rules that I am aware

 9    of.

10              THE COURT:  Understood.  But I am saying now given

11    that you know perhaps a little bit more than you knew at the

12    time that you sat down to write the pleadings, it might be wise

13    on your part to say let's not go in the direction of

14    complicating this litigation if in fact you are not going to be

15    able to establish those claims.

16              All right.  Anything else?

17              MR. ZITTER:  Thank you, your Honor.

18              THE COURT:  Thank you.

19

20                                    -  -  -

21

22

23

24

25
```