United States District Court
Southern District of New York
----------------------------------------------------------x

Alpha Capital Anstalt,

                  Plaintiff,

     v.                                           <u>Affirmation</u>

Oxysure Systems, Inc., Adar Bays LLC,
Union Capital LLC, JSJ Investments, LLC,
Group 10 Holdings, LLC and Macallan
Partners, LLC,

                  Defendants.

----------------------------------------------------------x

      Konrad Ackermann hereby affirms under penalties of perjury under the laws of the United States of America:

      1. I am a Director of Plaintiff Alpha Capital Anstalt ("Alpha Capital"). I submit this affirmation in support of Alpha Capital's motion for a preliminary injunction, pending final determination of this action, and for a temporary restraining order, pending final determination of this motion preventing Defendant Oxysure Systems, Inc. ("Oxysure"), and all those in active concert with it, from:

           i) honoring any conversion requests submitted by any holder of any Oxysure Series C, D or E Convertible Preferred Stock or any convertible note or other convertible security issued after December 26, 2013 and containing a variable conversion price; and

      ii) issuing or releasing from escrow any variable rate securities or securities which otherwise violate the terms of the Securities Purchase Agreement and the Certificate of Designation governing the Oxysure Series B Convertible Preferred Stock owned by Alpha Capital; and

      iii) issuing any securities for less than the amount set forth in Section 4.13 of the Securities Purchase Agreement; and

      iv) entering into any Subsequent Financing in violation of Alpha Capital's right to participate therein in accordance with Section 4.17 of the Securities Purchase Agreement.

I also request that the parties engage in expedited discovery in advance of the return date so that all of the pertinent facts, including conversions to date and the price at which the conversions occurred, can be before the Court. I have personal knowledge of the matters set forth herein. Absent the requested equitable relief, Alpha Capital will suffer immediate irreparable harm, as hereafter set forth.

    2. Alpha Capital is a Liechtenstein entity with its principal place of business in Vaduz, Liechtenstein. Oxysure is a Delaware corporation with its principal place of business in Frisco, Texas. Upon information and belief, as set forth in the Complaint, the Investor Defendants are all citizens of various states. Alpha Capital and Oxysure agreed that any claims relating to Alpha

Capital's purchase of preferred stock and warrants would be brought exclusively in the federal and state courts located in New York City, Borough of Manhattan (see Exhibit A and Exhibit C, the two Securities Purchase Agreements hereafter referenced, §5.9).

Oxysure Clearly Violated
Its Agreements With Alpha Capital

3. On or about December 26, 2013, Alpha Capital purchased 675 shares of Oxysure Series B Convertible Preferred Stock (the "Series B Stock") for $675,000. The Series B Stock was convertible into shares of Oxysure common stock. Alpha Capital also received, in connection with the Series B Stock, warrants (the "2013 Warrants") to purchase 613,636 additional shares of Oxysure common stock.[1]

4. On or about December 29, 2014, Alpha Capital purchased an additional 400 shares of the Series B Stock for $400,000. Alpha Capital also received, in connection with the additional Series B Stock, warrants to purchase 727,273 additional shares of Oxysure common stock (the "2014 Warrants"). The 2013 and 2014 Warrants are together referred to as the "Warrants".[2] The terms of the SPA and the 2014 Securities Purchase Agreement are identical in all material

---

[1] A copy of the December 2013 Securities Purchase Agreement ("SPA") pursuant to which Alpha Capital purchased both the Series B Stock and the 2013 Warrants is annexed hereto as Exhibit A. A copy of the 2013 Warrants is annexed hereto as Exhibit B.

[2] A copy of the December 2014 Securities Purchase Agreement pursuant to which Alpha Capital purchased the additional Series B Stock and the 2014 Warrants is annexed hereto as Exhibit C. A copy of the 2014 Warrants is annexed hereto as Exhibit D.

respects and will together be referred to as the SPA. Alpha Capital currently holds 750 shares of the Series B Stock and Warrants to purchase 1,340,909 shares of Oxysure common stock. Alpha Capital has invested over $1 million in Oxysure.

5. Alpha Capital had the right to convert each share of the Series B Stock, at any time and from time to time, into Oxysure common stock at an initial Conversion Price of $0.55 subject to downward adjustment, as set forth in the Certificate of Designation originally governing the terms of the Series B Stock and the Amended Certificate of Designation filed in connection with Alpha Capital's 2014 purchase of additional Series B Stock.[3] The initial Exercise Price of the Warrants was $1.20, subject to downward adjustment in accordance with the terms of the Warrants (Exhibits B and D, §2(b)).

6. In the SPA, the parties agreed that while Alpha Capital still owned the Series B Stock or the Warrants:

i) Oxysure would not enter into any Variable Rate Transactions, as defined and set forth in the SPA. In general, that provision prohibited Oxysure from issuing any securities or debt instruments which were convertible into Oxysure common stock at a variable conversion price - i.e., a price which fluctuated with the market price of Oxysure common stock; and

---

[3]The original Certificate of Designation is annexed hereto as Exhibit E. The Amended Certificate of Designation ("COD") is annexed hereto as Exhibit F. The right to convert and the Conversion Price of $0.55 is set forth in §6(a) and (b) of both documents.

4

ii) Oxysure would not issue any stock at a price less than the greater of the Series B Stock Conversion Price and the Exercise Price of the Warrants. Since December 2013, that price has been $1.20 per share; and

iii) Alpha Capital, along with another investor, had the right to participate in any Subsequent Financing, up to the full amount of any such financing.

Sections 4.13 and 4.17 of the SPA, which contains those provisions, is set forth in the footnote.[4]

---

[4] 4.13. <u>Subsequent Equity Sales</u>. Without prior written approval from Holder, from the date hereof until such time as the Preferred Stock and Warrants are no longer outstanding, the Company will not, without the consent of the Purchasers, . . . issue nor agree to issue any common stock, floating or Variable Priced Equity Linked Instruments nor any of the foregoing or equity with price reset rights (subject to adjustment for stock splits, distributions, dividends, recapitalizations and the like) (collectively, the "<u>Variable Rate Transaction</u>"). For purposes hereof . . . "<u>Variable Priced Equity Linked Instruments</u>" shall include: (A) any debt or equity securities which are convertible into, exercisable or exchangeable for, or carry the right to receive additional shares of Common Stock either (1) at any conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for Common Stock at any time after the initial issuance of such debt or equity security, or (2) with a fixed conversion, exercise or exchange price that is subject to being reset at some future date at any time after the initial issuance of such debt or equity security due to a change in the market price of the Company's Common Stock since date of initial issuance. . . .

For so long as Preferred Stock or Warrants are outstanding, the Company will not . . . issue any Common Stock or Common Stock Equivalents, if such issuance . . . would be at an effective price per share of Common Stock less than the higher of the Conversion Price or Warrant Exercise Price in effect at the time of such lower issuance . . . or would be issued or made on terms more favorable to such other holder or recipient than the Purchaser, with respect to the terms of the offering pursuant to the Transaction Documents.

4.17  <u>Participation in Future Financing</u>
(a) From the date hereof until the date that is the 24 month anniversary of the Closing Date, upon any proposed issuance by the Company or any of its Subsidiaries of Common Stock, Common Stock Equivalent, for cash consideration, Indebtedness or a combination thereof . . . (a "<u>Subsequent Financing</u>"), each Purchaser shall have the right to participate in up to an amount of the Subsequent Financing equal to 100% of the Subsequent Financing (the "<u>Participant Maximum</u>") on the same terms, conditions and price provided for in the Subsequent Financing...

Those provisions were very important to Alpha Capital in purchasing the Series B Stock and the Warrants. The issuance of other variable rate convertible securities, after Alpha Capital purchased the Series B Stock and the Warrants, places continuing substantial downward pressure on the price of the issuer's common stock, to Alpha Capital's detriment. Alpha Capital insisted upon the Variable Rate Transaction provision in order to insure that no such pressure would be exerted on Oxysure's common stock while Alpha Capital owned the Series B Stock and the Warrants, which were convertible into Oxysure common stock. Similarly, Oxysure's agreement not to issue stock at less than the higher of the Series B Stock Conversion Price and the Warrant Exercise Price was designed to insure, as much as possible, that the Series B Stock and the Warrants would retain their value. The right to participate in future financings would allow Alpha Capital to benefit further from its initial investment in Oxysure. Without the foregoing provisions, Alpha Capital would not have purchased the Series B Stock or the Warrants. Oxysure agreed to those provisions to induce Alpha Capital to invest over $1 million in Oxysure.

7. The SPA containing the parties agreement relating to future Variable Rate Transactions and the floor price for any additional securities issuances was publicly filed twice: first, as Document 10 in Oxysure's Form 10K filed with the SEC on April 15, 2014 and, again, as item 10.26 in Oxysure's Form 10K filed with the SEC on March 31, 2015 (Exhibit G). Thus the limitation on Oxysure's ability to issue variable rate convertible securities, the price at which any securities could be issued and Alpha Capital's right to participate in subsequent financings was publicly available since April 2013. Any subsequent sophisticated purchasers of Oxysure's

securities, such as the Investor Defendants, in the course of performing their normal due diligence in reviewing the public filings of a company in which they were considering an investment, would clearly learn of the limitations contained therein regarding Oxysure's issuance of additional securities. In any event, Oxysure simply had no right to issue any such securities.

8. In violation of Oxysure's agreement in the SPA, as hereafter set forth, Oxysure:

>i) issued Series C, D and E Convertible Preferred Stock (the "Series C Stock", the Series D Stock" and the "Series E Stock", as the case may be) and convertible notes to Defendants Adar and Union LLC on or about June 30, 2015; and

>ii) issued variable rate convertible notes (together with the convertible notes issued to Adar and Union LLC, the "Convertible Notes") to Defendants JSJ, Group 10, Union LLC and Macallan in or about the first quarter of 2015; and

>iii) did not inform Alpha Capital of, and did not afford Alpha Capital an opportunity to participate in, the subsequent financings in which Oxysure issued the Series C, D and E Stock and the Convertible Notes.

The Series D Stock and the Series E Stock, according to Oxysure's public filings, have been issued in escrow pending Oxysure's compliance with certain undertakings (see Exhibit H). The sale of that stock to the Investor Defendants, therefore, has not yet been completed.

9. In its Form 8K-Amended filed on July 8, 2015 (Exhibit H), and in a press release issued on July 7, 2015 (Exhibit I), Oxysure announced that on June 30, 2015 it had sold $2.7 million in Series C Stock and $300,000 in two convertible notes to Defendants Adar and Union LLC. That filing also disclosed the issuance of Series D Stock and the Series E Stock in escrow. All of the newly issued Oxysure securities contained variable conversion rates dependent upon the price of its stock at the time of conversion and provide for issuance of common stock at prices well below $1.20. The salient terms of the new securities are set forth in the Form 8K-Amended (Exhibit H).[5] Thus the issuance of new convertible notes and the Series C, D and E Stock and convertible notes to Adar and Union LLC is a clear and blatant violation of the variable rate transaction limitation, the minimum pricing provisions of the SPA and Alpha Capital's right to participate in that financing.

---

[5] Although not mentioned in the Press Release or in the text of the Form 8K-Amended, the conversion price of the Series C Stock is the higher of $0.005 or a 35% discount from the then current market price at the time of conversion, the Series D Stock is the higher of $0.49 or a 20% discount to the then current market price at the time of conversion, and the Series E Stock is a 15% discount to the then current market price at the time of conversion. See the Securities Purchase Agreements relating to the sale of the Series C, D and E Stock annexed hereto as Exhibit J and the respective Certificates of Designation annexed hereto as Exhibits K, L and M.

10. In addition, in its Form 10Q for the quarter ended March 31, 2015, filed on May 18, 2015, Oxysure disclosed its issuance of other variable rate convertible notes. Thus Oxysure disclosed (Exhibit N):

> During the three months ended March 31, 2015 we issued three convertible notes with a total principal value of $536,000 for $495,000 cash. The notes contained original issuance discounts for a total of $41,000, and interest rates ranging from 8% to 12%. The maturity dates of the notes range from September 25, 2015 to February 19, 2016. **The creditors have the option at any time to convert the principal and any accrued interest into common stock of the Company at an average discount rate of approximately thirty six percent off the market price of the Company's common stock.** (bold added)

Because the market price of Oxysure common stock during the first quarter of 2015 was substantially less than $1.20, that issuance violated both the variable rate transaction and the pricing provisions of Alpha Capital's SPA. In communications thereafter with Oxysure, Alpha Capital learned that such convertible notes were issued to Defendants JSJ, Group 10, Union LLC and Macallan who together purchased over $750,000 of such notes.[6] The notes themselves have not been publicly filed. Because the conversion price in the Convertible Notes varied with the market price of Oxysure common stock at the time of conversion, their issuance violated the terms of the SPA.

---

[6] From November 4, 2014 through February 19, 2015 JSJ purchased $75,000 face amount of such notes on November 4, 2014, Group 10 purchased $200,000 face amount of such notes on November 19, 2014 and an additional $200,000 face amount of such notes on February 19, 2015, Union LLC purchased $77,000 face amount of such notes on November 14, 2014 and Macallan purchased $200,000 face amount of such notes on January 4, 2015 (Exhibit O).

11. Oxysure's violations of its agreements with Alpha Capital are, therefore, clear and blatant. Alpha Capital, therefore, I am informed, is highly likely to prevail on the merits of its claims.

Absent Immediate Equitable Relief
<u>Alpha Capital Will Suffer Irreparable Harm</u>

12. Absent the requested temporary restraining order and preliminary injunction, Alpha Capital will suffer irreparable harm. First, Oxysure agreed in the SPA that in the event it violated any of its obligations therein, Alpha Capital would be entitled to equitable relief. Thus ¶5.15 of the SPA provides (Exhibit C):

> 5.15 Remedies. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

As is set forth in the Memorandum of Law served herewith, such agreement is tantamount to an admission that Alpha Capital is entitled to the equitable relief it seeks.

13. Second, any damages in this case will be difficult to prove. Oxysure common stock has declined from approximately $0.75 when Alpha Capital purchased the Series B Stock to

10

approximately $0.55 today (Exhibit P). How much of that decline or any future decline is or will be attributable to the market overhang created by the new Series C, D and E Stock and by the Convertible Notes will be difficult to establish. Alpha Capital's damages, therefore, will be difficult to prove. As is set forth in Memorandum of Law served herewith, difficulty in establishing damages also supports the requested award of equitable relief.

14. Third, it is unlikely that Alpha Capital will collect on any ultimate judgment in this case because Oxysure will likely be unable to satisfy any money judgment. Oxysure, according to its public filings, is an early stage technology company in the business of developing products with the capability of generating medical grade oxygen on demand, without the necessity of storing oxygen in compressed tanks. Oxysure itself and its accountants express substantial concern about Oxysure's ability to continue as a going concern. Thus Oxysure itself, in its most recent 10K filed on March 31, 2015, states (Exhibit Q):

> We are an early stage company and have a history of net losses. Currently, we have one product that we manufacture and make available for commercial sale, and to date we have not generated any significant product revenue. **As a result, we expect to continue to incur substantial net losses for the foreseeable future, which raises substantial doubt about our ability to continue as a going concern.** (Bold added)

In that filing Oxysure states that it does not have a long operating history and has not realized any substantial revenues. It has an accumulated deficit from inception, in 2004, through the end of 2014, of over $18 million. Because of the various factors which Oxysure sets forth in that filing,

11

it concludes that it may well continue to incur substantial losses and negative cash flows for the foreseeable future. Indeed, Oxysure expects its net losses to continue for the foreseeable future. Oxysure notes its dependence on raising funds from additional debt or equity to continue its operations. Based upon its most current financial statements for the quarter ended March 31, 2015 (Exhibit R), filed with its Form 10Q on May 18, 2015, Oxysure's current liabilities ($1,632,290) substantially exceed its current assets ($1,435,137), thereby making it impossible for Oxysure to pay its obligations in the ordinary course as they come due. Oxysure further states in that filing (Exhibit S):

> As a result of the foregoing circumstances our independent registered public accounting firm has included, and is likely in the future to include, an explanatory paragraph in their audit opinions **based on substantial uncertainty regarding our ability to continue as a going concern.** An audit opinion of this type may interfere with our ability to obtain debt or equity financing in the future. (bold added)

Its independent auditors in fact noted in their opinion their substantial uncertainty regarding Oxysure's ability to continue as a going concern (Exhibit T, independent auditor's opinion to Oxysure's most recent audited financials filed on March 31, 2015).

15. As is set forth in the Memorandum of Law served herewith, substantial doubt about the ability to collect any judgment at the end of a litigation, as in this case, supports an award of injunctive relief.

16. Fourth, Oxysure is a public company with publicly trading securities. Alpha Capital, as a purchaser of a public company's securities, should be entitled to court assistance in enforcing the terms of the Series B Stock. Such enforcement of the terms of a security will also insure the integrity of the public marketplace for securities - a purchaser of securities from a public company is entitled to obtain what he bargained for when he purchased the securities. As is set forth in the Memorandum of Law served herewith, a Court should specifically enforce the terms of a public company's securities, as Alpha Capital seeks to do herein, and not compel Alpha Capital to pursue a damages remedy which, as noted above, will be difficult to establish and collect.

17. Alpha Capital seeks herein only to hold Oxysure to the terms to which it agreed in order to induce Alpha Capital to invest over $1 million in Oxysure. There is no reason to allow Oxysure to take Alpha Capital's investment funds and then simply ignore very material terms of the agreement in reliance upon which those funds were invested. The Investor Defendants were, at the very least, certainly on notice of Oxysure's inability to issue the Series C, D and E Stock and the Convertible Notes. In any event, Oxysure issued to them securities which it did not have the right to issue. The Investor Defendants may well have a claim against Oxysure because Oxysure misrepresented to them its ability to issue those securities (see Exhibit J, §3(b) and (c)). But such rights, if any, I respectfully submit, cannot interfere with Alpha Capital's ability to enforce the terms of its prior, publicly filed, agreements with Oxysure.

18. Indeed, other than the award of the requested equitable relief, I respectfully submit that there is no other effective way to insure that Alpha Capital receives the benefits for which it bargained - insuring that Oxysure would not issue convertible securities with variable conversion rates, would not issue securities for less than an agreed upon minimum consideration and would provide Alpha Capital with a right to participate in subsequent financings. As set forth in the Memorandum of Law served herewith, case law supports the issuance of an injunction where, as here, there is no other effective method for enforcing the agreement of the parties. There is no reason why the Court should not hold Oxysure to the very agreement which it made to obtain Alpha Capital's investment.

19. Without the granting of the requested Temporary Restraining Order, Oxysure could well render moot any request for preliminary injunctive relief by converting the remaining balances of the Investor Defendants Series C Stock and Convertible Notes before any hearing on the preliminary injunction. The Investor Defendants will suffer no damages during the pendency of any Temporary Restraining Order because the price at which they can convert their Convertible Notes varies with the market price of Oxysure stock. Thus any decrease in the stock's value will be offset by an increased number of shares they would receive upon any conversion. If the Investor Defendants believe that the price of Oxysure common stock is about to rise, nothing prevents them from purchasing additional shares of the stock to profit from any such increase.

20. There has been no previous application for the relief requested herein.

15

Wherefore I respectfully request that the Court award the Preliminary Injunction and the Temporary Restraining Order requested herein and in the Order To Show Cause.

Dated: July 10, 2015

_____
Konrad Ackermann