# EXHIBIT 3

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") is effective as of the 9th day of August, 2013 by and between Oxysure Systems, Inc., a Company, with its principal office located at 10880 John W. Elliott Drive, Suite 600, Frisco, TX 75033, its successors or assigns (the "Company") and Anubis Capital Advisors, Inc., a Texas Corporation, with a mailing address of 2550 Midway Rd, Suite 198, Carrollton, Texas 75034, its successors or assigns (the "Consultant").

## W I T N E S S E T H

**WHEREAS,** the Consultant is engaged in the business of providing consulting services in connection with various management, marketing, business planning, financing and acquisition strategies;

**WHEREAS,** the Consultant is engaged in the business of introducing its clients to banks, lenders, investors, funds, other third party financing ("Capital Sources") and to synergistic business relationships and

**WHEREAS,** the Consultant is willing to introduce the Company to Capital Sources; and

**WHEREAS,** the Company desires to engage the Consultant and the Consultant agrees to be engaged by the Company to render such services on behalf of the Company pursuant to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants of the parties, which are hereinafter set forth and for other good and valuable consideration, receipt of which is hereby acknowledged,

**IT IS AGREED:**

1.    Recitals Adopted.  The parties hereto adopt as part of this Agreement each of the recitals which is contained above in the WHEREAS clauses, and agree that such recitals shall be binding upon the parties hereto by way of contract and not merely by way of recital or inducement; and such clauses are hereby confirmed and ratified as being true and accurate by each party as to itself.

2.    Engagement.

A.    Pursuant to the terms and conditions which are hereinafter set forth, the Company hereby retains the Consultant as an Consultant and consultant to the Company and its officers and directors, including but not limited to, providing the following services (the "Consulting Services"):

(1)    Reviewing, analyzing and assisting the Company in the preparation of a definitive business plan describing the Company's business, financial condition and future business potential;

(2)    Meeting with management and assisting management in developing and implementing marketing campaigns with respect to the Company;

(3)    Advising the Company in connection with general management, marketing and financing strategy;

(4)    Introducing the Company to potential business acquisitions and merger candidates ("Merger Candidates"), and Capital Sources;

(5)    Such other services as the Company shall from time to time request.



B.      The Consultant shall not be required to devote any minimum number of weeks, days, or hours to the affairs of the Company during the term of this Agreement; provided, however, that the Consultant devotes such time, attention and energies to the business of the Company, as the Consultant determines, in its sole and absolute discretion.

C.      The Consultant may utilize employees, agents or other consultants, in the Consultant's sole and absolute discretion, with respect to providing the Consulting Services.

D.      When requested in writing by the Company, the Consultant shall provide the Company a report outlining the Consultant Services performed, specifying any introductions made to the company, and detailing expenses.

3.      Introductions.      Upon an introduction made by the Consultant to any Capital Source, or Merger Candidate, the Company irrevocably acknowledges and agrees that it shall not circumvent, avoid, bypass or obviate the Consultant as set forth in Article "15" of this Agreement.

4.      Term.            The Company hereby retains the Consultant on a non-exclusive basis to perform the services set forth in Article "2" above during a three (3) month term, which shall be renewable upon written agreement of the parties for additional 3 month periods (the initial 3 month period and any renewals thereof, the "Term"), commencing on the date hereof, and the Consultant hereby accepts such engagement and shall perform for the Company the duties described herein, faithfully and to the best of its ability. During the Term, the Consultant shall report directly to the President of the Company or such other senior officer of the Company as shall be designated by the President of the Company.

5.      Compensation.    The Consultant shall receive the following as compensation for its services pursuant to this Agreement:

A.      The Company shall pay the Consultant a monthly consulting fee in the amount of $7,500 dollars per month during the Term of this Agreement (the "Consulting Fee").   The Consulting Fee shall be due and payable by the Company on first day of the applicable month; provided, however, that the Consulting Fee for the first month of the Term in the amount $7,500 dollars shall be paid upon the execution hereof.

B.      In addition to the Consulting Fee, the Company shall pay an arrangement fee (the "Arrangement Fee") to the Consultant in an amount equal to eight percent (8%) of i) any equity or debt financings raised by the Company in connection with a Capital Source, or any related person or entity, which provides for, or arranges for the provision of, investment capital including, but not limited to, a public or private placement, offering, syndication or other sale of equity or debt securities, and ii) the gross revenues generated in connection with any acquisition, joint venture, partnership, or participation resulting from the Consultants introduction to a Qualified Source ("Financing Transaction").  The Arrangement Fee can be paid to Anubis in Cash and/or Stock at Anubis' discretion.

The Arrangement Fee shall be due to the Consultant if such qualifying Financing Transaction occurs during the term of this Agreement, or within three (3) years after termination of this Agreement. If a Financing Transaction occurring through no introduction of Consultant to a Capital Source beyond three (3) years after termination of this Agreement shall not require an Arrangement Fee.

C.      Except as otherwise provided herein, (i) all fees due to the Consultant hereunder shall have no offsets, are non-refundable, non-cancelable and shall be free and clear of any and all encumbrances; (ii) all cash fees due the Consultant hereunder shall be paid to the Consultant immediately upon closing of any Financing Transaction by wire transfer of immediately available funds from the proceeds of the Financing Transaction, either directly or from the formal or informal escrow arrangement established for the Financing Transaction (collectively,



the "Closing Agent"), pursuant to the wire transfer instructions of the Consultant; (iii) all securities fees due the Consultant hereunder shall be made via DTC or the DWAC system, or by certified certificates, as applicable, and shall be delivered to the Consultant from the Closing Agent immediately upon closing of any Financing Transaction; (iv) all securities fees due the Consultant hereunder shall be duly issued, fully-paid (exclusive of warrants or options) and non-assessable and shall be in the same form, with the same terms and conditions as the securities provided to the Company pursuant to any Financing Transaction; and (v) all fees due the Consultant hereunder to be paid in shares of the Common Stock and warrants and/or options to purchase shares of the Common Stock (collectively, the "Registerable Stock") shall be duly issued, fully-paid (exclusive of warrants or options), and non-assessable. Notwithstanding anything otherwise contained herein, if the Company files a registration statement on Form S-1, S-3, S-4 or similar registration statement and in compliance with any and all federal and state securities laws, the Company agrees that it shall provide piggyback registration rights and register the Registerable Stock, in the name(s) of and to the account(s) designated by the Consultant. The Company agrees to pay all costs associated with registering the Registerable Stock for resale.

        D.   The Company authorizes and directs the Closing Agent to distribute directly or from escrow any and all fees due the Consultant hereunder. The Company agrees that such fees and the manner of payment and delivery as herein provided shall be included in the documentation of any Fee Transaction.

        6.   Costs and Expenses.  The Company shall reimburse the Consultant for any and all **pre-approved** expenses incurred by the Consultant in connection with performing the Consulting Services pursuant to this Agreement including, but not limited to, travel expenses, third party expenses, filing fees, copying, mailing and overnight courier expenses (the "Expenses"); Reimbursement by the Company to the Consultant will be made within thirty (30) days of the Company's receipt of all expense related documentation.

        7.   Due Diligence.  The Company shall supply and deliver to the Consultant all information relating to its business as may be reasonably requested by the Consultant in order to enable the Consultant to make a diligent investigation of the Company and its business prospects, provided that the Company shall have sole discretion as to what is deemed reasonably requested.

        8.   Best Efforts Basis.  The Consultant agrees that it will, at all times, faithfully and to the best of its experience, ability and talents, perform all the duties that may be required of and from the Consultant pursuant to the terms of this Agreement.  The Consultant does not guarantee that its efforts will have any impact on the Company's business or that any subsequent financial improvement will result of the Consultant's efforts.

        9.   The Company's Right to Approve Transactions.  The Company expressly retains the right to approve, in its sole discretion, each and every transaction introduced by the Consultant that involves the Company as a party to any agreements.  The Consultant and the Company mutually agree that the Consultant is not authorized to enter into agreements on behalf of the Company.  It is mutually understood and agreed that the Company is not obligated to accept or close on sales proposals, marketing proposals, financial transactions, any promotional proposals, or acquisition or merger transactions submitted by the Consultant.

        10.   Place of Services.  The Consulting Services contemplated to be performed by the Consultant will be performed at locations selected by the Consultant.  It is understood and expected that the Consultant will make contacts with persons and entities within and/or outside the United States deemed appropriate by the Consultant.

        11.   Non-Exclusive Services.  The Company acknowledges that the Consultant is currently providing services of the same or similar nature to other parties and the Company agrees that the Consultant is not prevented or barred from rendering services of the same nature or a similar nature to any other individual or entity, if and insofar as the other individual or entity is not a direct competitor to the Company.  The Consultant understands and agrees that the Company shall not be prevented or barred from retaining other persons or entities to provide services of the same or similar nature as those provided by Consultant.  The Consultant shall take reasonable steps to determine and to advise the Company of its position with respect to any activity, employment, business arrangement



or potential conflict of interest which may be relevant to this Agreement; provided, however, that the Consultant shall not be obligated to conduct an exhaustive review of the Company's activities or those of its clients to determine whether a conflict exists.

12.    Representations, Warrants and Covenants of the Consultant.

The Consultant represents, warrants and covenants to the Company as follows:

A.    The Consultant is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas with all requisite power and authority to carry on its business as presently conducted in all jurisdictions where presently conducted, to enter into this Agreement and to the transactions which are contemplated herein.

B.    The Consultant has the full authority, right, power and legal capacity to enter into this Agreement and to consummate the transactions which are provided for herein.  The execution of this Agreement by the Consultant and its delivery to the Company, and the consummation by it of the transactions which are contemplated herein have been duly approved and authorized by all necessary action by the Consultant's members and no further authorization shall be necessary on the part of the Consultant for the performance and consummation by the Consultant of the transactions which are contemplated by this Agreement.

C.    The business and operations of the Consultant have been and are being conducted in all material respects in accordance with all applicable laws, rules and regulations of all authorities which affect the Consultant or its properties, assets, businesses or prospects.  The performance of this Agreement shall not result in any breach of, or constitute a default under, or result in the imposition of any lien or encumbrance upon any property of the Consultant or cause an acceleration under any arrangement, agreement or other instrument to which the Consultant is a party or by which any of its assets are bound.  The Consultant has performed in all respects all of its obligations which are, as of the date of this Agreement, required to be performed by it pursuant to the terms of any such agreement, contract or commitment.

D.    The execution, delivery and performance of this Agreement: (i) does not violate any agreement or undertaking to which the Consultant is a party or by which the Consultant may be bound and (ii) shall not result in the imposition of any restrictions or obligations upon the Consultant other than the restrictions and obligations imposed by this Agreement.

E.    The Consultant has not entered into and is not subject to any agreement, including, but not limited, to any employment, noncompete, confidentiality or work product agreement which would (i) prohibit the execution of this Agreement, (ii) prohibit its engagement as a Consultant by the Company, or (iii) affect any of the provisions of, or its obligations pursuant to this Agreement.

F.    If, during the Term, any event occurs or any event known to the Consultant relating to or affecting the Consultant shall occur as a result of which (i) any provision of this Article "12" of this Agreement at that time shall include an untrue statement of a fact, or (ii) this Article "12" shall omit to state any fact necessary to make the statements herein, in light of the circumstances under which they were made, not misleading, the Consultant will immediately notify the Company pursuant to Paragraph "C" of Article "22" of this Agreement.

G.    It shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty that the Company knew or had reason to know that any representation, warranty or covenant of the Consultant in this Agreement or furnished or to be furnished to the Company contained untrue statements.

H.    No representation or warranty of the Consultant which is contained in this Agreement, or in a writing furnished or to be furnished pursuant to this Agreement, contains or shall contain any untrue statement



of a material fact, omits or shall omit to state any material fact which is required to make the statements which are contained herein or therein, in light of the circumstances pursuant to which they were made, not misleading.

I. All representations, warranties and covenants made in or in connection with this Agreement shall continue in full force and effect during and after the Term of this Agreement, it being agreed and understood that each of such representations, warranties and covenants is of the essence of this Agreement and the same shall be binding upon the Consultant and inure to the Company, its successors and assigns.

J. Consultant represents, warrants and covenants that it is not a registered representative with any broker-dealer in the United States, is not employed by or associated with any broker-dealer in the United States, is not an investment adviser either generally or with respect to the specific individuals.

13. Representations, Warrants and Covenants of the Company.

The Company represents, warrants and covenants to the Consultant as of the date of signing of this Agreement as follows:

A. The Company is a corporation organized, validly existing under the laws of the State of Delaware with all requisite power and legal authority to carry on its business as presently conducted in all jurisdictions where presently conducted, to enter into this Agreement and to the transactions which are contemplated herein.

B. The Company has the full authority, right, power and legal capacity to enter into this Agreement and to consummate the transactions which are provided for herein. The execution of this Agreement by the Company and its delivery to the Consultant, and the consummation by it of the transactions which are contemplated herein have been duly approved and authorized by all necessary action by the Company's Board of Directors and no further authorization shall be necessary on the part of the Company for the performance and consummation by the Company of the transactions which are contemplated by this Agreement.

C. The business and operations of the Company have been and are being conducted in all material respects in accordance with all applicable laws, rules and regulations of all authorities which affect the Company or its properties, assets, businesses or prospects. The performance of this Agreement shall not result in any breach of, or constitute a default under, or result in the imposition of any lien or encumbrance upon any property of the Company or cause an acceleration under any arrangement, agreement or other instrument to which the Company is a party or by which any of its assets are bound. The Company has performed in all respects all of its obligations which are, as of the date of this Agreement, required to be performed by it pursuant to the terms of any such agreement, contract or commitment.

D. The execution, delivery and performance of this Agreement: (i) does not violate any agreement or undertaking to which the Company is a party or by which the Company may be bound and (ii) shall not result in the imposition of any restrictions or obligations upon the Company other than the restrictions and obligations imposed by this Agreement.

E. If, during the Term, any event occurs or any event known to the Company relating to or affecting the Consultant shall occur as a result of which (i) any provision of this Article "13" of this Agreement at that time shall include an untrue statement of a fact, or (ii) this Article "13" shall omit to state any fact necessary to make the statements herein, in light of the circumstances under which they were made, not misleading, the Company will immediately notify the Consultant pursuant to Paragraph "C" of Article "22" of this Agreement.

F. It shall not be a defense to a suit for damages for any misrepresentation or breach of covenant or warranty that the Consultant knew or had reason to know that any representation, warranty or covenant of the Company in this Agreement or furnished or to be furnished to the Consultant contained untrue statements.



G. No representation or warranty of the Company which is contained in this Agreement, or in a writing furnished or to be furnished pursuant to this Agreement, contains or shall contain any untrue statement of a material fact, omits or shall omit to state any material fact which is required to make the statements which are contained herein or therein, in light of the circumstances pursuant to which they were made, not misleading.

H. All representations, warranties and covenants made in or in connection with this Agreement shall continue in full force and effect during and after the Term of this Agreement, it being agreed and understood that each of such representations, warranties and covenants is of the essence of this Agreement and the same shall be binding upon the Company and inure to the Consultant, its successors and assigns.

I. The Company agrees that if the Company shall at any time seek to register or qualify any of its capital stock, and if the Consultant elects to receive shares of common stock as consideration in lieu of cash pursuant to Article "5" of this Agreement (the "Shares"), then on each such occasion it shall include all of the Shares in such registration or qualification. All expenses in connection with preparing and filing any registration statement under this Paragraph "I" of this Article "13" of this Agreement (and any registration or qualification under the securities or "Blue Sky" laws of states in which the offering will be made under such registration statement) shall be borne in full by the Company; provided, however, that the Consultant shall pay any and all underwriting commissions and expenses and the fees and expenses of any legal counsel selected by the Consultant to represent the Consultant with respect to the sale of the Shares.

J. The Company agrees that, for the duration of the Term of this Agreement, the Consultant shall have the right to utilize the Company's address as his address, and to receive mail and deliveries, regardless of whether the mail or deliveries are related to the Consulting Services.

14. Non-Disclosure of Confidential Information.

A. As used in this Agreement, "Confidential Information" means information which is presented to the Consultant by the Company or developed, conceived or created by the Company, or disclosed to the Consultant or known by or conceived or created by the Consultant during the term of this Agreement, with respect to the Company, its business or any of its products, processes, and other services relating thereto relating to the past or present business or any plans with respect to future business of the Company, or relating to the past or present business of a third party or plans with respect to future business of a third party which are disclosed to the Company. Confidential Information includes, but is not limited to, all documentation, hardware and software relating thereto, and information and data in written, graphic and/or machine readable form, products, processes and services, whether or not patentable, trademarkable or copyrightable or otherwise protectable, including, but not limited to, information with respect to discoveries; know-how; ideas; computer programs, source codes and object codes; designs; algorithms; processes and structures; product information; marketing information; price lists; cost information; product contents and formulae; manufacturing and production techniques and methods; research and development information; lists of clients and vendors and other information relating thereto; financial data and information; business plans and processes; documentation with respect to any of the foregoing; and any other information of the Company that the Company informs the Consultant or the Consultant should know, by virtue of its position or the circumstances in which the Consultant learned such other information, is to be kept confidential including, but not limited to, any information acquired by the Consultant from any sources prior to the commencement of this Agreement. Confidential Information also includes similar information obtained by the Company in confidence from its vendors, licensors, licensees, customers and/or clients. Confidential Information may or may not be labeled as confidential.

B. Except as required in the performance of the Consultant's duties, as a Consultant, the Consultant will not, during or after the term of this Agreement, directly or indirectly, use any Confidential Information or disseminate or disclose any Confidential Information to any person, firm, corporation, association or other entity. The Consultant shall take all reasonable measures to protect Confidential Information from any



accidental, unauthorized or premature use, disclosure or destruction. The foregoing prohibition shall not apply to any Confidential Information which: (i) was generally available to the public prior to such disclosure; (ii) becomes publicly available through no act or omission of the Consultant, or (iii) is disclosed as reasonably required in a proceeding to enforce the Consultant's rights under this Agreement or (iv) is disclosed as required by court order or applicable law.

C.        Upon termination of this Agreement for any reason or at any time upon request of the Company, the Consultant agrees to deliver to the Company all materials of any nature which are in the Consultant's possession or control and which are or contain Confidential Information, Work Product or Work Products (hereinafter defined), or which are otherwise the property of the Company or any vendor, licensor, licensee, customer or client of the Company, including, but not limited to writings, designs, documents, records, data, memoranda, tapes and disks containing software, computer source code listings, routines, file layouts, record layouts, system design information, models, manuals, documentation and notes.

D.        All ideas, inventions, discoveries or improvements, whether patentable or not, conceived by the Consultant (alone or with others) during the term of this Agreement with respect to the product of the Company ("Work Products") shall be the exclusive property of and assigned to the Company or as the Company may direct without additional compensation to the Consultant. Any records with respect to the foregoing shall be the sole and exclusive property of the Company and the Consultant shall surrender possession of such records to the Company upon termination of this Agreement. Any Work Product shall be deemed incorporated in the definition of Confidential Information for all purposes hereunder.

E.        The Consultant will not assert any rights with respect to the Company, its business, or any of its product, processes and other services relating thereto, Work Product or any Confidential Information as having been acquired or known by the Consultant prior to the commencement of the term of this Agreement.

15.        Non-Circumvent.

A.        The Company agrees on its own behalf and on behalf of each of its past, present or future subsidiaries, parents, officers, directors, stockholders, consultants, affiliates, attorneys, employees, agents and its and their respective Immediate Families (as defined below; all of the foregoing are hereinafter collectively referred to as "Agents") that neither it nor its Agents shall directly or indirectly circumvent, avoid, disavow, obviate or bypass the Consultant in any way whatsoever, including, but not limited to, during the Term and for a period of three (3) years after the termination of this Agreement, neither it nor its Agents shall pursue or enter into any transaction or engage in any business activity involving a Third Party (as defined in Paragraph "C" of this Article "15" of this Agreement) or any person or entity who or which was introduced to or made known to it by or through a Third Party without the prior written consent of the Consultant. The Company acknowledges that the Consultant has advised the Company that the Consultant desires to extend this Agreement beyond its present term and that the Consultant believes that this Article "15" will increase the likelihood that the Company will agree to extend this Agreement.

For purposes of this Agreement, "Immediate Family" shall include the following: (A) any spouse, parent, spouse of a parent, mother-in-law, father-in-law, brother-in-law, sister-in-law, child, spouse of a child, adopted child, spouse of an adopted child, sibling, spouse of a sibling, grandparent, spouse of a grandparent, and any issue or spouse of any such persons, and (B) such child or issue of such child which is born and/or adopted during or after the term of this Agreement, and the issue (whether by blood or adoption) of any such person; provided, however, that it shall not include any person who was legally adopted after the age of eighteen (18) by any of the persons specified in subparagraphs "(A)" or "(B)" of this sentence. For purposes of this Agreement, an Immediate Family shall also be deemed to include any affiliate of a member of that Immediate Family, as defined in Rule 405 of the Securities Act of 1933, as amended, and any trust created for the benefit of one or more persons in that Immediate Family.



B.      The parties agree that the duration and scope for which the provisions set forth in this Article "15" of this Agreement are to be effective are reasonable. If any court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable by reason of such provision extending the covenants and agreements contained herein for too great a period of time or by reason of its being too extensive in any other respect, such agreement or covenant shall be interpreted to extend only over the maximum period of time and to the maximum extend in all other respects, as to which it is valid and enforceable, all as determined by such court in such action.

C.      For purposes of this Article "15" of this Agreement, a Third Party shall be deemed to include anyone directly introduced to the Company by the Consultant or an employee of the Consultant.  Third Party's shall also include: (i) employees of the Consultant, and (ii) any person or entity engaged in business with the Consultant (a) who or which is introduced to the Company by the Consultant or its employees or agents, (b) and with respect to whom the Consultant advises the Company is advised by the Consultant that it has a business relationship with such person or entity. Should a Third Party make an introduction that results in an investment or revenue to (c) the Company, that introduction shall be deemed to be a Third Party.

16.      <u>Indemnification</u>.

A.      Indemnification by the Consultant. In order to induce the Company to enter into and perform this Agreement, the Consultant does hereby indemnify, protect, defend and save and hold harmless the Company and each of its stockholders, affiliates, officers, directors, control persons, employees, attorneys, agents, partners and trustees and personal representatives of any of the foregoing ("Indemnified Parties"), from and against any loss resulting to any of them from:

i.      Any and all losses, liabilities, costs, damages, or expenses which the Company may suffer, sustain or incur arising out of or due to a breach by the Consultant of any covenant, representation or warranty made in this Agreement or from any misrepresentation and/or omission pursuant to this Agreement.

ii.      Any and all claims or actions against the Company, and any and all costs, expenses, losses, including but not limited to, arbitration awards, civil judgments, reasonable attorney fees and costs, and court or arbitration fees and costs, arising out of any act, or any omission of the Consultant in the performance of any duties or services, regardless of whether said claim or action against the Consultant is individually dismissed, prior to, or at the arbitration hearing or court proceeding.

iii.      Any and all losses, claims, damages or liabilities to which the Company may become subject under the Securities Act of 1933, as amended, (the "Act") or otherwise insofar as such losses, claims damages or liabilities (or actions in respect thereof) arise out of or are based upon violations of the Act, the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder and upon any untrue statement or alleged untrue statement or the alleged omission to state therein a material fact required to be stated in any statements written or and made by the Consultant in performing any of the Consulting Services pursuant to this Agreement.

B.      Indemnification by the Company. In order to induce the Consultant to enter into and perform this Agreement, the Company does hereby indemnify, protect, defend and save and hold harmless the Consultant and each of its members, affiliates, officers, managers, control persons, employees, attorneys, agents, partners and trustees and personal representatives of any of the foregoing ("Indemnified Parties"), from and against any loss resulting to any of them from:

i.      Any and all losses, liabilities, costs, damages, or expenses which the Consultant may suffer, sustain or incur arising out of or due to a breach by the Company of any covenant, representation or warranty made in this Agreement or from any misrepresentation and/or omission pursuant to this Agreement.

...



    ii.  Any and all claims or actions against the Consultant, and any and all costs, expenses, losses, including but not limited to, arbitration awards, civil judgments, reasonable attorney fees and costs, and court or arbitration fees and costs, arising out of any act, or any omission of the Company in the performance of any duties or services, regardless of whether said claim or action against the Company is individually dismissed, prior to, or at the arbitration hearing or court proceeding.

    iii.  Any and all losses, claims, damages or liabilities to which the Consultant may become subject under the Act or otherwise insofar as such losses, claims damages or liabilities (or actions in respect thereof) arise out of or are based upon violations of the Act, the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder and upon any untrue statement or alleged untrue statement or the alleged omission to state therein a material fact required to be stated in any statements written or and made by the Company with respect to any transaction.

    C.  <u>Reasonable Costs, etc</u>. The indemnification, which is set forth in this Article "16" of this Agreement shall be deemed to include not only the specific liabilities or obligations with respect to which such indemnity is provided, but also all reasonable costs, expenses, counsel fees, and expenses of settlement relating thereto, whether or not any such liability or obligation shall have been reduced to judgment.

    D.  <u>Third Party Claims</u>.  If any demand, claim, action or cause of action, suit, proceeding or investigation (collectively, the "Claim") is brought against an Indemnified Party for which the Indemnified Party intends to seek indemnity from the other party hereto (the "Indemnifying Party"), then the Indemnified Party within twenty-one (21) days after such Indemnified Party's receipt of the Claim, shall notify the Indemnifying Party pursuant to Paragraph "C" of Article "22" of this Agreement which notice shall contain a reasonably thorough description of the nature and amount of the Claim (the "Claim Notice"). The Indemnifying Party shall have the option to undertake, conduct and control the defense of such claim or demand. Such option to undertake, conduct and control the defense of such claim or demand shall be exercised by notifying the Indemnified Party within ten (10) days after receipt of the Claim Notice pursuant to Paragraph "C" of Article "22" of this Agreement (such notice to control the defense is hereinafter referred to as the "Defense Notice"). The failure of the Indemnified Party to notify the Indemnifying Party of the Claim shall not relieve the Indemnifying Party from any liability which the Indemnifying Party may have pursuant to this Article "16" of this Agreement except to the extent that such failure to notify the Indemnifying Party prejudices the Indemnifying Party. The Indemnified Party shall use all reasonable efforts to assist the Indemnifying Party in the vigorous defense of the Claim. All costs and expenses incurred by the Indemnified Party in defending the Claim shall be paid by the Indemnifying Party. If, however, the Indemnified Party desires to participate in any such defense or settlement, it may do so at its sole cost and expense (it being understood that the Indemnifying Party shall be entitled to control the defense). The Indemnified Party shall not settle the Claim. If the Indemnifying Party does not elect to control the defense of the Claim, within the aforesaid ten (10) day period by proper notice pursuant to Paragraph "C" of Article "22" of this Agreement, then the Indemnified Party shall be entitled to undertake, conduct and control the defense of the Claim (a failure by the Indemnifying Party to send the Defense Notice to the Indemnified Party within the aforesaid ten (10) day period by proper notice pursuant to Paragraph "C" of Article "22" of this Agreement shall be deemed to be an election by the Indemnifying Party not to control the defense of the Claim); provided, however, that the Indemnifying Party shall be entitled, if it so desires, to participate therein (it being understood that in such circumstances, the Indemnified Party shall be entitled to control the defense).

    Regardless of which party has undertaken to defend any claim, the Indemnifying Party may, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any such claim or demand; provided however, that if any settlement would result in the imposition of a consent order, injunction or decree which would restrict the future activity or conduct of the Indemnified Party or would not result in a full release of the Indemnified Party or any acknowledgement of wrongdoing, the consent of the Indemnified Party shall be a condition to any such settlement; provided further, however, that if the Indemnified Party disagrees with any settlement which does not require its consent, it may stop the Indemnifying Party from settling by filing a bond/or depositing into an escrow account for the benefit of the Indemnifying Party, the amount of general damages



alleged in the Claim against the Indemnifying Party and the Indemnifying Party shall agree not to settle the Claim without the consent of the Indemnified Party. Notwithstanding the foregoing provisions of this Article "16" of this Agreement, as a condition to the Indemnifying Party either having the right to defend the Claim, or having control over settlement as indicated in this Article "16" of this Agreement, the Indemnifying Party shall execute an agreement, in the form annexed hereto and made a part hereof as Exhibit "A", acknowledging its liability for indemnification pursuant to this Article "16" of this Agreement. Whether the Indemnifying Party shall control and assume the defense of the Claim or only participate in the defense or settlement of the Claim, the Indemnified Party shall give the Indemnifying Party and its counsel access, during normal business hours, to all relevant business records and other documents, and shall permit them to consult with its employees and counsel.

17.     Equitable Relief.   If either party breaches this Agreement, subject to the terms and conditions of this Agreement, the Consultant or the Company shall have the right, at its election, to obtain equitable relief including, but not limited to, an order for specific performance of this Agreement or an injunction, without the need to: (i) post a bond or other security, (ii) to prove any actual damage or (iii) to prove that money damages would not provide an adequate remedy. Resort to such equitable relief, however, shall not be construed to be a waiver of any other rights or remedies which either party may have for damages or otherwise.

18.     Time Periods Not Limited.   Any period of time set forth in this Agreement shall not be construed to permit the Consultant to engage in any of the prohibited acts set forth in this Agreement after such period if such acts would otherwise be prohibited by any applicable statute or legal precedent.

19.     Commitments of Non-Circumvention and Non-compete. Without the Company's prior written consent, Consultant will not, for a period of three (3) years from the date Consultant ceases being a Consultant of the Company, directly or indirectly solicit for employment any person who is employed by the Company, induce or attempt to induce any customer of the Company to cease or reduce such customer's business with the Company, or induce or attempt to induce any manufacturer, supplier, wholesaler or other entity which does business with the Company to cease or reduce such business with the Company. Excluded persons, entities, or Companies from the previous sentence include any person, entity, or Company that the Consultant has or has had a working relationship with or prior knowledge of.

20.     Agency. At all times during the Term, the Consultant shall be an independent contractor providing the Consulting Services, with the sole right to supervise, manage, operate, control and direct its performance incident to such consulting services.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of either party with respect to the indebtedness, liabilities, obligations or actions of the other or any of their employees or agents, or any other person or entity.  The Consultant shall indemnify and hold the Company harmless from and against any and all Federal, state and local withholding taxes on or in respect of any payments made to the Consultant by the Company.

21.     Company.       As used in this Agreement, "Company" shall mean Oxysure Systems, Inc. and its respective successors and assigns, and any of its present or future subsidiaries or organizations controlled by it.

22.     Miscellaneous.

A.     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

B.     Enforceability.  If any provision which is contained in this Agreement should, for any reason, be held to be invalid or unenforceable in any respect under the laws of any State of the United States, such invalidity or unenforceability shall not affect any other provision of this Agreement.  Instead, this Agreement shall be construed as if such invalid or unenforceable provisions had not been contained herein.



C.      Notices.  Any notice or other communication required or permitted hereunder must be in writing and sent by either (i) certified mail, postage prepaid, return receipt requested and First Class mail, (ii) overnight delivery with confirmation of delivery, or (iii) facsimile transmission with an original mailed by first class mail, postage prepaid, addressed as follows:

|  |  |
|---|---|
| If to the Company: | Oxysure Systems, Inc. |
| | 10880 John W. Elliott Drive, Suite 600, Frisco, TX 75033 |
| | Attention: Julian Ross, CEO |
| | |
| If to Consultant: | Anubis Capital Advisors, Inc. |
| | 2550 Midway Rd., Suite 198 |
| | Carrollton, Texas 75006 |
| | Attention: Jacob Cohen |

or in each case to such other address and facsimile number as shall have last been furnished by like notice.  If mailing is impossible due to an absence of postal service, and the other methods of sending notice set forth in this Paragraph "C" of this Article "22" of this Agreement are not otherwise available, notice shall be hand-delivered to the aforesaid addresses.  Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be; provided, however, that any notice sent by facsimile shall be deemed to have been given as of the date sent by facsimile if a copy of such notice is also mailed by first class mail on the date sent by facsimile; if the date of mailing is not the same as the date of sending by facsimile, then the date of mailing by first class mail shall be deemed to be the date upon which notice given.

D.      Governing Law; Disputes.  This Agreement shall in all respects be construed, governed, applied and enforced in accordance with the internal laws of the State of Texas without giving effect to the conflict of laws rules and be deemed to be an agreement made under the laws of and entered into in the State of Texas.  The parties agree that they shall be deemed to have agreed to binding arbitration in Dallas, Texas, with respect to the entire subject matter of any and all disputes relating to or arising under this Agreement including, but not limited to, the specific matters or disputes as to which arbitration has been expressly provided for by other provisions of this Agreement.  Any such arbitration shall be by a panel of three arbitrators and pursuant to the rules then obtaining of the American Arbitration Association in Dallas, Texas.  The parties may agree in writing to conduct any arbitration in another location or forum by their mutual consent.  In all arbitrations, judgment upon the arbitration award may be entered in any court having jurisdiction.  The parties specifically designate the Courts in the County of Dallas, State of Texas as properly having jurisdiction for any proceeding to confirm and enter judgment upon any such arbitration award.  The parties hereby consent to and submit to the exclusive personal jurisdiction over each of them by the Courts of the State of Texas in any action or proceeding, waive personal service of any and all process and specifically consent that in any such action or proceeding, any service of process may be effectuated upon any of them by certified mail, return receipt requested, in accordance with Paragraph "C" of this Article "22" of this Agreement.  The parties agree, further, that the prevailing party in any such arbitration as determined by the arbitrators shall be entitled to such costs and attorney's fees, if any, in connection with such arbitration in an amount not to exceed ten thousand ($10,000); provided, however, that if a proceeding is commenced to confirm and enter a judgment thereon by the Courts of the State of Texas and such application is denied, no such costs or attorneys fees shall be paid.  In connection with the arbitrators' determination for this purpose of which party, if any, is the prevailing party, they shall take into account all of the facts and circumstances including, without limitation, the relief sought, and by whom, and the relief, if any, awarded, and to whom.  In addition, and notwithstanding the foregoing sentence, a party shall not be deemed to be the prevailing party unless the amount of the arbitration award is greater than fifteen (15%) percent of the amount offered in writing by the other party.  For example, if the party initiating the arbitration ("A") seeks an award of $100,000 plus costs and expenses, the other party ("B") has offered A $50,000 prior to the commencement of the arbitration proceeding, and the arbitration panel awards any amount less than $57,500 to A, the panel should determine that B has "prevailed".



   E.  <u>Construction</u>.  Each of the parties hereto hereby further acknowledges and agrees that (i) each has been advised by counsel during the course of negotiations, (ii) each counsel has had significant input in the development of this Agreement and (iii) this Agreement shall not, therefore, be construed more strictly against any party responsible for its drafting regardless of any presumption or rule requiring construction against the party whose attorney drafted this agreement.

   F.  <u>Entire Agreement</u>.  The parties have not made any representations, warranties or covenants with respect to the subject matter hereof which is not set forth herein, and this Agreement constitutes the entire agreement between them with respect to the subject matter hereof.  All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Agreement which alone fully and completely expresses their agreement.  This Agreement may not be changed, modified, extended, terminated or discharged orally, but only by an Agreement in writing, which is signed by all of the parties to this Agreement.

   G.  <u>Further Assurances</u>.  The parties agree to use their best efforts to execute any and all such other further instruments and documents, and to take any and all such further actions which are reasonably required to consummate, evidence, confirm or effectuate this Agreement and the intents and purposes hereof.

   H.  <u>Binding Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

   I.  <u>Waiver</u>.  Except as otherwise expressly provided herein, no waiver of any covenant, condition, or provision of this Agreement shall be deemed to have been made unless expressly in writing and signed by the party against whom such waiver is charged; and (i) the failure of any party to insist in any one or more cases upon the performance of any of the provisions, covenants or conditions of this Agreement or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of any such provisions, covenants or conditions, (ii) the acceptance of performance of anything required by this Agreement to be performed with knowledge of the breach or failure of a covenant, condition or provision hereof shall not be deemed a waiver of such breach or failure, and (iii) no waiver by any party of one breach by another party shall be construed as a waiver with respect to any other breach of this Agreement.

   J.  <u>Counterparts</u>.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

   K.  <u>Separate Counsel</u>.  The Company acknowledges having had separate counsel of its own selection acting on its behalf in connection with the negotiation, execution and consummation of this Agreement, and covenants that it alone shall be liable and responsible for and shall not look to the Consultant in connection with the fees and expenses of such separate counsel.

**[THIS SECTION INTENTIONALLY LEFT BLANK]**



IN WITNESS WHEREOF, the parties to this Agreement have set their hands and seals or caused these presents to be signed of the day and year first above written.

OXYSURE SYSTEMS, INC.

By: _____
    Name:        Julian Ross
    Title:         CEO

ANUBIS CAPITAL ADVISORS, INC.

By: _____
    Name:        Jacob Cohen
    Title:         CFO