United States District Court
Southern District of New York
-----------------------------------------------------------------x
Alpha Capital Anstalt and
Osher Capital Partners, LLC,

                      Plaintiffs,

     v.	                                    15 CV 5443 (VM)(GWG)

Oxysure Systems, Inc. and
Julian Ross,

                      Defendants.
-----------------------------------------------------------------x

Plaintiffs' Memorandum of Law In Support
<u>Of Their Motion For Summary Judgment</u>

This memorandum of law is submitted by Plaintiffs Alpha Capital Anstalt ("Alpha Capital") and Osher Capital Partners, LLC ("Osher") in support of their motion for summary judgment pursuant to Rule 56.

Both Plaintiffs, as hereafter set forth, are entitled to summary judgment finding that Defendant Oxysure Systems, Inc. ("Oxysure") violated its agreements with Plaintiffs.[1] Osher is additionally entitled to summary judgment ordering Oxysure to:

      i) deliver to Osher immediately at least 2,016,234 shares of Oxysure's freely

          trading common stock, representing 4.99% of Oxysure's currently

          outstanding shares; and

---

[1] This motion relates to the First and Second claims for relief in the Alpha Capital Complaint and the Fifth, Sixth, Seventh and Eighth claims for relief in the Osher Complaint.

    ii) comply with all future conversion and/or redemption requests duly submitted by Plaintiffs in accordance with the terms of the agreements between and among the parties; and

    iii) pay damages in the amount of the diminution in the value of all shares which Oxysure is required to deliver pursuant to the order of the Court from the date Oxysure is required to deliver such shares until Oxysure actually delivers such shares or until judgment is entered; and[2]

    iv) inform Plaintiffs in writing, upon their written request, from time to time, of the number of then outstanding Oxysure common shares.

As is hereafter set forth, there are no material issues of fact requiring trial and the Plaintiffs are entitled to the requested relief.

## Argument

### Point 1

### Plaintiffs Are Entitled To An Order Finding That Oxysure Has Violated Its Agreements

The can be no dispute, as hereafter set forth, that Oxysure violated the agreements pursuant to which both Plaintiffs purchased Oxysure Series B Convertible Preferred Stock.

---

[2]Should the Court grant Osher the requested relief, and retain jurisdiction over Oxysure to enforce its order, Osher will withdraw all of its remaining claims except for an award of attorneys' fees. The Affirmation of Ari Kluger, attesting to the truth of the facts set forth herein, is submitted along with this brief.

A. Alpha Capital and Osher Purchase Oxysure's
   Series B Convertible Preferred Stock

In December 2013, Alpha Capital purchased 675 shares of Oxysure's Series B Convertible Preferred Stock (the "Stock") for $675,000. In December 2014, Alpha Capital purchased an additional 400 shares of Stock for $400,000. Alpha Capital currently holds 575 shares of Stock.[3] In December 2014, Osher purchased 125 shares of Stock for $125,000, which Osher currently holds.[4]

As holders of the Stock, both Alpha Capital and Osher had the right, from time to time, to convert all or any portion of their Stock into shares of Oxysure common stock. In the Securities Purchase Agreement ("SPA") pursuant to which Alpha Capital and Osher purchased the Stock, Oxysure agreed that it would not issue variable rate securities while Alpha Capital and Osher continued to own the Stock.[5] Thus ¶4.13 of the SPA provides:

> Subsequent Equity Sales. . . . [T]he Company will not, without the consent of the Purchasers, . . . issue nor agree to issue any common stock, floating or Variable Priced Equity Linked Instruments nor any of the foregoing or equity with price reset

---

[3] Alpha Capital holds all 400 shares purchased in 2014 and 175 shares purchased in 2013.

[4] Osher purchased 75 shares of Stock in December 2013 but converted all of that Stock prior to instituting suit. Both Alpha Capital and Osher received Warrants in connection with their Stock purchases. The Warrants are not the subject of this lawsuit. The exercise price of those Warrants, however, which is relevant, as hereafter set forth, is $1.20.

[5] The SPAs for the 2013 and 2014 Stock purchases for both Alpha Capital and Osher are substantively identical. Only the Alpha Capital 2014 SPA, therefore, is submitted with this motion as Exhibit A.

3

> rights . . . (collectively, the "Variable Rate Transaction"). For purposes hereof . . . "Variable Priced Equity Linked Instruments" shall include: (A) any debt or equity securities which are convertible into, exercisable or exchangeable for, or carry the right to receive additional shares of Common Stock either (1) at any conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for Common Stock at any time after the initial issuance of such debt or equity security, or (2) with a fixed conversion, exercise or exchange price that is subject to being reset at some future date at any time after the initial issuance of such debt or equity security due to a change in the market price of the Company's Common Stock since the date of initial issuance. . . .

That provision prohibited Oxysure from issuing any securities or debt instruments which were convertible into Oxysure common stock at a price which fluctuated with the market price of Oxysure common stock.

¶4.13 of the SPA also provided that Oxysure would not issue any common stock at a price less than the greater of the Stock Conversion Price and the Exercise Price of the Warrants.

> [T]he Company will not . . . issue any Common Stock or Common Stock Equivalents, if such issuance . . . would be at an effective price per share of Common Stock less than the higher of the Conversion Price or Warrant Exercise Price in effect at the time of such lower issuance . . . or would be issued or made on terms more favorable to such other holder or recipient than the Purchaser, with respect to the terms of the offering pursuant to the Transaction Documents.

Since December 2014, the exercise price of the Warrants has always been $1.20 per share.[6]

---

[6] The Warrants are submitted herewith as Exhibit B. ¶2(b) of the Warrants sets forth the $1.20 exercise price.

4

The SPA also required that Oxysure timely file all reports required to be filed pursuant to the Exchange Act, even if Oxysure was not then subject to the reporting requirements of the Exchange Act. ¶4.3(a) of the SPA provides:

> The Company covenants to timely file . . . all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act and file such reports **even if the Company is not then subject to the reporting requirements of the Exchange Act**. (bold added)

B. Oxysure's violations of the SPA

a. Oxysure's issuance of variable rate securities

Almost immediately after selling the Stock to Alpha Capital and Osher in December 2014, Oxysure violated its agreements in the SPA set forth above. Thus, in the first quarter of 2015, Oxysure issued three convertible notes whose conversion price varied with the market price of Oxysure's common stock. The first convertible note was issued on January 12, 2015, just two weeks after Oxysure agreed not to do so. The other convertible notes were issued on February 15 and March 19, 2015. In its Form 10Q, p. F-9, filed on May 18, 2015, Oxysure states:

> During the three months ended March 31, 2015 we issued three convertible notes with a total principal value of $536,000 for $495,000 in cash. The notes contained original issuance discounts for a total of $41,000, and interest rates ranging from 8% to 12%. The maturity dates of the notes range from September 25, 2015 to February 19, 2016. The creditors have the option at any time to convert the principal and any accrued interest into common stock

of the Company at an average discount rate of approximately thirty six percent off the market price of the Company's common stock.[7]

Oxysure further violated its agreements in the SPA when, on June 30, 2015, it issued Series C, D and E Convertible Stock (the "C, D and E Stock", as the case may be). Those securities were also convertible at a price which varied with the market price of Oxysure common stock. Thus ¶¶6(a) and (b) in the Certificate of Designation of Preferences, Rights and Limitations of Series C Convertible Preferred Stock (the "C COD") filed by Oxysure with the Delaware Secretary of State on June 30, 2015, which governs the terms of that stock (Exhibit E) provides in ¶6:

> Conversion
>
> a) <u>Conversions at Option of Holder</u>. Each share of Preferred Stock shall be convertible, at any time and from time to time from and after the Original Issue Date at the option of the Holder thereof, into that number of shares of Common Stock (subject to the limitations set forth in Section 6(d)) determined by dividing the Stated Value of such share of Preferred Stock by the Conversion Price. Holders shall effect conversions by providing the Corporation with the form of conversion notice attached hereto as <u>Annex A</u> (a "<u>Notice of Conversion</u>").
>
> Conversion Price
>
> b) The Conversion Price for the Preferred Stock shall be equal to the amount that is the higher of: (i) $.0005; or (ii) a 35% discount to the then current market price of the Common Stock at the time of conversion, as defined by the average of the two lowest closing prices during the ten trading days prior to the Conversion Date.

---

[7] A printout of p. F-9 is submitted herewith as Exhibit C. Copies of the actual convertible notes are submitted herewith as Exhibit D. Pursuant to the order of Magistrate Judge Gorenstein, those notes have been marked "attorneys' eyes only" and should not, therefore, be publicly filed, absent further order of the Court.

Thus on multiple occasions after December 2014, Oxysure issued variable rate securities in violation of its agreements with Alpha Capital and Osher. Both Alpha Capital and Osher, therefore, are entitled to an order declaring Oxysure in default of its agreements with Alpha Capital and Osher.

### b. Oxysure's failure to file reports

Oxysure, from the time Plaintiffs purchased their securities until April 18, 2016, was a reporting company under the Exchange Act required to file reports in accordance with that statute. Oxysure was required to file its Form 10K for the year 2015 by April 15, 2016. It failed to do so. On April 18, 2016 Oxysure filed a Form 15 (Exhibit F) whereby it terminated its registration under Section 12(g) of the Exchange Act. Although Oxysure was nevertheless obligated by statute to file the past due Form 10K,[8] by agreements with Plaintiffs Oxysure was required, but failed, to file its Form 10K Thus Oxysure is in clear violation of the SPA.

### Point 2

### Osher Is Entitled To An Order Compelling Oxysure To Deliver Stock Immediately Plus Related Relief

Osher is entitled to an order directing Oxysure to: i) deliver immediately 2,016,234 freely trading shares of Oxysure common stock; ii) comply with future properly submitted conversion and/or redemption requests; and iii) pay related damages.

---

[8] See Question 151.01 and the SEC's response annexed hereto as Exhibit G.

Upon the occurrence of a Triggering Event, the parties specifically negotiated and agreed that to remedy a Triggering Event, each Plaintiff would be entitled to redeem its Stock for shares of Oxysure common stock based upon an agreed formula. That agreement was important to Plaintiffs in order to, among other reasons, avoid, in the event of Oxysure's default, the difficulties and expense involved in litigating, proving damages and enforcing any judgment. Oxysure agreed to that provision to induce the Plaintiffs' investments. Without Oxysure's agreement to that remedy, Plaintiffs would not have purchased the Stock. Osher herein seeks to avail itself of that agreed upon contract right. To disallow enforcement of this negotiated, agreed upon, and reasonable remedy would impermissibly eliminate a material term of the contract between the parties.[9]

---

[9] In *Halifax Fund, L.P. v. Response U.S.A., Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997), the court compelled a public corporation to convert preferred stock into common. The court stated, 1977 WL 33173241 at *3:

> "There is no case - the defendant has not been able to cite any case, and the court is aware of none - that has the effect of precluding this Court from granting specific performance to remedy a clear case of a violation of a contract right to convert preferred stock into common stock. . . .
> In that connection, the Court rejects the defendant's argument that plaintiff has an adequate remedy at law, namely damages. In this case, only coercive relief will vindicate the rights being enforced . . ."

In *Delaware-New Jersey Ferry Co. v. Leeds,* Del.Ch., 186 A. 913, 916 (1936) the court noted the harm to the public securities market if publicly held securities were not enforced in accordance with their terms. In *Longview Special Finance v. Infinium Labs, Inc.*, 06 Civ. 1772, Judge Holwell of this Court, in dealing with a convertible security and granting injunctive relief, stated that "compelling compliance rather than simply awarding damages reinforces the sanctity of bargains between corporations and creditors and investors"(Transcript of hearing on November 29, 2006, p. 21 annexed hereto as Exhibit A).

As hereafter set forth, the above defaults are Triggering Events. ¶10 of The Certificate of Designation governing the Stock (the "B COD"), filed by Oxysure with the Delaware Secretary of State on December 20, 2014 (Exhibit H) provides:

<u>Section 10</u>. <u>Redemption Upon Triggering Events.</u>

    a)  "<u>Triggering Event</u>" means . . .

    iv.  . . . [T]he Corporation shall fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents, which failure or breach **could have** a Material Adverse Effect, and such failure or breach shall not, if subject to the possibility of a cure by the Corporation, have been cured within 30 calendar days after the date on which such failure or breach shall have first occurred. . . . (bold added)

    b)  Upon the occurrence of a Triggering Event, each Holder shall (in addition to all other rights it may have hereunder or under applicable law) have the right, exercisable at the sole option of such Holder, to require the Corporation to . . . (B) at the option of each Holder and with respect to the Triggering Events set forth in 10(a) . . . (iv) . . . (a) redeem all of the Preferred Stock then held by such Holder for a redemption price, in shares of Common Stock, equal to a number of shares of Common Stock equal to the Triggering Redemption Amount divided by 75% of the average of the 10 VWAP's immediately prior to the date of election hereunder . . .

Oxysure's improper issuance of variable rate securities could have a "Material Adverse Effect." That term is undefined in the B COD. The SPA, however, does contain a definition of

9

the term.[10] The SPA, in ¶3.1(b), in the context of Oxysure's representation therein that it is qualified to do business wherever necessary, provides:

> "except where the failure to be so qualified or in good standing, as the case may be, **could have** or reasonably be expected to result in: (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i) (ii) or (iii), a "Material Adverse Effect"). (bold added)

The issuance of variable rate securities, whereby the holders can obtain common stock at prices substantially below market - the convertible notes and the C Stock allow conversion at 35% and 36% discounts to market, respectively[11] - certainly encourages the issuance of substantially more shares of common stock upon conversion of the variable rate securities. The infusion of more Oxysure shares into the market certainly could (and, in fact, did) have a depressive effect on the price of the common stock - the greater the supply of common shares, the lower the price of the common shares. In fact the price of Oxysure's common stock has declined from $0.69 on January

---

[10] The SPA, ¶1.1, provides that any terms not defined therein shall have the meaning ascribed to them in the Certificate of Designation. There is no comparable provision in the B COD for terms not defined therein.

[11] Exhibit C, an excerpt from Oxysure's most recently filed 10K, states that the convertible notes are convertible at an average discount to market of 36%. Exhibit E, ¶6(b), establishes that the C Stock is convertible at a discount to market of 35%.

5, 2015 to $0.02 on April 19, 2016.[12] The issuance, therefore, of the variable rate securities "could have . . . a material adverse effect on the . . . business, prospects and condition (financial or otherwise)" of Oxysure (Exhibit J).

Indeed, Oxysure admits that the issuance of convertible preferred stock, such as the C, D and E Stock, could have a material adverse effect on its common stock. Thus in its most recent Form 10K filed March 31, 2015 (Exhibit J) Oxysure states that "the issuance of preferred stock [which Oxysure has already issued] could have a material adverse effect on the price of our common stock." In that Form 10K Oxysure also admits that: i) "A low share price severely limits the potential for our common stock;" and ii) it is "likely to attempt to raise additional capital through issuances of debt or equity securities which may cause our stock price to decline . . . and/or limit our financial flexibility." There can be no question, therefore, that the issuances of the variable rate securities complained of herein meets the definition of material adverse effect. A Triggering Event, therefore, has clearly occurred, allowing Osher to demand redemption of its Stock into common stock, as Osher has done.

Oxysure's failure to file agreed upon reports also could have a material adverse effect on its business, properties or condition. It will be more difficult for Oxysure to raise the capital necessary to continue in business because of the lack of publicly filed information. Indeed, while Oxysure stock closed at $0.045 on Friday, April 15, 2016, the day before it filed Form 15 to terminate its registration under section 12(g) of the Exchange Act, on Monday, April 18, 2016,

---

[12]See Bloomberg stock reports submitted herewith as Exhibit I.

11

Oxysure stock closed at $0.0249. There were no other public announcements by Oxysure, either on April 15 or April 18, which would account for such a steep decline in Oxysure's stock price. Oxysure lost half its value in one trading day as a result of terminating its statutory obligation to make public filings.

On April 19, 2016, therefore, Osher by letter demanded that Oxysure redeem its Stock (Exhibit K).[13] The formula set forth in the B COD obligated Oxysure to deliver at least 6,028,519 shares of freely trading Oxysure common stock.[14] The calculation of the number is set forth in that letter.

The B COD, however, ¶6(d) (Exhibit H, ¶6(d)), limits the number of common shares

---

[13] Osher sent similar demand letters to Oxysure to redeem its Stock on November 2, 2015, December 2, 2015 and April 4, 2016 which Oxysure did not honor. As permitted by the SPA ¶5.13, Osher withdrew those demands and sent a new demand letter on April 19, 2016 because Oxysure stock had declined substantially in price from the time of those earlier demands, entitling Osher to substantially more shares. Osher fully expects the price of Oxysure common stock to decline further at the time judgment is entered and, therefore, also requests an award of damages to compensate Osher for the loss it incurred based upon Oxysure's failure to deliver the shares.

[14] "Triggering Redemption Amount" is defined in ¶1 of the B COD (Exhibit G) as follows:
> "Triggering Redemption Amount" means, for each share of Preferred Stock, the sum of (a) the greater of (i) 100% of the Stated Value and (ii) the product of (y) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (z) the Stated Value divided by the then Conversion Price, (b) all accrued but unpaid dividends thereon, and (c) all liquidated damages and other costs, expenses or amounts due in respect of the Preferred Stock.

which Oxysure may issue to either Plaintiff at any one time to 4.99% of Oxysure's then outstanding number of common shares - the Beneficial Ownership Limitation, as defined therein.

Based upon Oxysure's most recent publicly filed share information, Oxysure, as of February 19, 2016, had 40,405,496 shares outstanding (Exhibit L). 2,016,234 is 4.99% of those shares. Because Oxysure is no longer required by statute to file periodic public reports, the number of outstanding shares will no longer be publicly available. Plaintiffs request, therefore, that Oxysure provide them and the Court with the number of currently outstanding shares and provide Plaintiffs with information about its then outstanding shares, in writing, from time to time, upon Plaintiffs' written request, in connection with future redemption or conversion requests.

Because the Beneficial Ownership Limitation prevents Oxysure from delivering all of the common shares to which Osher is entitled upon redemption, the unredeemed Stock remains outstanding (Exhibit H ¶10(b)). After Osher sells the 4.99% of Oxysure's outstanding stock to be delivered immediately, Oxysure will submit further redemption requests, based upon Oxysure's defaults set forth herein and at the then obtaining price of Oxysure stock, until all of Osher's Stock is redeemed. Because the price of Oxysure stock has declined so rapidly, Osher also seeks, and is entitled to, damages in the amount of the diminution in value of the common stock from the time Oxysure was required to deliver it until the time of actual delivery or entry of judgment, whichever sooner occurs. In the case of the shares which Oxysure must deliver immediately, because of permitted withdrawals and renewals of redemption requests, Oxysure is required to

deliver those shares on April 26, 2016 (Exhibit H ¶10(b)). To the extent Oxysure fails to deliver timely the shares required to be delivered upon future redemptions, the same damages rule should apply.

## Conclusion

Alpha Capital and Osher, therefore, respectfully request that the Court grant the requested relief.

Law Offices of Kenneth A. Zitter

By_____
Kenneth A. Zitter, Esq.
Attorneys for Plaintiffs
  Alpha Capital Anstalt and
  Osher Capital Partners, LLC
260 Madison Avenue, 19th Floor
New York, New York 10016
(212) 532-8000
KAZ-3195
