## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **ALPHA CAPITAL ANSTALT,** | § | |
| **OSHER CAPITAL PARTNERS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
|         *v.* | § | **Case No. 15-cv-005443-VM (IMB)** |
| | § | **(Ref Case 1:15-cv-09594)** |
| **OXYSURE SYSTEMS, INC. et al.** | § | |
| | § | |
| *Defendants.* | § | |

---

## OXYSURE SYSTEMS, INC.'S RESPONSE TO SUMMARY JUDGMENT

---

# I.

## <u>INTRODUCTION</u>

Plaintiffs have moved for summary judgment asking this Court to declare that Defendants violated the contracts here at issue, and enforce several of their provisions to award Plaintiffs shares and other compensation. However, Plaintiffs' own testimony, actions, and general course of dealings undermine these efforts, establishing instead that the entire transaction was void or, at minimum, that factual issues remain.

***<u>First</u>***, the Plaintiff entities and the chief agent who negotiated these transactions indisputably did not hold broker-dealer registrations with the SEC, but the activities and contracts at issue here are quintessentially of the kind *requiring* such registration. Among other things, Ari Kluger, the principal of Osher Capital who ran the deals, effected capital markets transactions on behalf of others, negotiated key terms, performed valuation analysis, and built in transaction-based compensation for himself/his companies. These activities are among the behavioral *sine qua non* requiring broker-dealer registration. Such transactions are rendered void under federal law, and thus neither Osher nor Alpha can enforce the contracts that arose from them.

***<u>Second</u>***, the debentures that Plaintiffs cite as violating their agreement did no such thing. They were precisely the type of "Indebtedness" that the Plaintiffs negotiated the right to forbid— but allowed smaller indebtedness of less than $100,000, and then $200,000 to be sought freely. Plaintiffs were fully aware of Oxysure's utilization of such debentures, without which Oxysure would lose access to capital. Moreover, the parties' course of dealings clearly establishes that Plaintiffs were aware of, and ratified, various transactions and instruments they now take aim at in their motion. This type of bait-and-switch is not allowed under the law of contracts in this or any other jurisdiction; at minimum it belies a genuine issue of fact for trial.

_**Third**_, the Series C transactions hardly violated the Series B terms. The Plaintiffs actually negotiated a right of first refusal allowing them to _participate_ in exactly the kind of transactions they now allege breached the contract and triggered its penalty clauses. This renders their argument absurd on its face, if not oppressive.

_**Finally,**_ as detailed in the affidavits and other evidence referenced herein, extenuating circumstances interfered with Defendants' ability to discharge their obligations here, and carry out its business in general. Thus, even if Plaintiffs had established a violation in some technical, abstruse sense of thing—they have not—summary judgment is inappropriate where factual issues exist on the impossibility of a party fulfilling its contract obligations.

Accordingly, this Court should deny Plaintiffs' motion for summary judgment in its entirety.

## II.

## ARGUMENTS AND AUTHORITIES

### A.  The Entire Transaction is Void and Therefore Unenforceable as a Matter of Law

As discussed below, Ari Kluger is a principal of Defendant Oshar Capital who helped negotiated the financing agreements between Alpha Capital Assets and Oxysure, however neither he nor any of his companies is registered as a broker-dealer. Because his participation in these transactions required such registration, they are void or avoidable under federal law, and summary judgment may not issue for the Plaintiffs.

### 1.  Federal Law Voids Any Transaction Involving the Unlicensed Brokerage or Dealing in Securities Such as the Regulation D Offerings Here

The description "broker-dealer" is a term of art within the world of securities law, connoting an individual or entity that—due to regular participation in transactions involving

tradable investments—must be registered and licensed with various regulatory authorities.[1]  A broker is "any person engaged in the business of effecting transactions in securities for the account of others."[2] Similarly, a "Dealer" is someone who "engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise."[3] Some examples of professionals that typically must hold broker-dealer licensures include: underwriters, investment bankers, market makers, and chartered financial analysts.[4]

Federal laws require broker-dealer registration with national regulatory bodies such as the SEC and FINRA; key federal statutes in this area include the Securities Act of 1933,[5] and the Securities Exchange Act of 1934 (the "Exchange Act").[6] Federal law does not completely preempt state regulation of the securities industry, and most states have passed their own laws requiring, *inter alia*, broker-dealer registration with state agencies.[7] State regulations in this field are often referred to as "blue sky" laws.[8]

---

[1] *See*, e.g., *Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976) ("The terms 'broker' and 'dealer' are words of art, with a specific meaning both in the industry and to those members of Congress intimately involved in the drafting of securities legislation.") *aff'd,* 545 F.2d 754 (1st Cir. 1976).

[2] 15 U.S.C. § 78c(a)(4)(A).

[3] 15 U.S.C. § 78c(a)(5)(A).

[4] *See generally*, Kathy H. Rocklen and Benjamin J. Catalano, *Broker-Dealer Registration and FINRA Membership*, Published by the Broker-Dealer & Investment Management Regulation Group-Proskauer Rose, LLP (September 2011) (retrieved at: http://www.proskauer.com/files/uploads/broker-dealer/Broker-Dealer-Registration-FINRA-Membership-App.pdf) (last visited May 19, 2016).

[5] 15 U.S.C. § 77a *et seq*.

[6] 15 U.S.C.A. § 78a *et seq*.

[7] *See, e.g., A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999) ("Although the enactment of [various federal securities laws have] narrowed the role of state blue sky laws by expanding the range of federal preemption, federal and state regulations each continue to play a vital role in eliminating securities fraud and abuse.").

[8] *Id*.

Section 15(a) of the Exchange Act makes it illegal for an unregistered broker-dealer to effect any transaction involving tradable investments.[9]

Section 29(b) provides that "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, … *the performance of which involves the violation of*, *or the continuance of any relationship or practice in violation of*, any provision of this chapter or any rule or regulation thereunder, shall be void."[10]

The SEC may exempt a broker-dealer from registration for dealing in a particular exempt security.[11] However, the SEC has not exempted placement agents or broker dealers regarding Reg D offerings.[12] The SEC's own Guide Book provides the grounds for this argument as well.[13] It explains in plain English that:

> A security sold in a transaction that is exempt from registration under the [1933 Act] is not necessarily an 'exempted security' under the Exchange Act. **For example, a person who sells securities that are exempt from registration under Regulation D of the 1933 Act must nevertheless register as a broker-dealer**. *In other words, 'placement agents' are not exempt from broker-dealer registration*.[14]

---

[9] 15 U.S.C § 78o(a)(1) ("It shall be unlawful for any broker or […any…] person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.").

[10] 15 U.S.C § 78cc(b) (emphasis added).

[11] *See* 15 U.S.C. § 78c(12)(vii).

[12] *See id.; see also* 17 C.F.R. §§ 240-15a-6 et seq. (reflecting all exemptions from registration as a broker dealer; no Regulation D exemption).

[13] *See, Guide to Broker Dealer Registration*, Div. of Trading & Markets, U.S. Securities & Exchange Commission, April 2008, § II (D)(4) ("*Broker-Dealers Must Register Before Selling Unregistered Securities—Including Private Placements (or Regulation D offerings)* (emphasis in original) *available at* https://www.sec.gov/divisions/marketreg/bdguide.htm.

[14] *See* 15 U.S.C. § 78c(12)(vii); 17 C.F.R. §§ 240-15a-6; see also *Guide to Broker Dealer Registration*, Div. of Trading & Markets, U.S. Securities & Exchange Commission, April 2008, § II (D)(4) (bold in original, italics added).

---

The federal courts have exclusive jurisdiction over suits and defenses arising under the Exchange Act.[15] And courts have held that Section 29(b) includes an implicit private cause of action that can be raised as a defense to an unregistered broker-dealer's suit to enforce a service contract, or in an independent suit, and that in either instance a claim for rescission may lie.[16]

To avoid or rescind a contract under the Exchange Act, a party must demonstrate that its counterparty violated the Exchange Act by its involvement in one or more "'prohibited transactions'"—*i.e.*, that because of its activities it *should* have been registered as a broker-dealer but was not so registered.[17] Indeed, a contract is void under the Exchange Act if it was "illegal when made *or as in fact performed*,"[18] and the "[plaintiff] need not prove ... *scienter* to establish a violation."[19]

Courts in this Circuit and others have consistently held that signatories to agreements involving securities are within the class permitted to sue for avoidance and rescission under the Exchange Act.[20] The existence and substance of the contracts between Oxysure and the Plaintiffs

---

[15] 15 U.S.C. § 78aa.

[16] *See Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 557-58 (5th Cir. 1982) ("courts have uniformly ... held or assumed that [private] suits [for rescission] can be brought [under §29(b)]"). *See also Pan Am. Life Ins. Co. v. MacInnis*, No. 99-cv-2491, 1999 WL 1220763 at *1 (E.D. La. Dec. 17, 1999).

[17] *Apex Global Partners*, 2009 WL 2777869 at *3 (quoting *Reg'l Properties*, 678 F.2d at 559) (collecting cases and restating elements of private cause of action under Section 29(b) of the Exchange Act, denying defendant's §12(b)(6) motion to dismiss). *Accord Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1283 (D. Colo. 2013).

[18] *Reg'l Properties*, 678 F.2d at 560 (emphasis added).

[19] *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (citing *SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C. 1980)).

[20] *See Reg'l Properties*, 678 F.2d at 559 (Section 29(b) permits real estate developers to rescind contract with unregistered consulting specialist hired to assist in raising capital by locating investors to purchase shares in plaintiffs' limited partnership); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) ("It follows that the purchases [defendant] made ... were in violation of § 15(a) of the Exchange Act [and that] ... [plaintiff] may void these transactions [under] section 29(b) of that Act."); *Apex Global Partners*, 2009 WL 2777869 at 3-4 (overruling unregistered consultant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6); *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n. 6. (2d cir.1998); *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1443–44 n.5 (9th Cir. 1984); *Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*, 93 F.Supp.2d 220, 233 (D.Conn. 2000) (all allowing rescission claims based on allegations of failing to properly register as a broker-dealer). *Cf. S&D Trading Acad., LLC v. AAFIS Inc.*,

is indisputable,[21] as is the fact that none of Ari Kluger, LH Financial, or Oshar Capital were licensed as broker-dealers in the applicable time period is likewise indisputable.[22] Thus, if they were acting as broker-dealers under the contract as "made *or as in fact performed*," the agreement is, at minimum, voidable, and summary judgment must be denied.[23]

What constitutes acting as a broker-dealer is a fact-specific inquiry, but courts have held that, when in doubt the Exchange Act should be "interpreted broadly" to effectuate its remedial purpose.[24] Furthermore, there is broad agreement that "transaction-based compensation [is] one of the hallmarks of being a broker-dealer."[25] Transaction-based compensation, in turn, is compensation that is in any way—directly or indirectly—tied to the "size, value, or occurrence" of securities transactions.[26]

Beyond those principles, one is a broker-dealer if they have "a certain regularity of participation in securities transactions at key points in the chain of distribution."[27] There is no talismanic test, additional factors courts typically consider include the defendant's: "(1) history of

---

336 F. App'x 443 (5th Cir. 2009) (affirming district court's grant of summary judgment against unregistered securities consulting firm under analogous recisionnary provisions of Texas's blue sky laws).

[21] *See* Doc.# 75-1.

[22] *See* Declaration of Julian Ross, May 20, 2016.

[23] *Reg'l Properties*, 678 F.2d at 560 (emphasis added).

[24] *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04-CV-586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) (citing *Massachusetts Fin. Servs. Inc., v. Securities Investor Prot. Corp.*, 411 F. Supp 411, 415 (D.Mass. 1976), *aff'd* 545 F.2d 754 (1st Cir. 1976)).

[25] *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (internal quotation marks and citation omitted). *Accord SEC v. Martino,* 255 F.Supp.2d 268, 283-84 (S.D.N.Y. 2003); *SEC v. Margolin,* No. 92-Civ-6307, 1992 WL 279735, at *5 (S.D.N. Y. Sep. 30, 1992); *DeHuff v. Digital Ally, Inc*., No. 3:08-cv-327, 2009 WL 4908581, at *3 (S.D. Miss. Dec. 11, 2009) ("transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

[26] See GlobalTec Solutions, LLP, SEC No-Action Letter, 2005 WL 3695276, at *1 (Dec. 28, 2005).

[27] *Massachusetts Fin. Services, Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass. 1976) (emphasis added) *aff'd*, 545 F.2d 754 (1st Cir.1976)).

---

selling the securities of other issuers; (2) involvement in [giving] advice to investors;"[28] "(3)

active[ly] rather than passive[ly] find[ing] investors; (4) involve[ment] in negotiations between the

issuer and the investor; (5) mak[ing] valuations as to the merits of the investment or giv[ing]

advice;"[29] and (6) negotiating financing from the capital markets.[30]

It is axiomatic that in establishing "a certain regularity of participation in securities

transactions" on the part of the defendant, an Exchange Act plaintiff may refer to activities beyond

its own transaction.[31] Because "broker-dealer registration requirement[s] serve[] as [a] keystone

of the entire system of [financial] regulation … designed to protect prospective [counterparties]

[by imposing] standards of professional conduct, financial responsibility requirements,

recordkeeping requirements, and supervisory obligations over [licensees]," a securities consultant

cannot compartmentalize its activities across multiple clients or transactions in a hyper-technical

fashion to justify operating outside of this regulatory framework.[32] Rather, "the Supreme Court

---

[28] *S.E.C. v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (citing *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr.6, 1984) and *National Executive Planners*, 503 F.Supp. at 1073).

[29] *Martino*, 255 F. Supp. 2d at 283 (quoting *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr. 6, 1984) (additional citations omitted)).

[30] *Cornhusker Energy Lexington*, 2006 WL 2620985 at *2 (plaintiff's allegations and evidence, interpreted favorably upon defendant's motion for summary judgment, demonstrated that "advisor and consultant" who offered to "identify and introduce sources of capital to provide financing" was acting as broker-dealer); *Apex Global Partners*, 2009 WL 2777869 at *3 ("recommending or designing financing methods" triggers broker-dealer registration requirements); *Salamon v. Teleplus Enterprises, Inc.*, No. 05-cv-2058, 2008 WL 2277094 at *8 (D.N.J. June 2, 2008) (same).

[31] *Mass. Fin. Services*, 411 F.Supp. at 415 (consultant's "history of selling the securities of other issuers" relevant but not dispositive of establishing violation of broker-dealer registration requirements); *George*, 426 F.3d at 797 (same).

[32] *Roth v. S.E.C.*, 22 F.3d 1108, 1109 (D.C. Cir. 1994). *See also id* ("The interlocking requirements of registration and supervision act to ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells.'" (quoting *Persons Deemed Not to Be Brokers*, Exchange Act Release No. 20943 (May 9, 1984), 49 Fed.Reg. 20512, 20515 (1984) (brackets in original)).

has instructed that [the] requirement[s] [of the Exchange Act] be construed 'flexibly to effectuate its remedial purposes.'"[33]

### 2. Osher Capital Acted as a Broker-Dealer

The Series B shares were Regulation D offerings—thus, anyone placing or negotiating on behalf of a buyer (other than in in-house officer of the buyer, in this case, Alpha Capital) had to be a registered broker-dealer, or affiliated with one.[34] In this case, Defendants' own testimony (along with other evidence) demonstrates "a certain regularity of participation in securities transactions at key points in the chain of distribution," and this triggers the registration requirements of the Exchange Act.

*First*, Ari Kluger, who claims he is a principal of Osher Capital and LH Financial, negotiated on behalf of both Osher and Alpha.[35] Moreover, Kluger had extensive "involve[ment] in the negotiations between [Oxysure] and [Alpha Capital]."[36] Kluger and his firms helped Alpha "make valuations as to the merits of the investment" in Oxysure and performed all the relevant analyses,[37] and "mak[ing] valuations as to the merits of [an] investment or giv[ing] advice" about same is a quintessential broker-dealer activity necessitating registration.[38] Thus, the evidence shows that Kluger regularly participated in securities transactions at the point of origination on

---

[33] *S.E.C. v. Goble*, 682 F.3d 934, 945 (11th Cir. 2012) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).

[34] *See* 15 U.S.C. § 78o(a)(1) ("It shall be unlawful for any broker or dealer which is either a person ….to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless such broker or dealer is registered in accordance with subsection (b) of this section.").

[35] *See* Doc.# 74 (Affidavit of Ari Kluger) ("I am an officer of LH Financial, which is a service company for Alpha Capital Anstalt. LH negotiated the purchase of Oxysure securities at issue in this case on behalf of Alpha Capital. I was involved in these negotiations and in all the events subsequent to the purchase. I am also a Principal of Osher Capital Partners, LLC.").

[36] *See* Declaration of Julian Ross, May 20, 2016.

[37] *Martino*, 255 F. Supp. 2d at 283 (quoting *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr. 6, 1984) (additional citations omitted)).

[38] *SEC v. Hansen*, No. 83-cv-3692., 1984 U.S. Dist. LEXIS 17835 at 26 (S.D.N.Y. Apr. 6, 1984).

behalf of Alpha Capital,[39] which is the *sine qua non* of behavior requiring broker-dealer registration.[40]

**Second**, as the affidavit of Julian Ross sets forth, Kluger and LH Financial hold themselves out as having a "history of selling securities of other issuers" such as Oxysure[41] to their clients, like Alpha Capital,[42] and in representing investors, predominantly Alpha Capital.[43] Moreover, they hold themselves out as negotiating financing from the capital markets for companies like Oxysure.[44] A history of participation in capital market transactions weighs in favor of finding that broker-dealer registration was required.[45]

**Finally**, despite claiming to be a principal of Osher Capital and of LH Financial, after Kluger negotiated the 2013 Series B transaction on behalf of Alpha, he caused Oxysure to register shares (shares that were contracted for and paid for by Alpha) in Osher Capital's name, presumably as a fee for doing the work.[46] Kluger also caused Oxysure to pay Osher a $20,000 fee and issue warrants to Osher Capital.[47] As part of the 2014 transaction, Oxysure again was required to issue

---

[39] *See* Declaration of Julian Ross, May 20, 2016.

[40] *Massachusetts Fin. Services, Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass. 1976) (emphasis added) *aff'd*, 545 F.2d 754 (1st Cir.1976)).

[41] *S.E.C. v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (citing *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr.6, 1984) and *National Executive Planners*, 503 F.Supp. at 1073).

[42] A search of LexisNexis reveals

[43] *Martino*, 255 F. Supp. 2d at 283 (quoting *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr. 6, 1984) (additional citations omitted)).

[44] *Cornhusker Energy Lexington*, 2006 WL 2620985 at *2 (plaintiff's allegations and evidence, interpreted favorably upon defendant's motion for summary judgment, demonstrated that "advisor and consultant" who offered to "identify and introduce sources of capital to provide financing" was acting as broker-dealer); Apex Global Partners, 2009 WL 2777869 at *3 ("recommending or designing financing methods" triggers broker-dealer registration requirements); *Salomon v. Teleplus Enterprises, Inc.*, No. 05-cv-2058, 2008 WL 2277094 at *8 (D.N.J. June 2, 2008) (same).

[45] *S.E.C. v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (citing *SEC v. Hansen*, 1984 WL 2413 at *10 (S.D.N.Y. Apr.6, 1984).

[46] *See* Declaration of Julian Ross, May 20, 2016.

[47] *See* Declaration of Julian Ross, May 20, 2016.

---

a portion of Alpha Capital's shares to Osher, issue Osher warrants, and pay Osher a fee.[48] Regardless of whether a fee is calculated as an overall percentage, transaction-based compensation includes any fees that are tied to the occurrence of the transaction itself.[49] This "involve[ment] in negotiations between the issuer and the investor" and then receiving "transaction-based fees" "are hallmarks of being a broker-dealer."[50]

The immediate impact of these activities is to *void* the entire transaction as to both Osher and Alpha under the Exchange Act because the agreements between Oxysure and Osher, and between Oxysure and Alpha, both "involve[d] the violation of, or the continuance of any relationship or practice in violation of" the Exchange Act.[51]

At a bare minimum, there are genuine questions of fact for the trier of fact to decide before finding that the Transaction Agreements are enforceable at all, much less how they are enforceable. Accordingly, Summary judgment is manifestly improper at this stage.

### 3. Rule 56(f) Entitles Oxysure to Further Discovery to Further Develop this Argument

Rule 56(f) provides that: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may

---

[48] *See* Declaration of Julian Ross, May 20, 2016.

[49] *See GlobalTec Solutions, LLP*, SEC No-Action Letter, 2005 WL 3695276, at *1 (Dec. 28, 2005).

[50] *See S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (internal quotation marks and citation omitted). *Accord DeHuff v. Digital Ally, Inc.*, No. 3:08-cv-327, 2009 WL 4908513, at *3 (S.D. Miss. Dec. 11, 2009) ("transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

[51] *See, generally*, 15 U.S.C. § 78cc(b) ("Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, … the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation[.]").

order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Thus, "Rule 56(f) requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment."[52] The Second Circuit has identified four elements a party must include in a declaration requesting additional discovery under Rule 56(f). The declaration must explain: "(1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."[53]

Here, the attached declaration of Mazin A. Sbaiti explains:

> (1) Additional discovery is needed into the nature of the relationship between Alpha Capital and Ari Kluger, LH Financial, and Osher Capital. Such additional discovery will lay bare for the Court the true relationship which they defensive put forth as being a principal-agent relationship; the fees or nature of remuneration; as well as the ongoing activities that constitute "broker dealer" activities.

> (2) Those facts are reasonably expected to create a genuine issue of material fact as to the validity of the Agreement sued upon and moved upon in summary judgment. Alternatively, they may not create a material issue of fact, but in fact determine as a matter of law that the Agreements are void and unenforceable.

> (3)(4) Oxysure has not had the opportunity to get such discovery and has not even had the opportunity to propound discovery on Osher Capital. Oxysure requested depositions of Mr. Kluger last September, but were denied the opportunity and told by Judge Gorenstein to wait until after document discovery was completed. Then, before document discovery was over, Osher filed a new case which was joined to the Alpha case, and Alpha amended its pleadings. This through the existing discovery scheduling order

---

[52] *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 814-15 (S.D.N.Y. 1985) (citation omitted).

[53] *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004).

in flux and we anticipated needing a new one. No Rule 26(f) conference was held for Osher's case. Still, Oxysure immediately moved to dismiss the new claims in January 2016. While the Court contemplated granting Oxysure's motion to dismiss the new claims on a telephonic hearing on April 8. 2016, Alpha and Osher requested a briefing schedule for summary judgment on their contract claims only. This was still before discovery could begin on Osher or continue on the old claims, including Oxysure's affirmative defenses (which Oxysure was reasonably anticipating beginning once the status of the Complaints was settled). Thus, due to the convoluted progression of these matters, no depositions have occurred on either side, much less any expert discovery, and Oxysure has not even yet had the chance to propound discovery on Osher Capital.[54]

Accordingly, this Court should deny summary judgment, or at the very least abate summary judgment until after discovery is complete.

## B. The Series B Transaction Excepts the Debt Instruments at Issue from the Scope of the Prohibitions Contained Therein

The Stock Purchase Agreement permits Oxysure to issue any indebtedness that is less than $200,000 of notional value. Therefore, because the so-called transactions Plaintiffs challenge are definitionally "Indebtedness," they are subject to a separate contractual regime which only prohibits indebtedness over $200,000. This is no more evidenced than by the fact that between December 2013 and December 2014 (i.e., between the first and second closings of the Series B transactions), Oxysure disclosed that it had taken on several such convertible notes, treating them as "debt" for GAAP purposes, without incident.[55]

This reveals the current motion for it truly is: a last-ditch desperate "Hail Mary" to cobble together some kind of an argument to put Oxysure in a bad light.

### 1. The Series B Transaction Allowed Oxysure to Issue Any "Indebtedness" For Less than $200,000

---

[54] See Sbaiti Decl. at ¶¶ 1, 2 ,and 5.

[55] See Decl. of Julian Ross, May 20, 2016.

The 2014 Series B Securities Purchase Agreement, the "SPA,"[56] expressly defines "Indebtedness" as:

> For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $200,000 other than debt financing from a licensed United States bank regularly engaged in such lending activity which may include the issuance of a nominal amount of warrants or options exercisable at or above the Conversion Price which would then be in effect, and (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business, but in all cases excluding trade accounts payable incurred by the Company and its Subsidiaries in the ordinary course of business; and (z) the present value of any lease payments in excess of $200,000 due under leases required to be capitalized in accordance with GAAP.[57]

The Transactions Plaintiffs contend violated the SPA are in fact not violations at all. They all meet the foregoing definition of "Indebtedness" except to the extent that they are for less than $200,000. Thus, in prohibiting Oxysure from incurring any further "Indebtedness," the SPA *allowed* Oxysure to incur indebtedness of less than $200,000 through this contractual carve-out.[58] This was a purposeful carve-out.

Moreover, Section 3.14 of the SPA gave the Series B Holder the right of first refusal on any "Indebtedness." It would make no sense at all to say that Plaintiffs are allowed to participate in certain types of "Indebtedness," but that Indebtedness of less than $200,000 which would otherwise be permitted under the SPA § 3.1(z), is all of the sudden foreclosed under SPA § 3.14. Therefore, the carve-out—that any debt instrument below $200,000 was not "indebtedness" raises a genuine issue of fact of whether the transactions at issue actually violated the SPA.

---

[56] *See* Doc.# 75-1.

[57] Doc.# 75-1 (SPA at § 3.1(z)).

[58] Doc.# 75-1 (SPA at at § 3.1(z)) and § 4.22).

**2. Every Single one of the So-Called "Variable Rate Transactions" Listed by Plaintiffs is a "Debt" Instrument—Therefore, There is No Violation**

Plaintiffs' own allegations show that the Transactions complained of were the types of transactions that were less than $200,000. Thus, even if they were "Indebtedness" of a type that might be violative (which we do not concede they were), they would otherwise fit within the carve-out because they were issued after the 2014 transaction, and were for less than $200,000.

**3. The Parties' History and Course of Performance Supports Oxysure's Position**

Plaintiffs contend that the Transactions were not "Indebtednss," they are "Variable Rate Transactions." Indeed, there is a plausible argument for each. At best, the language is ambiguous as to whether the Transactions identified by Plaintiffs are "Variable Rate Transactions," and therefore prohibited, or "Indebtedness" of less than $200,000, and therefore permitted.

Where the language of a contract is held ambiguous, it raises a question of fact and the fact finder may properly consider "extrinsic evidence as to the parties' intent."[59] "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder."[60] Analysis of extrinsic evidence may entail review of "negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its

---

[59] *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009); *see also Collins v. Harrison—Bode*, 303 F.3d 429, 433-34 (2d Cir. 2002) ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is [487] admissible to determine the parties' intent." (citation omitted)).

[60] *JA Apparel Corp.*, 568 F.3d at 397; *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent. That intent may be proven by extrinsic evidence.").

terms."[61] The review of the surrounding facts and circumstances may also include consideration of industry custom and practice, and any relevant course of performance or course of dealing.[62]

Here, Plaintiffs entered into a 2013 Transaction for the Series B. Oxysure disclosed to Plaintiffs, through their agent, that Oxysure predominantly funded itself, and needed to fund itself, through small debt instruments, typically smaller convertible notes.[63] Email examples demonstrate these disclosures and the parties' understanding.[64] Furthermore, it bears noting that after the December 2013 transaction, Oxysure disclosed in its 10-K and 10-Qs, that it had taken on more such convertible debt—each time incrementally—and fully disclosed it.[65] One would need to only compare one disclosure to another to know that Oxysure had taken on tens of thousands of additional obligations each quarter.

Still, despite all the diligence and disclosure, Osher and Alpha came back for a second helping in 2014, and purchased a second round of Series B—as they have themselves admitted in their own pleadings.[66] Plaintiffs took the Series B subject to the increasing dependency of Oxysure on obtaining these small "Indebtedness." Not only that, but Oxysure affirmatively renegotiated the limit of the carve-out. In 2013, "Indebtedness" included any "debt" that was more than $100,000.[67]

---

[61] U.S. Fire Ins. Co. v. Gen. Reinsurance Corp., 949 F.2d 569, 571 (2d Cir. 1991) (alteration omitted) (quoting 67 Wall St. Co. v. Franklin Nat'l Bank, 37 N.Y.2d 245, 248-49, 333 N.E.2d 184, 371 N.Y.S.2d 915 (1975)).

[62] See Hoyt v. Andreucci, 433 F.3d 320, 332 (2d Cir. 2006) (in determining the meaning of ambiguous contractual language, the factfinder "may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract").

[63] Decl. of Julian Ross, May 20, 2016.

[64] Decl. of Julian Ross, May 20, 2016.

[65] Decl. of Julian Ross, May 20, 2016.

[66] See Decl. of Julian Ross, May 20, 2016.

[67] See Decl. of Julian Ross, May 20, 2016 (citing Ex. A, 2013 SPA § 3.1(z)).

In 2014, Oxysure negotiated it to be any debt over $200,000, thus signaling its increasing utilization of these instruments and needing to carve out the larger ones so as to avoid default.[68]

Therefore, the evidence raises a genuine issue of fact that Parties have a course of dealing and a course of performance of treating the smaller instruments as the exempt "Indebtedness" and not as "Variable Rate Transactions." Accordingly, summary judgment would be inappropriate.

### 4. Rule 56(f) Entitles Oxysure to Further Discovery to Further Develop this Argument Prior to Being Dismissed on Summary Judgment

Rule 56(f) provides that: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Thus, "Rule 56(f) requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment."[69] The Second Circuit has identified four elements a party must include in a declaration requesting additional discovery under Rule 56(f). The declaration must explain: "(1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."[70]

Here, the attached declaration of Mazin A. Sbaiti explains:

---

[68] *See See* Decl. of Julian Ross, May 20, 2016 (citing Ex. A-1, 2014 SPA § 3.1(z)); *See also* Doc.# 75-1 (2014 SPA § 3.1(z)).

[69] *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 814-15 (S.D.N.Y. 1985) (citation omitted).

[70] *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004).

(1) Additional discovery is needed into the negotiation, notice and awareness and intent behind the contract, behind the negotiation and scope of the terms in the SPA § 3.14 and 3.1. Emails and deposition testimony from Osher Capital and Ari Kluger have not been requested yet that would further highlight the course of dealing and course of performance.

(2) That evidence is reasonably expected to create a genuine issue of material fact as to the proper construction of the contract terms, the duty of good faith and fair dealing, and in light of the the parties' course of performance, and their reasonable and legitimate expectations after the December 18 2014, Series B sale.

(3)(4) Oxysure has not had the opportunity to get such discovery and has not even had the opportunity to propound discovery on Osher Capital. Oxysure requested depositions of Mr. Kluger last September, but were denied the opportunity and told by Judge Gorenstein to wait until after document discovery was completed. Then, before document discovery was over, Osher filed a new case which was joined to the Alpha case, and Alpha amended its pleadings. This through the existing discovery scheduling order in flux and we anticipated needing a new one. No Rule 26(f) conference was held for Osher's case. Still, Oxysure immediately moved to dismiss the new claims in January 2016. While the Court contemplated granting Oxysure's motion to dismiss the new claims on a telephonic hearing on April 8. 2016, Alpha and Osher requested a briefing schedule for summary judgment on their contract claims only. This was still before discovery could begin on Osher or continue on the old claims, including Oxysure's affirmative defenses (which Oxysure was reasonably anticipating beginning once the status of the Complaints was settled). Thus, due to the convoluted progression of these matters, no depositions have occurred on either side, much less any expert discovery, and Oxysure has not even yet had the chance to propound discovery on Osher Capital.[71]

It would be manifestly unfair to Oxysure for the Court to grant summary judgment at so early a stage and before discovery is even half over given the substantial fact issues.

## C. The Series C, D and E Issuances Did Not Violate the Series B Shares' Terms

---

[71] *See* Sbaiti Decl. at ¶¶ 3, 4 and 5.

1.   **Plaintiffs Knew About the Transaction During The Eight Weeks Prior to The Closing and Neither Objected Nor Asked to Participate**

As the Affidavit of Julian Ross, CEO of Oxysure, explains:

- The substantive discussions between Mr. Ross and the Series C, D, and E purchasers began in or around May 10, 2015.

- The purpose of the Series C, D and E transactions were to (i) allow Oxysure to retire some debt and repay certain current obligation as well as provide working capital; and (ii) allow Oxysure to increase its "float" in order to meet the requirements of uplisting to a national stock exchange such as the NYSE or NASDAQ.

- Mr. Ross was in constant communications with Plaintiff's agent, Mr. Ari Kluger from the inception of the Transactions, in May 2015.

- On or about June 12, 2015, Mr. Ross faxed the terms of the Transactions to Mr. Kluger to determine whether he or Plaintiff were interested in participating.

- Around June 16, 2015, in an email exchange verifying the faxes, Mr. Kluger sought "schedules" that did not exist, intimating that he would make a decision and inform Mr. Ross, but had not accepted or given notice of the intent to participate at that time.

- Ten days later, around June 25, 2015, Mr. Kluger received the signed Series C, D and E Securities Purchase Agreements from Mr. Ross. He expressly stated via email that he and his clients would not be participating, but never stated that he was invoking any rights to block the Transactions. [72]

---

[72]   *See* Decl. of Julian Ross, May 20, 2016.

Therefore, Plaintiff had ample advanced notice of the Transactions—nearly two months'
worth of advanced notice. Plaintiff neither exercised its right to participate in the Transactions
under SPA § 4.17, nor exercised its right that it now claims resides in SPA §4.13.[73]

### 2.   Plaintiffs Have No Evidence of Injury, Damages or Causation

What Plaintiffs are primarily concerned about is dilution and the concomitant value of its
stock. But dilution alone cannot be the basis of a claim of irreparable harm.[74] Nonetheless and
whatever the merits of Plaintiffs' factual allegations, it is clear that at most Plaintiffs have stated
is a case for damages.[75] "After a trial on the merits, if this Court concluded that the value of the
shares decreased after the Transactions as a result of defendant's alleged wrongful actions, then
the Court could compare the difference in value, and this difference would measure the plaintiffs'
damages."[76]

But there is no opinion of a single designated expert to either confirm that they suffered
damages *caused by the issuance of the Series C, D or Eshares*, as opposed to other events, negative
news, or the like. Such event studies are the hallmark of securities damages analyses.[77]

Accordingly, Plaintiffs have not proven injury, damages or causation under their theory of
the case.

### 3.   Plaintiffs are Not Entitled to Judgment on The Theory That The Series C, D, or E Issuances Were Somehow Defaults Under the Series C, D, or E Shares

---

[73]  *See* Decl. of Julian Ross, May 20, 2016.

[74]  *See Klein v. Panic*, 1986 Del. Ch. LEXIS 487, *6 (Del. Ch. Nov. 20, 1986) (rejecting plaintiff's contention that "dilutive effect of the additional outstanding stock would, of itself, constitute irreparable injury").

[75]  *See Rovner v. Health-Chem Corp.*, 1996 Del. Ch. LEXIS 83, *37-38 (Del. Ch. July 3, 1996) ("plaintiffs' theory that the Stock Purchase will dilute the cash value of their shares clearly states a claim for money damages.").

[76] Id.

[77]  *See, e.g.,In re Johns-Mansville Corp.*, 68 B.R. 155, 162 and n.9 (Bankr. SDNY 1986) (calculating injury to shareholders diluted shares "as a result of a transfer of currently outstanding stock from current shareholders to other parties in interest, as well as the issuance of additional common and preferred stock of Manville [sic]."); *see alsoIn re Union Carbide Litig.*, 676 F.Supp. 458, (SDNY 1987); *Rickel & Assocs. v. Smith,* 272 B.R. 74, 88 (Bankr. SDNY 2002); *Gruber v. Victor*, 1996 U.S. Dist.12567, *27 (S.D.N.Y., Aug. 28, 1996).

Plaintiff's invocation of a restrictive covenant fails. Moreover, the facts and evidence show that Plaintiff is advocating a misreading of the SPA. Indeed, the only evidence before the Court— the Series B, and C transaction documents—prove that not a single right of Plaintiffs' under the Series B documents was impaired by the Series C Transaction.

Section 4.13 of the SPA is a procedural provision requiring consent of Plaintiff for any "Variable Rate Transaction." The last clause of this provision—which Plaintiff hangs its hat on— provides in full that: "For so long as Preferred Stock or Warrants are outstanding, the Company will not amend the terms of any securities or Common Stock Equivalents or of any agreement outstanding or in effect as of the date of this Agreement pursuant to which same were or may be acquired nor issue any Common Stock or Common Stock Equivalents, if such issuance or the result of such amendment would be at an effective price per share of Common Stock less than the higher of the Conversion Price or Warrant Exercise Price in effect at the time of such lower price issuance or amendment or would be issued or made on terms more favorable to such holder or recipient than the Purchaser, with respect to the terms of the offering pursuant to the Transaction Documents."

Plaintiff only quotes part of this provision to suggest that it provides a categorical bar—at the option of the Plaintiff—to any future equity sales. That is plainly not true as the specific introductory language and the context surrounding the language actual evinces the intent to limit it to situations where the Company might amend the terms of securities or agreement for securities that would displace the Series B as the most favored class of securities from a conversion price standpoint.

To simply ignore the provisional and modifying specific language, and extract from the middle of this clause a categorical bar ignores the rules of construction applicable to this type of

provision that require that every term be given its proper meaning.[78]

Moreover, Section 4.13's "consent" language must be read in conjunction with Section 4.17 which provides the mechanism for obtaining consent. For one thing, Section 4.17 provides that the Company may seek "Subsequent Financing" which can be any combination of stock or indebtedness. It provides that Plaintiff may participate in such financing up to 100% of the proposed financing if (a) Plaintiff receives notice of the proposed financing at least 7 trading days prior to the closing; and (b) the notice includes the terms of the financing. Under this Section 4.17, Plaintiff has five trading days to (i) give notice of its intent to participate, at what amount, and has such funds "ready, willing and available for investment on the terms set forth in the Subsequent Financing Notice."[79] Otherwise, if the Company does not receive such notice from the Plaintiff, it "shall be deemed to have notified the Company that it does not elect to participate."[80] Section 4.17(d) further provides that if the Series B purchasers in the aggregate take less than 100% of the Subsequent Financing, then the Company may "effect the remaining portion of such Subsequent Financing" on the terms and with the persons set forth in the Subsequent Financing Notice."

Perhaps most importantly, nowhere in Section 4.17 does it state that Plaintiff or any other Series B purchaser has the right to outright block the Subsequent Financing if it elects not to participate.[81] The Series C transactions are keyed to uplisting features which are contingent—they are not directly keyed to variable rate transactions as contemplated in the Series B language.[82]

---

[78] *See County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) ("It is axiomatic that courts construing contracts must give 'specific terms and exact terms . . . greater weight than general language.'").

[79] *See* Doc.# 75-1 (SPA at Section 4.17(c)).

[80] *Id.*

[81] *See* Decl. of Julian Ross, May 20, 2016 (citing Exs. A and A-1, SPA § 3.14).

[82] *Compare id.* with Doc.# 75-5 (Series C Certificate of Designation).

Here, Plaintiff received the pre-Notice required under Section 4.17.[83] As the Affidavit of Julian Ross, CEO of Oxysure, explains, Mr. Ross was in constant communications with Plaintiff's agent, Mr. Ari Kluger from the inception of the Transactions, at least as of May 2015.[84] On or about June 10, 2015, Mr. Ross faxed the terms of the Transactions to Mr. Kluger to determine whether he or Plaintiff were interested in participating.[85] Around June 16, 2015, in an email exchange verifying the faxes, Mr. Kluger sought "schedules" that did not exist, but in any event had not accepted or given notice of the intent to participate.[86] Ten days later, around June 25, 2015, Mr. Kluger received the signed Series C, D and E Securities Purchase Agreements, and expressly stated via email that he and his clients would not be participating, but never stated that he was invoking any rights to block the Transactions.[87]

Therefore, Section 4.13 and 4.17 must be read in conjunction with each other. Oxysure substantially, if not completely, complied with the procedural requirements under Section 4.17. Plaintiffs effectively ignored these facts in favor of invoking a phantom restrictive covenant under Section 4.13.

Plaintiff's reading of Section 4.13's language would render Section 4.17 either a nullity or render it anemic because it would impute a right after electing not to participate, to prevent the Subsequent Financing entirely. That is plainly not what Section 4.13 was intended to do, and completely contradicts the procedural mechanisms of Section 4.17. The specific words in both provisions should be read harmoniously, and those preclude the broad, general restrictive covenant

---

[83] *See* Decl. of Julian Ross, May 20, 2016.

[84] *Id*.

[85] *Id*.

[86] *Id*.

[87] *Id*.

that Plaintiff seeks.[88]

This Court should not accept Plaintiff's reading of the SPA as a restrictive covenant because it would violate public policy. Here, the warrants at issue are worthless while their strike price is at $1.20. But Plaintiff's reading is essentially that Plaintiff can dictate to Oxysure how much capital it can raise while its stock is trading below $1.20. It would be nearly impossible for Oxysure to raise money at something above that price. But Oxysure is a Delaware Corporation and so Delaware's corporate governance rules act upon the veracity of Plaintiff's reading. In essence, Plaintiff's reading of Section 4.17 would be tantamount to a wrongful delegation by Oxysure's directors to the Purchasers of their duties of managing Oxysure's financing structure and balance sheet. It is thus void as a matter of corporate law.

The management of a corporations financing and health is a non-delegable duty under Delaware statutory law and precedential decisions.[89] Thus, given a choice of how to construe Sections 4.13 and 4.17, this Court should choose the construction that does not entail the Directors of Oxysure effectively abdicating their roles or impermissibly delegating their duties to managing the capital structure of Oxysure to Purchasers of the Series B shares—e.g., Plaintiff. As explained

---

[88] *See Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2003) (holding that even where there is no "true conflict" between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely towards the matter to which the specific words or clause relate).

[89] *See* 8 Del. C. § 141 (a) (providing that the "business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."); 8 Del. C. §§ 151-53, 157, 161 & 162 (vesting boards with authority to issue stock and to regulate their corporations' capital structures). This has been the rule for the past half-century. *See Abercrombie v. Davies,* 123 A.2d 893, 899 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957) (court "cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters"); *Quickturn Design Systems v. Shapiro,* 721 A.2d at 1292 (invalidating provision within a rights plan eliminating the power of certain future boards to redeem the rights as "invalid under Section 141(a), which confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation"); *Adams v. Clearance Corp*., 35 Del. Ch. 459, 121 A.2d 302 (1956) (holding that the general rule forbidding the directors to delegate managerial duties applies as well to a delegation of a single duty as to the delegation of several or of all duties); *Field v. Carlisle Corporation,* 68 A.2d 817 (Del. 1949) (director's duty to determine sufficiency of consideration of shares issued is a non-delegable duty).

---

in the Restatement (Second) of Contracts, a "promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy.'"[90]

In short, this Court should not read the SPA language in a manner that gratuitously oppresses Oxysure and hands Plaintiff the reigns over the Company. But that is precisely what Plaintiffs ask this Court to do.

**D.  Oxysure's Form 15 Filing Is Not An Event of Default And Raises Questions of Fact**

Plaintiffs finally seek a judgment for a default arising from Oxysure's Filing of a Form 15. This has never been alleged in any complaint or amended complaint, and therefore, should be dismissed out of hand for that reason. Summary judgment cannot be granted on an unplead claim or theory.[91]

However, impossibility or impracticability of performance is a defense to the enforcement of a contract where, as here, unforeseeable events conspired to render performance impossible.[92] These acts were not cause by the acts of Oxysure.[93]

Here, Oxysure's Form 15 filing was occasioned by a combination of Plaintiffs' own scare tactics which impeded Oxysure's ability to "uplist" to a major stock exchange, and by subsequent unforeseeable events that rendered Oxysure's performance impossible or impracticable.[94] Such a

---

[90] *See* Restatement (Second) of Contracts § 193.

[91] *Cement & Concrete Workers Dist. Council Welfare Fund v. Angel Constr. Grp., LLC*, No. 08-CV-1672 (RRM), 2010 U.S. Dist. LEXIS 89440, at *16 (E.D.N.Y. June 15, 2010) ("Accordingly, since plaintiffs **did not plead** this claim in their Complaint, and have not sought leave to add such a **claim** pursuant to Rule 15 of the Federal Rules of Civil Procedure, the Court respectfully recommends that **summary judgment** be **denied** to the extent plaintiff seeks monies owed during the time period January 1, 2009 to April 30, 2009.").

[92] *See J.J. Cassone Bakery, Inc. v. Consolidated Edison Co*., 168 Misc. 2d 272, 279, 638 N.Y.S.2d 898, 904 (N.Y. Sup. Ct. 1996) ("To excuse the promisor's performance by reason of a supervening act, it is generally understood that such act was unforeseeable when the **contract** was created, the events causing the result were fortuitous and beyond the control of either party to the **contract** and the event, when it occurred, was vigorously challenged by diligent efforts of the promisor to avoid the consequences of **impossibility**" (emphasis added).), *rev'd in part on other grounds*, 168 Misc. 2d 272, 280, 638 N.Y.S.2d 898 (2d Dep't 1997).

[93] *See* Decl. of Julian Ross, May 20, 2016; Restatement (2d) of Contracts § 265.

[94] *See* Decl. of Julian Ross, May 20, 2016.

Force Majeur, one that was not anticipated by anyone, is grounds to estop enforcement of the provision in question. Filing the Form 15 was neither an elective nor strategic move by Oxysure.[95] These are the risks one takes as Plaintiffs took them – they cannot say that there has been a breach that entitles them to damages where the basis of the agreement has been vitiated by events outside of Oxysure's control.

Again, at a minimum, whether the grounds for arguing whether Oxysure's ability to maintain its filing status with the SEC is a question of fact and is not dispositive on summary judgment.

## IV.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that Summary Judgment be denied.

Respectfully submitted,

FRIEDMAN & FEIGER, L.L.P.

By: /s/ *Mazin A. Sbaiti*
Mazin A. Sbaiti
Mazin@fflawoffice.com
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

---

[95] *See* Decl. of Julian Ross, May 20, 2016.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of May 2016, a copy of the above was served via electronic filing, First Class mail, and/or facsimile upon the following counsel of record:

Kenneth Zitter
260 Madison Avenue #18
New York, NY 10016
Ph: 212-532-8000
Fax: 212-679-8998

_    /s/ Mazin A. Sbaiti, Esq._____