Collin County )
               )
State of Texas )

## DECLARATION OF JULIAN ROSS

I, Julian Ross, hereby declare under penalty of perjury that the following testimony is true and correct to the best of my personal knowledge or investigation:

"My name is Julian Ross and I am founder and CEO of OxySure Systems, Inc.

OxySure, in mid-year 2013, was approached by Ari Kluger through a friend named Rich Berg about a potential financing of OxySure involving what became a Series B preferred share issuance. Kluger held himself and his entity LH Financial out as representatives of investors generally, and specifically, Alpha Capital Anstalt. I had heard of him and his other outfit, Osher Capital as well, as being involved in the business and that was one reason we agreed to enter into negotiations with them. Kluger was heavily involved in the negotiations, conducting the financial discussions, and engaging in elaborate discussions about the value of Series B shares with respect to conversion ratios. And he along with his lawyer discussed the merits of the investment with us on behalf of Alpha Capital. The discussions culminated in a first investment ("Tranche 1") in December 2013 comprising 750 Series B shares at $1,000 per share. As  part of the Tranche 1 issuance, OxySure also had to issue a total of  886,364 warrants. At some point during the discussions regarding Tranche 1, I was told that 75 of the Tranche 1 Series B shares (value $75,000) Alpha was purchasing would actually be issued to Osher Capital. This occurred as well at closing—OxySure issued Osher75 shares of Series B stock that Osher. Simultaneously, I was told that a $20,000 fee was payable to Osher Capital as part of the transaction, which OxySure paid. In addition, I was informed that 68,182 warrants were to be issued to Osher Capital as part of the transaction. While some or all of these elements appeared to be some kind of compensation to Ari Kluger—at the time I was not as familiar as I am now with the registration requirements under the securities laws. I did look up Mr. Kluger,LH Financial and Osher Capital on the FINRA Broker Check system, and none is listed as being a licensed Broker Dealer.

The Series B shares issued in Tranche 1 would convert to OxySure Common Stock which at the time was trading on the OTCQB for approximately$.70per share. OxySure's quarterly SEC filings in 2013 reflected the fact that OxySure depended fairly consistently on small, short term notes that were convertible into OxySure common stock. Indeed, as the four emails I have attached to this declaration show (true and correct copies are attached hereto as Exhibits B–E) we discussed this fact extensively. Thus, Ari Kluger knew full well that we were not and could not agree to stop issuing these small instruments of indebtedness. Accordingly, when the Trance 1 transaction closed in December 2013 (A true and correct copy of the SPA is attached hereto as Exhibit A), OxySure agreed that it would issue no additional Indebtedness, but specifically negotiated for the definition of Indebtedness to exclude any indebtedness (loans, notes, or any

instrument of indebtedness) of less than $100,000 each. After the Tranche 1 transaction, as reflected in OxySure's SEC filings[1] issued on April 15, 2014 (10-K/A), May 15, 2014 (10-Q), August 14, 2014 (10-Q), and November 14, 2014, (10-Q), OxySure accumulated more of these indebtedness instruments. These quarterly filings reflected the accumulation of convertible notes in small increments. For example, in the April 15, 2014 10-K/A, Page F-18 reflects in detail the convertible notes outstanding. The subsequent 10-Q filings reflect, for example, on the balance sheet, that the Convertible Notes payable, net of discount, exist and in fact were increasing each quarter. These disclosures were likewise made to Plaintiffs and we never hid the fact that this was a significant source of financing for OxySure.

At no time did we ever contemplate that the smaller notes which we had carved out of the prohibition on additional "Indebtedness" were supposed to meet or fall into the "Variable Rate Transaction" side, which we had anticipated was more for equity lines of credit types of transactions, or transactions such as the Series B share issuances themselves, which would be subject to the SPA § 3.16 process for allowing Alpha and Osher to participate in any future offerings, based on a "right of first refusal" regime.

During the year subsequent to the Tranche 1 issuance (2014), Kluger constantly kept abreast of OxySure's progress and received updates. Usually, after each quarterly filing (which was always accompanied by a shareholder conference call) Kluger would request an update to discuss the details of the quarterly filing. As public company investors, it was my impression that Kluger and his associates and analysts studied all OxySure's filings, not just the 10Ks and 10Qs but also the Form 8 filings, as he always had detailed questions about each filing. In November 2014, Kluger approached me again about doing another round of Series B transactions. These negotiations culminated in a new issuance of Series B preferred stock ("Tranche 2"). Prior to closing Tranche 2, Kluger and his analyst, Yosef Milgrom, received a whole new set of disclosures, including the outstanding "Indebtedness" and convertible notes. He never raised an issue about these having been done in violation of the Series B covenants – I continued to be under the impression that these financings were part of the "Indebtedness" carve-out we negotiated. In fact, to allow OxySure more flexibility to do such transactions – in essence, to do fewer, but larger ones—OxySure negotiated for the carve-out ceiling to be increased to $200,000 from the previous ceiling of $100,000. Meaning, under the revised definition of the term "Indebtedness" all instruments of Indebtedness under $200,000 was permissible under the Trance 2 Series B issuance, instead of $100,000.

The Tranche 2 issuance closed in December 2014 (a true and correct copy of the stock purchase agreement is attached as Exhibit A-1) comprised the initial issuance of a total of 525 shares of Series B stock at $1,000 per share, plus a total of 954,546 warrants. At the time of closing, I was

---

[1] All are available at the SEC website at https://www.sec.gov/cgi-bin/browse-edgar?company=OxySure&owner=exclude&action=getcompany, and they are incorporated herein.

again told that $42,000 was to be paid to Osher as a fee, and 76,364 warrants was to be paid to Osher as a fee.  OxySure did that.

On or about May 10, 2015, I began discussions with various entities such Adar Bays LLC and Union Capital LLC to do a round of funding as part of a strategy to raise needed capital and improve OxySure's outstanding equity shares, or "float." The capital was needed in order to meet certain debt and current obligations, as well as for working capital. We had been trying to uplist to a national exchange such as one of the NYSE exchanges or NASDAQ and increasing our float and stockholder equity are key prerequisites to that end. Uplisting was in the best interest of all shareholders and would be catalytic for OxySure in a positive waybecause of increased volume trading and increased liquidity. We eventually decided on the Series C, D, and E transactions, whose relative contingencies, as one can see, are keyed to benchmarks related to uplisting on such a national exchange. Thus, we did not deem these to be the types of "Variable Rate Transactions" envisioned in the Series B SPA § 3.14 provisions.

During this period, I was in constant communications with Plaintiff's agent, Mr. Ari Kluger from the inception of the Transactions, in May 2015. On or about June 12, 2015, I faxed the terms of the Transactions to Mr. Kluger to determine whether he or Plaintiff were interested in participating. Around June 16, 2015, in an email exchange verifying the faxes, Mr. Kluger sought "schedules" that did not exist, intimating that he would make a decision and inform me of same, but had not accepted or given notice of the intent to participate at that time. I have attached true and correct copies of the fax and emails hereto as Exhibits F-I. Ten days later, around June 25, 2015, Mr. Kluger received the signed Series C, D and E Securities Purchase Agreements from me. He expressly stated via email that he and his clients would not be participating, but never stated that he was invoking any rights to block the Transactions. I did not believe he had such rights anyway if he chose not to participate, so I took his silence (upon the expiry of the required notice period) merely to indicate that he did not intend to participate. As of June 30, 2015, Plaintiff neither exercised its right to participate in the Transactions under SPA § 4.17, nor exercised its right that it now claims resides in SPA §4.13.

Respectfully submitted this 20th Day of May, 2016.


/s/ Julian Ross


_____