# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **ALPHA CAPITAL ANSTALT,** | § | |
| **OSHER CAPITAL PARTNERS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Case No. 15-cv-05443-VM-GWG** |
| | § | **(Ref Case 1:15-cv-09594)** |
| **OXYSURE SYSTEMS, INC. et al.** | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| v. | § | |
| | § | |
| **JULIAN ROSS,** | § | |
| | § | |
| *Counter-Plaintiff.* | § | |

---

## REPLY BRIEF OF DEFENDANT JULIAN ROSS IN OPPOSITION TO PLAINTIFF ALPHA'S MOTION TO AMEND COMPLAINT

---

JULIAN ROSS, Defendant,
     Counter-Plaintiff *Pro Se*
5100 Eldorado Parkway
Suite 102-801
McKinney, Texas 75070
T: (972) 752-3403
F: (844) 262-0854
Legalprose2000@gmail.com

I

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................II

TABLE OF AUTHORITIES ....................................................................................... III

I.   Introduction ........................................................................................................... 2

II.   The Motion should be denied by reason of Undue Delay....................................... 4

III.   The Motion should be denied because allowing Alpha to amend its complaint will cause Undue Prejudice to Ross........................................................................................... 8

IV.   The Motion should be denied because the suit against Ross personally is in Bad Faith...... 16

V.   The Motion should be denied because of the futility of amendment.................................... 18

VI.   A NEW SCHEDULING ORDER SHOULD BE DENIED ................................. 23

VII.   CONCLUSION ................................................................................................. 24

CERTIFICATE OF SERVICE ..................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Accord ScripsAmerica, Inc. v. Ironridge Global LLC*, 56 F. Supp. 3d 1121, 1161 .................... 21

*Accord Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006) ......... 20

*Ajax Hardware Mfg. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir. 1977) .................. 20

*Ansam, Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) .......................... 5

*Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011) .............................................. 24

*Barclay v. Deko Lounge*, 10-cv-0190 (E.D.N.Y. Jan. 14, 2014) ................................................. 7

*Bentkowsky v. Scene Magazine*, 637 F.3d 689, 696 (6th Cir. 2011).......................................... 23

*Bild v. Konig*, 09-CV-5576 (ARR) (VVP) (E.D.N.Y. Jul. 3, 2014) ............................................ 7

*Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ............................................ 12

*Cat3, LLC v. Black Lineage, Inc.*, 14 Civ. 5511 (AT) (JCF) (S.D.N.Y. Sep. 21, 2015) .............. 6

*Citicorp Trading v. Western Oil Refining*, 790 F. Supp. 428, 435 (S.D.N.Y. 1992)................... 20

*Coggins v. Cnty. of Nassau*, No. 07-CV-3624 (JFB) (AKT) (E.D.N.Y. May. 26, 2017).......... 6, 7

*Crimmins Contracting Co. v. City of New York*, 74 N.Y.2d 166, 172-173, 542 N.E.2d 1097, 1100 (1989) ............................................................................................................. 11

*Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 95 (S.D.N.Y. 2010) ................................ 6

*Ferran v. Off. Of. Dist. Att'y*, 351 Fed.Appx. 508 (2d Cir. 2009) .................................................. 3

*Foman v. Davis*, 371 U.S. 178 (1962) ........................................................................................... 5

*Graff v. Billet*, 64 N.Y.2d 899, 902, 477 N.E.2d 212, 213-214 (1984) ........................................ 9

*Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, slip op. at 4517 (2d Cir. 1995)..... 18

*Harkabi v. Sandisk Corp.*, 08 Civ. 8203 (WHP) (S.D.N.Y. Mar. 12, 2012) ................................. 6

*Helmsley-Spear v. Westdeutsche Landesbank Girozentrale*, 692 F. Supp. 194, 203 (S.D.N.Y. 1988) ............................................................................................................... 20

*In re Halas*, 104 Ill.2d 83, 92, 470 N.E.2d 960, 964 (1984)....................................................... 11

*Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987) .......................... 20

*Lamothe v. Town of Oyster Bay*, No. 08-CV-2078, 2011 WL 4974804, at *9 (E.D.N.Y. 2011). 18

*Leucadia Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir. 1988), cert. den. 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989) ........................................................................ 20

*Levy v. Carol Management Corporation*, 260 A.D.2d 27, 33 (N.Y. App. Div. 1999)................. 17

*Lynch v. Suffolk Cty. Police Dept*, 348 Fed. Appx. 672, 676 (2d Cir. 2009)............................... 11

*Mace v. Cnty. of Sullivan*, 12-2587-cv (2d Cir. Jul. 16, 2013) ..................................................... 7

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ............................................ 4

*Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001)............................................... 18

*Mineola Garden City Co. v. Bank of Am.*, 49 F.Supp.3d 283 (E.D.N.Y. 2014) .......................... 11

*Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 183 (E.D.N.Y. 2013) ......................................... 18

*Padro v. Astrue*, 10-CV-3387 (NGG). (E.D.N.Y. Apr. 27, 2011)................................................ 12

*Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 15-CV-3526 (AJN) (S.D.N.Y. Oct. 17, 2016) ..................................................................................................... 6

*Puma Indus. Consulting, Inc. v. DAAL Assocs, Inc.*, 808 F.2d 982, 986 (2d Cir. 1987)............. 18

*Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)................................................... 12

*Saunders v. NYC Dept. Of Education*, 07 CV 2725 (SJF) (LB). (E.D.N.Y. Jul. 20, 2010)........... 5

*Sethi v. Randy Narod, Erica Lee, Deborah Morrissey & Cambridge Who's Who Publ'g, Inc.*, 974 F.Supp.2d 162 (E.D.N.Y. 2013) ........................................................................................ 6

*Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008)........................................................................... 11

*Sorenson v. Wolfson*, 10 Civ. 4596 (JGK) (S.D.N.Y. Jul. 8, 2014) .............................................. 7

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014) ................................................................................................................................ 18

*Thaler v. U.S.*, 706 F. Supp.2d 361 (S.D.N.Y. 2009) .................................................................. 5

*Trump-Equitable Fifth Avenue Co. v. H.R.H. Constr. Corp.*, 106 A.D.2d 242, 244, 485 N.Y.S.2d 65, 67 (1985) ...................................................................................................................... 11

*Turturro v. City of New York*, 77 AD3d 732, 734 [2nd Dept 2010] ............................................ 8

*U.S. v. Mulheren*, 938 F.2d 364, 370–71, Fed. Sec. L. Rep. (CCH) P 96082 (2d Cir. 1991) ....... 22

*United States Fire Ins. Co. v. Schnackenberg*, 88 Ill.2d 1, 4, 429 N.E.2d 1203, 1205 (1981) ....... 9

*United States v. Seckinger*, 397 U.S. 203, 210 (1970) ................................................................ 9

*William Stockler Co. v. Heller*, 189 A.D.2d 601, lv denied 81 N.Y.2d 936) .............................. 17

*Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir.1995) ...................................................... 5

*Zucker ex rel. Situated v. Porteck Global Servs., Inc.*, 13-CV-2674(JS)(AKT) (E.D.N.Y. Oct. 23, 2015) ................................................................................................................................... 5


**Statutes**

F.R.C.P. 15(a) ............................................................................................................................. 5

F.R.C.P. 6(2)(c) .......................................................................................................................... 4

F.R.C.P. 6(b)(1)(B) ................................................................................................................. 7, 17

FED. R. CIV. P. 26(f) ................................................................................................................ 14

Restatement (Second) of Contracts § 206 ................................................................................... 9

SEC's Rule 144 .......................................................................................................................... 22

Securities Exchange Act Section 9(a)(1), 15 U.S.C.A. § 87; Markowski at 529 ........................ 22


**Other Authorities**

Ann G. Fort, Mandatory E-Discovery: Compliance Can Create David and Goliath Issues, Reminiscent of the Early Days of Sarbanes-Oxley, DAILY REP., Mar. 19, 2007, at 13 ........ 14

Fischel, Should the Law Prohibit "Manipulation" in the Financial Markets, 105 Harv. L. Rev. 503, 512–518 (1991) .......................................................................................................... 22

John H. Beisner, The Centre Cannot Hold— The Need for Effective Reform of the U.S. Civil Discovery Process ......................................................................................................... 14, 15

Litigation Cost Survey of Major Companies ............................................................................. 15

Peter Lyman & Hal R. Varian, How Much Information?, 2003 .................................................. 15

Socha-Gelbmann Electronic Discovery Survey .......................................................................... 15

Stephanie Raposo, Quick! Tell Us What KUTGW Means, WALL ST. J., Aug. 5, 2009, at D1 . 14

The Legal and Economic Implications of Electronic Discovery: Options for Future Research .. 15

Thel, Regulation of Manipulation Under Section 10(B): Securities Prices and the Text of the Securities Exchange Act of 1934, 1988 Colum. Bus. L. Rev. 359, 382 (1988). ..................... 21

## I.  INTRODUCTION

Defendant and Counter-Plaintiff Julian Ross ("Ross") respectfully submits this First Amended reply brief in Opposition to Plaintiff Alpha Capital Anstalt's ("Alpha") motion ("Motion") to amend its complaint (the "Amendment"). The Motion bears all the hallmarks of case law in various courts where similar motions have been denied. For reasons set forth herein, Alpha's Motion to amend its complaint should be denied.

This lawsuit started as a breach of contract case between Alpha on the one hand, and Oxysure Systems, Inc. ("Oxysure") on the other hand, with Alpha seeking a restraining order and injunction against Oxysure (Doc. ## 1, 40). Oxysure was a publicly traded Delaware corporation that until recently was fully reporting with the Securities and Exchange Commission ("SEC") and governed by a Board of Directors.[1]  The contracts giving rise to the dispute are between Oxysure on the one hand and Alpha and Osher Capital Partners, LLC ("Osher") on the other hand. These contracts involved two tranches of financing, of which the first tranche was closed on December 26, 2013 ("Tranche 1") and the second tranche was closed on December 29, 2014 ("Tranche 2").[2] Julian Ross was Oxysure's former CEO, and at all times acted for and on behalf of Oxysure.[3]

The Motion by Alpha comes *more than two and one-half years* after it filed its initial complaint. This is an astonishing delay, given that Alpha initiated this lawsuit on July 14, 2015 by petitioning for a Temporary Restraining Order and then advocating for a quick-trigger discovery schedule. It appeared that Alpha wanted to push the case forward as quickly as possible. With Alpha's apparent initial urgency to move the case forward, it has provided no

---

[1] See Declaration of Julian Ross in Support of Defendant's Opposition to Plaintiff Alpha's Motion to Amend Complaint ("Ross Decl.") provided herewith, § 37.
[2] *Id*. § 4.
[3] *Id*. §§ 1 – 3.

plausible explanation for the delay in seeking the amendment in its Motion. As an initial matter, Alpha's proposed Amendment not only adds Ross, a *non-party individual* [4] to its claims, it expands its initial breach of contract claim (Doc. ## 1, 40) to add claims of fraud in the inducement and market manipulation (Doc. # 117.3).

Alpha's Motion comes after it appears to have exhausted so many of its legal options, and is simply improper and in bad faith. At this late stage, almost two and one-half years after this lawsuit was initiated: (i) Alpha has already moved for a temporary restraining order and injunction against Oxysure, which was denied (Doc. ## 1, 3); (ii) Rule 26 disclosures were filed long ago by the parties in September 2015; (iii) a scheduling order was already entered by the Court, in terms of which discovery closed more than eighteen (18) months ago; (iv) Alpha has already once amended its initial complaint more than two years ago; and (v) Alpha has already moved for summary judgment, which was denied (Doc. ## 73, 84). Alpha has not plausibly explained the undue delay. Further, Alpha's Motion is brought in bad faith, will cause undue prejudice to Ross and is ultimately futile, and should be denied (please see *Ferran v. Off. Of. Dist. Att'y*, 351 Fed. Appx. 508 (2d Cir. 2009) (noting that district courts may "deny leave [to amend a complaint] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party")).

---

[4] *Id.* § 2, §§ 4 – 10.

## II.   THE MOTION SHOULD BE DENIED BY REASON OF UNDUE DELAY

Alpha initially sued Oxysure, the party that entered into the two Series B Preferred transactions[5] with Plaintiffs, along with five other third party defendants.[6] It should be instructive to the Court that Alpha did not sue Ross in his individual capacity *from the out outset* (please see Doc. ## 1, 2). Then, three months later Alpha amended its complaint on October 15, 2015 (Doc. # 40), notably after its motion for injunction and temporary restraining order was denied by the Court (Doc. # 3).  In this first amendment (Doc. # 40) Alpha again does not seek to add Ross as a defendant (as it proposes to do with this Amendment). Instead, its first amendment only drops Alpha's tortious interference claims (Doc. ## 1, 40). Alpha does not mention Ross as a party nor is Ross included as a defendant in his personal capacity. This is consistent with Ross's repeated claims that he never as a party to the Tranche 1 and Tranche 2 transactions.[7] A scheduling order ("Scheduling Order") was signed by this Court on August 24, 2015 (Doc. # 25). In the Scheduling Order the Court specified that the "*deadline for all discovery to be completed in this case was April 25, 2016.*" (See Docket ## 25, 46, 115). Alpha then filed a motion for summary judgment on April 26, 2016 (Doc. # 73), which was denied on November 2, 2016 (Doc. # 84). Alpha had plenty of opportunity to file this Motion during all this time, in accordance with the Scheduling Order and in accordance the local rules and the Court's individual rules. Alpha has not plausibly explained the undue delay, and no supporting affidavits were provided with the Motion in accordance with F.R.C.P. 6(2)(c). For these reasons alone Alpha's Motion should be denied (See *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) (holding that

---

[5] See Ross Decl. §§ 4 - 10
[6] Alpha did not sue Ross initially. Instead, along with Oxysure Systems, Inc. Alpha sued Adar Bays, LLC (dismissed on 08/19/2015), Union Capital, LLC (dismissed on 08/19/2015), JSJ Investments, LLC (dismissed on 08/28/2015), Group 10 Holdings, LLC (dismissed on 08/19/2015) and Macallan Partners, LLC (dismissed on 08/19/2015). Please see Doc. # 1 (Adar Bays, Union Capital, JSJ Investments, Group 10 and Macallan Partners, collectively, the "Investor Defendants")
[7] See Ross Decl. § 2, §§ 4 – 10.

4

"the district court did not abuse its discretion in denying the motion in part and thereby disallowing the claim pertaining to the mortality table.). Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires," it is within the sound discretion of the district court to grant or deny leave to amend. *Id.* (citing *Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir.1995) (upholding the denial of a motion to amend a complaint that was filed two and one-half years after the commencement of the action and three months prior to trial); see also *Ansam, Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) [Ansam] (upholding the denial of a motion to amend a complaint when discovery already had been completed and the non-movant had already filed a motion for summary judgment)). A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (See also *Foman v. Davis*, 371 U.S. 178 (1962)).

While Alpha's Motion fails to meet the burden regarding undue or inordinate delay[8] in general, it also fails to meet the burden on several specific levels.

***First***, Alpha seeks its Amendment, which adds *additional claims* almost eighteen (18) months after its motion for summary judgment was filed on April 26, 2016 (Doc. # 73) and almost a year after its was motion for summary judgment was denied on November 2, 2016 (Doc. # 84). Alpha should be precluded from filing this Amendment in which *new claims* are being added after inordinate delay, and/or after a party has filed a motion for summary judgment.

---

[8] See *Zucker ex rel. Situated v. Porteck Global Servs., Inc.*, 13-CV-2674(JS)(AKT) (E.D.N.Y. Oct. 23, 2015) (affirming the district court's denial of leave to amend where plaintiff moved to amend "after an inordinate delay) (*Barclay v. Deko Lounge*, 10-cv-0190 (E.D.N.Y. Jan. 14, 2014) (affirming district court's denial of leave to amend where "Plaintiffs sought to amend their complaint after an inordinate delay; *Thaler v. U.S.*, 706 F. Supp. 2d 361 (S.D.N.Y. 2009) (affirming district court's denial of leave to amend where plaintiffs "sought to amend their complaint after an inordinate delay,…"); *Saunders v. NYC Dept. Of Education*, 07 CV 2725 (SJF) (LB). (E.D.N.Y. Jul. 20, 2010) (affirming denial of leave to amend based upon the inordinate delay in seeking such relief, i.e., nearly two years had elapsed between the time the original complaint had been filed and the motion seeking leave to amend…); and Ansam, *supra* (upholding the denial of a motion to amend a complaint when discovery already had been completed and the non-movant had already filed a motion for summary judgment…)

(see for example, *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 95 (S.D.N.Y. 2010) (upholding denial of leave to amend where *new claim was raised* after defendants had moved for summary judgment based on the previous complaint) [emphasis added] (*Coggins v. Cnty. of Nassau*, No. 07-CV-3624 (JFB) (AKT) (E.D.N.Y. May. 26, 2017) [Coggins] (affirming denial of leave to amend where the motion was filed after "discovery had closed, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint) (*Sethi v. Randy Narod, Erica Lee, Deborah Morrissey & Cambridge Who's Who Publ'g, Inc.*, 974 F.Supp.2d 162 (E.D.N.Y. 2013) (holding that district court did not exceed discretion to deny leave to amend complaint two years after filing of complaint and after filing of summary judgment motion)). Further, Alpha should be precluded from amending its complaint so long after it became aware of the need to consider a possible [additional] claim.[9] (see *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 15-CV-3526 (AJN) (S.D.N.Y. Oct. 17, 2016) (upholding denial of leave to amend where "Plaintiffs became aware of the need to consider a possible [additional] claim . . . more than seven months before moving to amend their complaint) (*Cat3, LLC v. Black Lineage, Inc.*, 14 Civ. 5511 (AT) (JCF) (S.D.N.Y. Sep. 21, 2015) (upholding denial of leave to amend where party had knowledge of relevant facts seven months before seeking amendment) (*Harkabi v. Sandisk Corp.*, 08 Civ. 8203 (WHP) (S.D.N.Y. Mar. 12, 2012) (affirming denial of motion to amend where plaintiff's expert was in possession of relevant information seven months before leave to amend was sought)).

---

[9] Alpha filed a Statement of Relatedness on December 8, 2015 (See 15-cv-09594-VM, Doc. #6) seeking to consolidate its first amended complaint with Osher's complaint (See 15-cv-09594-VM, Doc. #1). Therefore, Alpha was intimately aware of the Osher claims, and knew or should have known about the need to consider a possible [additional] claim(s). It should also be noted that both Alpha and Osher are represented by the same attorney, Kenneth Zitter. This Motion was filed on August 3, 2017, more than one and one-half years after the filing date of the Statement of Relatedness.

**Second**, Alpha should be precluded from amending its complaint so long after the discovery deadline has passed. Discovery in this case was closed on April 25, 2016, almost one and one-half years ago (see *Bild v. Konig*, 09-CV-5576 (ARR) (VVP) (E.D.N.Y. Jul. 3, 2014) (upholding denial of leave to amend complaint where *discovery had closed*, defendant had filed for summary judgment, and nearly two years had passed since start of litigation) [emphasis added] (*Mace v. Cnty. of Sullivan*, 12-2587-cv (2d Cir. Jul. 16, 2013) (affirming district court's denial of plaintiffs' motion for leave to amend complaint two months after *discovery had closed* and nearly two years after the filing of the original complaint) [emphasis added] (Coggins, *supra* (affirming denial of leave to amend where the motion was filed *after discovery had closed*, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint) [emphasis added] (*Sorenson v. Wolfson*, 10 Civ. 4596 (JGK) (S.D.N.Y. Jul. 8, 2014) (finding undue delay where plaintiff sought to amend seven months after discovering new facts *because discovery was closed*, non-movant had filed for summary judgment, and more than two years had passed since filing of initial complaint) [emphasis added] (*Barclay v. Deko Lounge*, 10-cv-0190 (E.D.N.Y. Jan. 14, 2014) (affirming district court's denial of leave to amend where "Plaintiffs sought to amend their complaint after an inordinate delay. By that time, *discovery had closed*, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint [emphasis added])).

**Third**, Alpha has provided no credible support for the delay in seeking its  Motion, and its neglect is not excusable (see F.R.C.P. 6(b)(1)(B)). Alpha attempts to explain away the undue delay by infering that it opted to exhaust procedural options against Oxysure first (motion for summary judgment, etc), ostensibly in the name of judicial economy. This argument is unremarkable, if not downright disingenuous. The more probable reason is that Alpha seeks to

punish and harass Ross for its dispute with Oxysure. In addition, Oxysure filed for bankruptcy on December 5, 2016, thereby effectively foreclosing Oxysure as a viable candidate any additional recovery. Alpha had decided to focus on Ross as an alternative, a sort of legal "hail Mary" if Alpha deemed it necessary. Alpha as much admits so in its memorandum supporting its Motion (Doc. # 117.5), in the sense that Alpha effectively treats Ross as a "backstop" litigant. This in and as of itself creates a slippery slope for Alpha, in that: (i) it conflates the parties and ignores the fact that Oxysure was never a sole proprietorship (quite to the contrary, it was a publicly traded company with a Board of Directors and thousands of stockholders[10]), that Oxysure (and not Ross personally) was the beneficiary of the Tranche 1 and Tranche 2 financing proceeds, and that Ross was never a party (and could not possibly be) to the Tranche 1 or Tranche 2 transactions[11]; and (ii) it demonstrates, by Alpha's own admission that the Motion and the proposed suit against Ross is improper and in bad faith.[12]

### III.   THE MOTION SHOULD BE DENIED BECAUSE ALLOWING ALPHA TO AMEND ITS COMPLAINT WILL CAUSE UNDUE PREJUDICE TO ROSS

Leave to amend should be denied where the proposed amendment is palpably insufficient or patently devoid of merit (see CPLR 3025[b]; *Turturro v. City of New York*, 77 AD3d 732, 734 [2nd Dept 2010]). Alpha's attempt to sue Ross in his personal capacity (as is Osher's) through the proposed Amendment will cause undue prejudice to Ross, yet it is by all accounts, palpably insufficient and patently devoid of merit, for the following reasons.[13]

---

[10] Ross Decl. § 37.
[11] Ross Decl. §§ 2 – 10.
[12] Ross has previously maintained that the suit by Osher against him in his personal capacity is in bad faith (see Ross's affirmative defenses and counter-claim, Doc. # 126).
[13] These arguments are equally applicable to the futility of the Amendment, argued incrementally in Section V herein.

*First*, the Ross continues to maintain that he did not intend to submit to New York jurisdiction in his personal capacity (see Ross Decl. § 3; Doc. # 61). All the documents in the Tranche 1 Document Set and the Tranche 2 Document Set (see Ross Decl.) were drafted by Plaintiffs' counsel (see Ross Decl. § 5, § 8; Exhibits 1A, 1B to Ross Decl.). Plaintiffs cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it. See, e. g., *United States Fire Ins. Co. v. Schnackenberg*, 88 Ill.2d 1, 4, 429 N.E.2d 1203, 1205 (1981); *Graff v. Billet*, 64 N.Y.2d 899, 902, 477 N.E.2d 212, 213-214 (1984); Restatement (Second) of Contracts § 206; *United States v. Seckinger*, 397 U.S. 203, 210 (1970). The drafters of the Second Restatement justified the rule as follows: "Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party." Restatement (Second) of Contracts § 206, Comment (a) (1979). Plaintiffs drafted an ambiguous document, and they cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result. That rationale is well-suited to the facts of this case. As a practical matter, it seems unlikely that Ross had any idea that by signing a form agreement provided by Plaintiffs that he might be incurring a substantive liability in his personal capacity. In the face of such doubt, courts have been unwilling to impute this intent to the parties who did not choose the language.

**Second**, Ross was never a party to the Tranche 1 or Tranche 2 transactions (or any transactions) with Alpha (or Osher). Plaintiffs have inferred that Ross: (a) agreed to New York jurisdiction in his personal capacity; and / or (b) became a party[14] when he signed that certain escrow agreement dated December 29, 2014 (Doc. # 97). That escrow agreement (the so-called Escrow Agreement 2 – see Ross Decl. § 9) is also provided as Exhibit D5 to the Ross Decl. and forms part of the Tranche 2 Document Set (see Ross Decl. §§ 8 – 10). Alpha and Osher's failure to produce the complete set of documents supporting the Tranche 2 transaction is deceptive on its face. The Tranche 2 Document Set (represented by Exhibits D, D1 – D9 to Ross Decl.) constitutes the complete record of the Tranche 2 transaction (not just the Escrow Agreement 2), and categorically reveals that Ross was never a party to the Tranche 2 transaction. Similarly, the Tranche 1 Document Set (represented by Exhibits B, B1 – B10) to Ross Decl.) constitutes the complete record of the Tranche 1 transaction, and categorically reveals that Ross was never a party to the Tranche 1 transaction. At all times, Ross executed all the documents as CEO of Oxysure, and the transactions were ultimately approved by Oxysure's Board of Directors (see Ross Decl.  §§ 4 – 10; Exhibits A, B, B1 – B10, C, D, D1 – D9[15]). It should be instructive to the Court that Alpha and Osher produced only the Escrow Agreement 2 as "evidence" that Ross either: (a) consented to New York jurisdiction in his personal capacity; or (b) became a party to the Tranche 2 transaction in his personal capacity (see Doc. # 97). Neither is true. While Ross's signature appears below the party on behalf of whom he was signing (on Escrow Agreement 2), his name and title does not appear below the signature line. However, this was merely an

---

[14] To the extent Plaintiffs argue that Ross committed a fraud or tort by omission or misrepresentation, such claims are barred by the integration/merger clause in Section 5.3 in each of the SPA 1 and SPA 2 which provides as follows: "Entire Agreement. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof **and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules**." (emphasis added).

[15] See Exhibits B7 and D6 where the Board of Directors of Oxysure approved the Tranche 1 and Tranche 2 transactions, respectively.

10

oversight. Escrow Agreement 1 (Exhibit B6 to Ross Decl.) and Escrow Agreement 2 are the same form, and have the same blank space where name and title are supposed to be inserted. However, while Ross remembered to insert his name and title in Escrow Agreement 1, he overlooked to do so in Escrow Agreement 2. This was simply an oversight or a mistake. He never signed in his personal capacity or agreed to New York jurisdiction in his personal capacity. However, taken as a whole, reviewing all the documents together, it becomes abundantly clear that Ross was never a party to the agreements in his personal capacity and these transactions were between Oxysure and Plaintiffs.[16] The evidence shows that Alpha's Motion, to the extent it attempts to add Ross in his personal capacity is utterly bereft of any merit and should be denied.[17]

    ***Third***, Ross has numerous meritorious defenses to Alpha's proposed amended claims that Alpha cannot escape. These include failure to state a valid cause of action; failure to state any claims upon which relief can be granted; lack of capacity for personal liability; waiver; estoppel

---

[16] The integration/merger clause in Section 5.3 in each of the SPA 1 and SPA 2 provides as follows: "Entire Agreement. **The Transaction Documents, together with the exhibits and schedules thereto**, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules." (emphasis added). Therefore ALL of the documents and schedules taken together form part of the agreement (for example, Exhibits B, B1 – B10 all together comprise the "Entire Agreement" for Tranche 1; and Exhibits D, D1 – D9 all together comprise the "Entire Agreement" for Tranche 2). Therefore, the Escrow Agreement 2 standing alone does not constitute "Entire Agreement" (in the case of the Tranche 2). Therefore, Alpha and Osher's presentation of the Escrow Agreement 2 as "evidence" that Ross either consented to New York jurisdiction or was a party in his personal capacity is false and deceptive (See Doc. # 97; Ross Decl.), and Alpha and Osher are attempting to violate another cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other. See, e.g., *In re Halas*, 104 Ill.2d 83, 92, 470 N.E.2d 960, 964 (1984); *Crimmins Contracting Co. v. City of New York*, 74 N.Y.2d 166, 172-173, 542 N.E.2d 1097, 1100 (1989); *Trump-Equitable Fifth Avenue Co. v. H.R.H. Constr. Corp.*, 106 A.D.2d 242, 244, 485 N.Y.S.2d 65, 67 (1985); Restatement (Second) of Contracts § 203(a) and Comment b; *id.*, § 202(5). See also *Mineola Garden City Co. v. Bank of Am.*, 49 F.Supp.3d 283 (E.D.N.Y. 2014) (Holding that a contract should be read to give effect to all its provisions). Ross simply was never a party, and the Motion is bereft of merit.

[17] "A district court has abused its discretion if it [has] based its ruling on an erroneous view of the law or on a clearly *erroneous assessment of the evidence*, or rendered a decision that cannot be located within the range of permissible decisions." [emphasis added] (*Lynch v. Suffolk Cty. Police Dept*, 348 Fed. Appx. 672, 676 (2d Cir. 2009) (citing *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (citation, alterations, and quotation marks omitted)).

or acquiescence; these proposed amended claims being barred by the doctrine of unclean hands and other equitable defenses; these proposed amended claims are barred by the doctrines of consent; offset; ratification; rescission; and failure to mitigate.

In addition to being devoid of merit, Alpha's Motion should be denied because it will incur enormous additional costs, resources and time, exacerbating the undue prejudice to Ross (see for example, *Padro v. Astrue*, 10-CV-3387 (NGG). (E.D.N.Y. Apr. 27, 2011) (affirming [the] district court's denial of plaintiff's motion to amend where amendment "would have prejudiced defendants because the amendment was sought at a late stage of the litigation, after the close of discovery and after defendants had moved for summary judgment.). "In gauging prejudice," a court considers, "among other factors, whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)) (internal quotation marks omitted).

**First**, allowing Alpha to amend its complaint will add a second plaintiff against Ross and a second layer of significant additional discovery needed by Ross. It is inapposite for Alpha to suggest that Ross will not need to take additional discovery because the discovery in Osher case will be "identical." Alpha is a Liechtenstein entity with its principal place of business in Vaduz, Liechtenstein (Doc. #2 at 2; Doc. # 40, § 1), whereas Osher is a New York entity with its principal place of business in Rockland County, New York (Doc. No. 117.4, § 1). If the Court allows Alpha to amend its complaint, Ross will have to, for example conduct discovery of Alpha, its legal structure and relationships (including its relationships with Osher and Osher's principal, Ari Kluger); as well as of its executives, Board, employees, agents, representatives, associates,

business dealings, financings, processes, protocols, strategies (including investment strategies and criteria), documents, media (including electronic media), and communications (including internal and external communications), as well as take depositions in Liechtenstein, a foreign jurisdiction with foreign laws with which Defendant Ross has zero familiarity, nor in which he has any contacts, attorneys, agents or representatives  (See Ross Decl. § 41). A second layer of discovery, especially discovery in a foreign jurisdiction will be extremely expensive and time consuming.

   ***Second***, allowing Alpha to amend its complaint will expand the set of claims, expanding the *scope* of discovery relating to Alpha. The expanded set of claims[18] will require expanded discovery, and the expanded litigation will raise issues outside the facts of the original Alpha case or claims.

   ***Third***, the combination of the expanded scale and scope discovery requirements will add significant expenses, resources and time needed by Ross and exacerbate the undue prejudice to Ross. The facts outlined above will cause Alpha's proposed amendment to be undeniably unduly burdensome to Ross. The expanded discovery costs are real, and any inability by Ross to execute discovery fully and comprehensively may be fatal to his ability to obtain justice.  Contrary to Alpha's assertions the discovery is *not* 100% duplicative of existing discovery (in the Osher complaint).  The expanded discovery translates to real cost, and very real increases in resources and time needed. It will also add significant delays to the resolution of this case, which has been proceeding for more than two and one-half years already.

   [Further] escalating (or exacerbating) the costs of electronic discovery are the qualitative differences between electronic and paper documents. As the drafters of the Federal Rules

---

[18] Alpha's initial claim was for breach of contract, whereas its proposed amendment expands the set of claims to include fraud in the inducement, market manipulation, and breach of contract.

observed, most people adopt a more informal style when drafting emails, text messages, and instant messages, a practice that tends to make privilege review "more difficult, and . . . correspondingly more expensive."[19] The casual milieu of email and other electronic communications also gives rise to linguistic ambiguities that further complicate the reviewer's task. Employees frequently devise their own abbreviations and shorthand terminology for such correspondence,[20] a convention that leaves reviewing attorneys unable to comprehend documents without guidance from the authors.[21]

The additional costs associated with production of electronic records can be considerable. One expert estimates the cost of producing a single electronic document to be as high as $4.[22] Verizon, which has devoted considerable attention to electronic discovery issues, has estimated that producing one gigabyte of data—the equivalent of between 15,477 and 677,963 printed pages[23]—costs between $5,000 and $7,000.[24] But far more than a single gigabyte of data will often be at issue. Commentators opine that even a typical midsize case now involves at least 500 gigabytes of data, resulting in costs of $2.5 to $3.5 million for electronic discovery alone.[25] Another study found that from 2006 to 2008, the average surveyed company spent between

---

[19] FED. R. CIV. P. 26(f) advisory committee's note to 2006 amendment.

[20] See Stephanie Raposo, Quick! Tell Us What KUTGW Means, WALL STREET JOURNAL., Aug. 6, 2009, at D1 ("In many offices, a working knowledge of text-speak is becoming de rigueur.") (KUTGW stands for "keep up the good work").

[21] John H. Beisner, The Centre Cannot Hold— The Need for Effective Reform of the U.S. Civil Discovery Process [Beisner], at 14, 15 (citing George L. Paul and Jason R. Baron, Information Inflation: Can the Legal System Adapt?, 13 RICH. J.L. AND TECH. 10, ¶ 1 (2007), ¶ 38) ("Thus, it is not surprising that lawyers and those to whom they delegate search tasks may not be particularly good at ferreting out responsive information through the use of simple keyword search terms."). These abbreviations also complicate the process of locating relevant documents in the first instance, as keyword searches may not incorporate these key terms.
http://www.uscourts.gov/sites/default/files/john_beisner_the_centre_cannot_hold_0.pdf

[22] Ann G. Fort, Mandatory E-Discovery: Compliance Can Create David and Goliath Issues, Reminiscent of the Early Days of Sarbanes-Oxley, DAILY REP., Mar. 19, 2007, at 13.

[23] Beisner, *supra* at 15

[24] *Id.*

[25] *Id.*

$621,880 and $2,993,567 per case on electronic discovery.[26] At the high end, companies in the study reported average per-case discovery costs ranging from $2,354,868 to $9,759,900.[27] The costs of electronic discovery are continuing to rise. One report indicates that the volume of information, including electronically stored information, is growing at a rate of 30 percent annually.[28] The growing cache of electronic information drives up costs, as companies are forced to cull through ever-larger stockpiles of data to identify responsive documents. According to the influential Socha-Gelbmann Electronic Discovery Survey, expenditures for the collection and processing of electronic documents in the United States will reach $4.7 billion in 2010, an increase of 15 percent over the prior year.[29] Notably, this figure does not include the cost of reviewing these documents for responsiveness or privilege, a process that can comprise between 75 and 90 percent of the cost of producing electronic records.[30] For these reasons alone, Alpha should not be allowed to amend its complaint at this late stage of this litigation, after two and one-half years of litigation has already taken place and enormous expense and resources have already been spent.

---

[26] *Id.*

[27] *Id.* (citing Litigation Cost Survey of Major Companies, Survey designed by Lawyers for Civil Justice, Civil Justice Reform Group, and U.S. Chamber Institute for Legal Reform and administered by Searle Center on Law, Regulation, and Economic Growth, Appendix 1, at 3)

[28] *Id.* (citing Peter Lyman & Hal R. Varian, How Much Information?, 2003 (Executive Summary), at 2, available at http://www2.sims.berkeley.edu/research/projects/how-much-info-2003/printable_execsum.pdf.,(estimating that "new stored information grew about 30% a year between 1999 and 2002")).

[29] *Id.*

[30] *Id.* (citing James N. Dertouzos et al., RAND INSTITUTE FOR CIVIL JUSTICE, The Legal and Economic Implications of Electronic Discovery: Options for Future Research 3 (2008), available at http://www.rand.org/pubs/occasional_papers/2008/RAND_OP183.pdf.

## IV.  THE MOTION SHOULD BE DENIED BECAUSE THE SUIT AGAINST ROSS PERSONALLY IS IN BAD FAITH

Ross (along with Defendant Oxysure) filed a motion to dismiss on February 4, 2016 (Doc. # 60) raising, *inter alia* the issue of personal jurisdiction over Ross, and the issue of Ross's lack of liability for Oxysure's alleged breaches of contract or fraud. In response (after some other intervening procedural activities), on April 20, 2017 Plaintiffs' counsel wrote a letter to the Court stating "Attached is the Escrow Agreement which Your Honor requested to be faxed" (Doc. # 97). While it is unclear when the Court requested this document from Plaintiffs' counsel, is clear is that the Court was interested in evidence that shows Ross: (i) consented to New York's jurisdiction in his personal capacity; and / or (ii) was a party to the agreement(s) between Oxysure and Plaintiffs in his personal capacity. This presentation by Plaintiffs, followed now by this Motion is disingenuous and in bad faith, for the following reasons.

*First*, Plaintiffs oddly produced the one document where Ross's title was not present at the signature line. Why this one document, out of a total of 21 closing documents (11 closing documents for Tranche 1 – the Tranche 1 Document Set, and 10 closing documents for Tranche 2 – the Tranche 2 Document Set)? Why did they not produce the first escrow agreement, the Escrow Agreement 1? Is it because the two documents are almost identical, except that Escrow Agreement 1 *did* have Ross's title at the signature line, and Escrow Agreement 2 did not?[31] Or why did they not produce any other additional documents from either of the closing sets? The answer is very simple: it would more likely than not have raised questions with the Court regarding the veracity of Plaintiffs' allegation that Ross was a party or that he consented to New York jurisdiction. Ross has consistently maintained that neither is true (see Section III herein).

---

[31] See Ross Decl. at 3, 9

16

**Second,** Alpha makes it clear in its memorandum (in support of its Motion) that suing Ross was a "backstop." Its intent appears to be to hold Ross accountable for Oxysure's obligations. It is improperly alleging that Ross agreed to New York jurisdiction in his personal capacity and improperly conflating the parties. This all amounts to bad faith. Ross has alleged that this suit against him personally is vexatious (Ross Decl. §§ 28, 40, 44). Alpha did not sue Ross from the outset. Alpha did not sue Ross when it lost its motion for a restraining order. Alpha did not sue Ross before, during or soon after it filed and lost its motion for summary judgment. Alpha had every opportunity to amend its complaint earlier, and it failed to do so without excusable neglect (required under F.R.C.P. 6(b)(1)(B)). This all adds up to one thing – bad faith, and sanctions in this case are especially appropriate (see *Levy v. Carol Management Corporation*, 260 A.D.2d 27, 33 (N.Y. App. Div. 1999) (where the court looked at the broad pattern of the Levys' conduct … and not just the question [of] whether a strand of merit, illusory at that, might be parsed from the overwhelming pattern of delay, harassment and obfuscation that has continued with the appeal (citing *William Stockler Co. v. Heller*, 189 A.D.2d 601, lv denied 81 N.Y.2d 936)).

**Third**, Alpha (and Plaintiffs generally) have exhibited a pattern of behavior throughout the course of this lawsuit that can only be aptly characterized as an endless shape shifting of complaints and allegations, with perfunctory and incomplete allegations, described by Defendants' former counsel as "…a merry-go-round that needs to stop spinning." (Doc. # 99, ¶ 1). The only reasonable conclusion here is that the entire lawsuit against Ross personally is vexatious, without merit and in bad faith.

17

## V.  THE MOTION SHOULD BE DENIED BECAUSE OF THE FUTILITY OF AMENDMENT

A proposed amendment may be denied as futile where it has no merit or fails to demonstrate a cognizable or sufficient claim. (*Lamothe v. Town of Oyster Bay*, No. 08-CV-2078, 2011 WL 4974804, at *9 (E.D.N.Y. 2011)). Generally, a motion to amend is reviewed pursuant to the same standard invoked with respect to a Rule 12(b)(6) motion to dismiss. (*Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 183 (E.D.N.Y. 2013)). However, where a motion to amend is filed subsequent to the filing of a motion for summary judgment, "'even if the amended complaint would state a valid claim on its face,' leave to amend may be denied where 'the evidence in support of plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law.'" *Id*. (quoting *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001)). See also *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014) ("when the motion to amend is filed after the close of discovery *and the relevant evidence is before the court*, a summary judgment standard will be applied instead.") [emphasis added]. Alpha's Motion is futile, and should be denied, as further elaborated below.

*First*, the breach of contract claim(s) is eviscerated by the evidence before the Court. Ross was never a party and cannot be held liable for Oxysure's alleged breaches of contract or fraud. Defendants "cannot be held individually liable for a breach of contract [if] they acted in their capacities as officers." (*Puma Indus. Consulting, Inc. v. DAAL Assocs, Inc.*, 808 F.2d 982, 986 (2d Cir. 1987); see also *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, slip op. at 4517 (2d Cir. 1995) ("Immunity extends to officers or employees who induce their corporation to breach a contract.")). The facts in this case amply support the case law, as illustrated in

18

Sections III and IV above. Ross cannot possibly have breached either of the SPA 1 or the SPA 2 (he cannot conceivably breach a contract to which he was not a party).

*Second*, the proposed fraud in the inducement claim(s) cannot stand. Alpha is precluded from this claim by the Election of Remedies and Economic Loss Doctrines. Under New York law, a fraud in the inducement claim requires an election of remedies – either the plaintiff affirms the contract and seeks damages, or repudiates the contract, and seeks rescission; plaintiffs cannot have it both ways. New York's "election of remedies" doctrine provides that "one may not both affirm and disaffirm a contract. . .or take a benefit under an instrument and repudiate it." (*Accord Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 768 F. Supp. 115, 117 (S.D.N.Y. 1991) (citing *Lumber Mut. Cas. Ins. Co. of N.Y. v. Friedman*, 28 N.Y.S.2d 506 (1941)). The Morse/Dieselcourt dismissed damages pleadings of fraud, holding that a plaintiff cannot recover damages and also rescission pursuant to the election of remedies rule because "an award of damages for fraud affirms the contract" while "rescission vitiates the contract and places the parties in status quo prior to the transaction." *Id*. (quoting *Vitale v. Coyne Realty, Inc.*, 66 A.D.2d 562, 414 N.Y.S.2d 388, 393 (4th Dep't 1979)).

The election of remedies rule thus bars the pursuit of alternative relief after a party has "chosen one of two or more co-existing inconsistent remedies, and in reliance upon that election, that party must also have gained an advantage, or the opposing party must have suffered some detriment." *331 East 14th St. LLC v. 331 East Corp.*, 740 N.Y.S.2d 327 (1st Dep't 2002) (quoting *Prudential Oil Corp. v. Phillips Petroleum Co.*, 418 F. Supp. 254, 257 (S.D.N.Y. 1975).

Here, Alpha's (i) continued conversion of its shares of Series B Preferred to Oxysure common stock over a period of fifteen (15) months (**an astounding ten conversions in total - see Ross Decl. §§ 11 – 22; and Exhibits E1 – N3 to Ross Decl.**), (ii) bringing a temporary

19

restraining order and injunction claim here in New York under the choice of forum language to enforce the Series B Preferred SPA terms (which was tried by this Court on July 17, 2015), and (iii) filing its lawsuit against Oxysure claiming contract damages, collectively amount to an election to affirm the Series B Preferred transactions (the Trance 1 and Tranche 2 transactions) and reap the advantages of their enforcement. *Accord Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006).

Even if Alpha could clear the election of remedies bar (which it cannot), it should be noted that the burden of proof in alleged fraud cases under New York law is a high one; one who claims fraud must prove each element of fraud, not merely via a fair preponderance of the credible evidence but instead by clear and convincing evidence. (*Leucadia Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir. 1988), cert. den. 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989); *Citicorp Trading v. Western Oil Refining*, 790 F. Supp. 428, 435 (S.D.N.Y. 1992); *Helmsley-Spear v. Westdeutsche Landesbank Girozentrale*, 692 F. Supp. 194, 203 (S.D.N.Y. 1988)). The elements of a fraud claim under New York law are as follows: (1) with intent to defraud (2) a party makes a material false representation (3) the party seeking relief reasonably relied on said misrepresentation (4) which proximately caused the party seeking relief to suffer a monetary loss. (*Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987) [Katara]). Alpha (and Osher) has failed to establish each and every one of the elements of a fraud claim under the clear and convincing standard of proof required by New York law. (*Katara, supra*; *Ajax Hardware Mfg. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir. 1977)).

***Third***, the proposed market manipulation claim(s) are not viable. The market manipulation claim(s) simply lack sufficient factual allegations to make out a claim for market manipulation. The market manipulation claim is based solely on a singular email to a third party,

JSJ Investments in November 2014 (the "JSJ Email") requesting them to "…stay out of the market."  Ross contends that the email was simply an attempt to assist authorities with possible investigations at the time related to potentially illegal or aggressive short selling by unscrupulous market makers (See Ross Decl. §§ 33 – 36). Notwithstanding, the JSJ Email does not translate to market manipulation.[32] Far from it. The claim is simply legally insufficient as well as factually insufficient. To be legally sufficient, Plaintiff has to prove market manipulation under Rule 10b-5 under the Securities Exchange Act (the "Act").  The Supreme Court has made clear that a manipulation claim under 10b-5 requires recognized manipulative devises under the securities laws—it is a "term of art" and not a general catch-all (*Santa Fe Indus*, 430 U.S. at 476) (holding that "where the sole basis for market manipulation claims is alleged misrepresentations or omissions, ***plaintiffs have not made out a market manipulation claim***[.]" 2006 U.S. Dist. LEXIS 205, *17-18) (emphasis added)).[33]  In addition, Section 10(b), and Rule 10b-5 thereunder, have become the Securities and Exchange Commission's ("SEC") principal tool in addressing market manipulation.[34] (*Accord ScripsAmerica, Inc. v. Ironridge Global LLC*, 56 F. Supp. 3d 1121, 1161 (C.D. Cal. 2014) (rejecting manipulation claim based upon allegations that plaintiff "was misled by [defendant]'s statements and assurances regarding the amount of stock it would sell in a given period," and where plaintiff did not allege "that investors in its stock were misled as to the effect of [defendant]'s trading activity")).

---

[32] Other than the email, Plaintiffs have offered no prima facie evidence, because there is none. All they have provided are vague, illusory inferences about statements made (all prefaced by the primer "upon information and belief" (sic). These allegations are unconvincing and should not be treated as credible. And even if they were (which they are not), market manipulation claims have to satisfy the basic criteria outlined in this Section V, which could never happen (see Ross Decl. §§ 33 – 35).

[33] This requirement in the market manipulation jurisprudence comports with § 3.1(ff) in both SPA 1 and SPA 2's representation and warranty of "Regulation M Compliance." Regulation M, as discussed previously in this case, strictly looks market activity, not misstatements or omissions.

[34] Thel, Regulation of Manipulation Under Section 10(B): Securities Prices and the Text of the Securities Exchange Act of 1934, 1988 Colum. Bus. L. Rev. 359, 382 (1988).

Some courts have conceptually separated what can be characterized as a traditional manipulation from an alleged "open-market manipulation."[35] The distinction lies primarily in how the manipulator accomplishes the price movement necessary to profit. Traditional manipulations involve behavior that, if discovered, is inherently illegal, and several of these behaviors are explicitly proscribed under Section 9(a)(1) of the Act. These include wash sales, matched orders, and fictitious trading.[36] Plaintiffs have offered no allegations of any such behavior or trades, nor have they provided any proof or prima facie evidence of any transactions involving Ross (or Oxysure for that matter), let alone specific instances of wash sales, matched orders, or fictitious trading.

Open-market manipulations, on the other hand involve a course of conduct consisting entirely of facially legitimate transactions. This taxonomy can be subdivided into "trade-based manipulations" and "contract-based manipulations."[37] A trade-based manipulation involves an attempt by the manipulator to increase the price of a security or commodity by trading, and to sell at a profit before the price returns to its "correct" level. Here, there are no allegations or evidence to suggest Ross (or Oxysure for that matter) engaged in any trades that meet these criteria.[38] Contract-based manipulations are also completed with facially legitimate open market transactions. Yet rather than deriving their intended profitability from the manipulative trades themselves, the price moving trades are intended to trigger or benefit some other contractual right. An example of this would be executives who have employment agreements where bonuses

---

[35] See e.g., *U.S. v. Mulheren*, 938 F.2d 364, 370–71, Fed. Sec. L. Rep. (CCH) P 96082 (2d Cir. 1991) (noting that none of the "traditional badges of manipulation" were present, in discussion of why the defendant's behavior did not constitute manipulation).

[36] Securities Exchange Act Section 9(a)(1), 15 U.S.C.A. § 87; Markowski at 529.

[37] Fischel, Should the Law Prohibit "Manipulation" in the Financial Markets, 105 Harv. L. Rev. 503, 512–518 (1991).

[38] See Ross Decl. § 33 where he states that he "…never engaged in any trades whatsoever in Oxysure's stock that were not reported to the SEC on Forms 3, 4 or 5 or that were not strictly in accordance with securities laws and the SEC's Rule 144 in particular."

are triggered by the company's stock price reaching certain levels, and where they purchase their own company's stock to trigger the bonus, and the thereafter sell the stock. Here again, there are no allegations or evidence to suggest Ross (or Oxysure for that matter) engaged in any trades in order to receive any contractual benefits. Simply put, the JSJ Email simply doesn't cut it. Therefore, no manipulation claim has been alleged *ab initio*.

Alpha's motion should be denied for its futility (*Guzman v. Macy's Retail Holdings, Inc.* (S.D.N.Y. 3-29-2010), 09 Civ. 4472 (PGG). (S.D.N.Y. Mar. 29, 2010) (noting that futility can justify denying leave to amend).

## VI.   A NEW SCHEDULING ORDER SHOULD BE DENIED

Alpha did not seek diligent discovery leading to the proposed Amendment or a new scheduling order. The Court needs to find "…good cause for amending a scheduling order had been met when the moving party had diligently sought discovery leading to proposed amendment." Alpha never sought any discovery relating Ross personally. Zero. No depositions. No interrogatories. No documents. Nothing (see for example Doc. # 99, ¶ 1).[39]  In determining whether to amend a scheduling order (or issue a new one where a previous scheduling order has long expired, as is the case here) courts consider five factors: (1) when the moving party learned of the issue that is the subject of the [new] discovery; (2) how the discovery will affect rulings on pending motions; (3) the length of the discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to discovery requests ((*Bentkowsky v. Scene Magazine*, 637 F.3d 689, 696 (6th Cir. 2011) ("overarching inquiry in these overlapping

---

[39] In fact, not only did Alpha (and Osher for that matter) not seek diligent discovery of Ross, they actively stymied discovery.  For example, they refused to produce Ari Kluger, the principal of both Plaintiffs and the only negotiator on behalf of both Plaintiffs, for deposition, forcing Oxysure to file an emergency motion to compel deposition on September 11, 2015 (Doc. # 32).

factors is whether the moving party was diligent in pursuing discovery) (*Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011) ("significant consideration is whether there has already been adequate opportunity for discovery)). Unquestionably, Alpha had ample opportunity to conduct inquiry as to Ross personally, and none was conducted. Alpha was simply dilatory. A scheduling order may be moot if the Court denies Alpha's Motion. Notwithstanding, Defendant respectfully requests the Court to deny Alpha's request for a new scheduling order.

## VII.   CONCLUSION

For the reasons set forth herein, Defendant Ross respectfully requests the Court to:

(i)      Deny Alpha's Motion seeking the Amendment;

(ii)     Deny Alpha's request for a new scheduling order;

(iii)    Dismiss all claims in this entire case against Ross personally with prejudice.


/s/ Julian T. Ross
Julian Ross, Defendant, Counter-Plaintiff *Pro Se*

24

**CERTIFICATE OF SERVICE**

This is to certify that on the 17th day of October, 2017, a true and correct copy of the above and foregoing instrument was served via electronic service and/or First Class mail, upon the following counsel of record in accordance with the Federal Rules of Civil Procedure:

Kenneth Zitter
260 Madison Avenue #18
New York, NY 10016
Ph: 212-532-8000
Fax: 212-679-8990

/s/ Julian T. Ross
Julian Ross