IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALPHA CAPITAL ANSTALT, | § | |
| OSHER CAPITAL PARTNERS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 15-cv-05443-VM-GWG |
| | § | (Ref Case 1:15-cv-09594) |
| OXYSURE SYSTEMS, INC. et al. | § | |
| | § | |
| *Defendants.* | § | |

Collin County )
State of Texas )

### DECLARATION OF JULIAN ROSS, AS AMENDED IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF ALPHA'S MOTION TO AMEND COMPLAINT

I, Julian Ross, hereby declare under penalty of perjury that the following testimony is true and correct to the best of my personal knowledge or investigation:

**1.** "My name is Julian Ross. I am over the age of 18 and am competent to make this declaration. I was the CEO of Defendant Oxysure Systems, Inc. (the "Company," "OSI" or "Oxysure") prior to the filing of its bankruptcy on December 5, 2016. Oxysure is a Delaware corporation that had its principal place of business in Collin County, Texas.

**2.** I represented Oxysure in my capacity as its CEO during Oxysure's negotiations with the Plaintiffs in this case, specifically Alpha Capital Anstalt ("Alpha") and Osher Capital Partners, LLC ("Osher"). Alpha and Osher were both represented by Ari Kluger ("Kluger") throughout these negotiations. All documents memorializing the transactions between Oxysure and Alpha and between Oxysure and Osher were signed by me in my capacity as CEO of Oxysure. Further, all subsequent documents relating to Oxysure's performance under the agreements were signed by me in my capacity as CEO of Oxysure. At no time did I ever participate in or became party in any way to these transactions in my personal capacity.

**3.** It is for these reasons that I noted with dismay the "escrow agreement" (Docket No. 97) provided by counsel for the Plaintiffs Kenneth Zitter ("Zitter") to this court on 4/25/2017. With this document Plaintiffs sought to represent to this Court "evidence" that" (a) I submitted to New York jurisdiction in my personal capacity; and / or (b) I was a party to the transactions between Oxysure and Plaintiffs in my personal capacity. This representation is false and deceptive. I never agreed to submit to New York jurisdiction *in my personal capacity*. If I knew that is what the drafter of the document meant, I would not have signed the document. Further, I never signed this document in my personal capacity; I only signed it in my capacity as CEO of Oxysure.

Moreover, this document formed part of a set of closing documents, all signed by me in my capacity as CEO of Oxysure and on behalf of Oxysure.

4.  There were 2 tranches of financing concluded between Oxysure and Plaintiffs. The first tranche was closed on December 26, 2013 ("Tranche 1") and the second tranche was closed on December 29, 2014 ("Tranche 2"). In each tranche of financing Plaintiffs purchased shares of Oxysure's series b preferred stock ("Series B Preferred"). The Series B Preferred had a stated value of $1,000 per share and initially each share was convertible into the common stock of Oxysure at $.55 per share of common stock. Therefore, for example one share of Series B Preferred was convertible into 1,818 shares of Oxysure common stock. Oxysure also issued warrants in connection with the Series B Preferred, and these warrants had an exercise price of $1.20 per share.

5.  Upon the closing of Tranche 1 on December 26, 2013, Plaintiffs' attorney Edward Grushko ("Grushko") sent to Oxysure a packet comprising a cover letter and a compact disc ("CD") on which the fully executed closing documents for Tranche 1 (the "Tranche 1 Document Set") were copied. Grushko's firm drafted all the documents relating to Tranche 1 (see Exhibit 1A). A true and correct copy of Grushko's cover letter dated December 27, 2014 is provided hereto as Exhibit A. This cover letter was addressed to me *in my Capacity as Chairman & CEO of Oxysure only*.

6.  Further, the closing documents in the Tranche 1 Document Set were all *signed in my capacity as CEO* of Oxysure. Enclosed hereto are true and correct copies of the Tranche 1 Document Set, numbered Exhibits B through B9 as follows:

    - Exhibit B – Securities Purchase Agreement ("SPA 1"); *signed by me in my capacity as Chief Executive Officer* on page 38. The SPA 1 is the governing document for the Tranche 1 transaction, and is the main document whereupon the transaction is based. All the other documents are ancillary or supporting documents. *As is abundantly clear from the SPA 1, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
    - Exhibit B1 – Common Stock Purchase Warrant issued to Alpha (Warrant No. 54 as to 613,636 shares of common stock); *signed by me in my capacity as CEO* on page 13 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
    - Exhibit B2 – Common Stock Purchase Warrant (Warrant No. 56 as to 90,909 shares of common stock) issued to Arline Josephberg, an associate of Plaintiffs; *signed by me in my capacity as CEO* on page 13 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*

- Exhibit B3 – Common Stock Purchase Warrant (Warrant No. 57 as to 45,455 shares of common stock) issued to Daniel Schustak, an associate of Plaintiffs; *signed by me in my capacity as CEO* on page 13 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
- Exhibit B4 – Common Stock Purchase Warrant (Warrant No. 55 as to 68,182 shares of common stock) issued to Plaintiff Osher; *signed by me in my capacity as CEO* on page 13 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
- Exhibit B5 – A *second* Common Stock Purchase Warrant (Warrant No. 58 as to 68,182 shares of common stock) issued to Plaintiff Osher; *signed by me in my capacity as CEO* on page 13 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
- Exhibit B6 – Escrow Agreement ("**Escrow Agreement 1**"); *signed by me in my capacity as CEO* on page 8 (please note that the document template provided by Plaintiffs and their attorney Grushko did not have a typed provision for name and title – these had to be hand written onto the document upon signature). [1]
- Exhibit B7 – A Legal Opinion, provided by counsel for Oxysure and on behalf of Oxysure. One of the exhibits to this legal opinion is the **minutes of the Special Meeting held by the Board of Directors of Oxysure authorizing the Tranche 1 transaction**. The minutes were signed by all the directors of the Oxysure Board, including myself. *Clearly I am not a party in my personal capacity, and this transaction is authorized for Oxysure by the Board of Directors of Oxysure.*
- Exhibit B8 – Stock Certificate issued to Plaintiff Alpha; *signed by me in my capacity as President and Secretary of Oxysure.*
- Exhibit B9 – The as-filed (with the Secretary of State in Delaware) Certificate of Designations and Preferences for the Series B Preferred Stock of Oxysure; signed by me in my capacity as Chief Executive Officer of Oxysure on page 22 (please note also Article 1 on page 1, where I certify that I am the Chief Executive Officer of Oxysure Systems, Inc.

---

[1] Please see Exhibit D5 for Escrow Agreement 2. Escrow Agreement 1 and Escrow Agreement 2 are the same form, and have the same blank space where name and title are supposed to be inserted. However, while Defendant Ross remembered to insert his name and title in Escrow Agreement 1, he did not do so in Escrow Agreement 2. This was simply an oversight or a mistake. He never signed in his personal capacity.

- Exhibit B10 – The disbursement letter drafted and submitted by Plaintiffs and their attorneys to Oxysure, requiring it for signature as a condition precedent to the closing of the transaction (Tranche 1).

7. These documents overwhelmingly and categorically show that at no time was I a party in my personal capacity to Tranche 1 or any transactions between Plaintiffs and Oxysure. As illustrated by each and every single document related to Oxysure's pre-transaction involvement - Exhibits A through B9 (a total of 11 documents on this subject alone) – each and every document refers to Oxysure Systems, Inc. as the party involved; not a single document indicates me, Julian T. Ross as a party in my personal capacity to any of the transactions between Oxysure and Plaintiffs in any way, shape or form. The idea that I could ever sign any documents in my personal capacity is preposterous on its face. Oxysure was incorporated in 2004 and became a fully reporting company with the US Securities and Exchange Commission ("SEC") circa August 2011. The Company's shares became publicly traded on the over the counter bulletin board (OTC) circa February 2012. The Company's shares traded under the ticker symbol "OXYS." As at September 23, 2016 Oxysure had in excess of 2,700 stockholders. All Oxysure's filings and public disclosures can be found at the SEC website located at www.sec.gov. I was an officer of this public company and only conducted my duties in my capacity as CEO of Oxysure. The Company's affairs were at all times overseen by a Board of Directors, as evidenced by Exhibit B7. At no time was Oxysure a sole proprietorship, let alone a sole proprietorship owned by me.

8. Upon the closing of Tranche 2 on December 29, 2014, Plaintiffs' counsel Grushko sent to Oxysure a packet comprising a cover letter and a compact disc ("CD") on which the fully executed closing documents for Tranche 2 (the "Tranche 2 Document Set") were copied. Grushko's firm drafted all the documents relating to Tranche 2 (see Exhibit 1B). A true and correct copy of Grushko's cover letter dated December 31, 2014 is provided hereto as Exhibit C. This cover letter was addressed to me *in my Capacity as Chairman & CEO of Oxysure only*.

9. Further, the closing documents in the Tranche 2 Document Set were all *signed in my capacity as CEO* of Oxysure. Enclosed hereto are true and correct copies of the Tranche 2 Document Set, numbered Exhibits D through D8 as follows:

- Exhibit D – Securities Purchase Agreement ("SPA 2"); *signed by me in my capacity as Chief Executive Officer* on page 41. The SPA 2 is the governing document for the Tranche 2 transaction, and is the main document whereupon the transaction is based. All the other documents are ancillary or supporting documents. *As is abundantly clear from the SPA 2, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
- Exhibit D1 – Common Stock Purchase Warrant (Warrant No. 2014-001 as to 727,273 shares of common stock) issued to Alpha; *signed by me in my capacity as CEO* on page 13. *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
- Exhibit D2 – Common Stock Purchase Warrant (Warrant No. 2014-004 as to 25,000 shares of common stock) issued to Arline Josephberg, an associate of

> Plaintiffs; *signed by me in my capacity as CEO* on page 13. *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
> 
> - Exhibit D3 – Common Stock Purchase Warrant (Warrant No. 2014-002 as to 150,909 shares of common stock) issued to Plaintiff Osher; *signed by me in my capacity as CEO* on page 13. *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
> - Exhibit D4 – A *second* Common Stock Purchase Warrant (Warrant No. 2014-003 as to 51,364 shares of common stock) issued to Plaintiff Osher; *signed by me in my capacity as CEO* on page 13. *Here again, I am not a party to the agreement in my personal capacity, nor is there any mention of me in my personal capacity, nor is my personal address listed (for notice or otherwise).*
> - Exhibit D5 – Escrow Agreement ("**Escrow Agreement 2**")[2]; *signed by me in my capacity as CEO* on page 8. As noted the signature line is directly underneath the *party*, on behalf of which the signature is appended, which is Oxysure. I never consented to this escrow agreement as a party in my personal capacity. At best, the fact that my title as CEO was not explicitly added was an error by the drafter (Grushko and his firm). The fact that the title was not hand-written in by me was an oversight or mistake, but nevertheless does not make me a party to the document. The party was and remains Oxysure, as is clearly shown above my signature. In the same escrow agreement used for Tranche 1 (please see Exhibit B6) my title was hand written underneath the line by me. The agreements are the same in form, substance and intent. For Plaintiffs to claim that this escrow agreement somehow changed the parties to the SPA 2 is ludicrous and non-sensical. In any event, this is a document that supports and is ancillary to the SPA 2 (Exhibit D), which is between the parties Oxysure and Plaintiffs. I was never a party to this document or any other document executed between Oxysure and Plaintiffs in my personal capacity. I never consented to New York jurisdiction in my personal capacity.
> - Exhibit D6 – A Legal Opinion, provided by counsel for Oxysure and on behalf of Oxysure. On the 6th page of this exhibit I signed in my capacity as Secretary of Oxysure. On the 10th page of this exhibit I signed in my capacity as Director and Secretary of Oxysure. One of the exhibits to this legal opinion is the "**Unanimous Consent of the Directors (of Oxysure) in Lieu of Special Meeting" authorizing the Tranche 2 transaction**, signed by all the directors of the Oxysure Board at the time, including myself.[3]

---

[2] Please see Exhibit B6 for Escrow Agreement 1. Escrow Agreement 1 and Escrow Agreement 2 are the same form, and have the same blank space where name and title are supposed to be inserted. However, while Defendant Ross remembered to insert his name and title in Escrow Agreement 1, he did not do so in Escrow Agreement 2. This was simply an oversight or a mistake. He never signed in his personal capacity. Escrow Agreement 2 is the one document provided by Plaintiffs to this Court on 4/25/2017 (Docket No. 97) as "evidence" (sic) that I was a party to the transactions between Oxysure and Plaintiffs in my personal capacity.

[3] Please note further that three of the resolutions taken by the Oxysure Board state as follows: "RESOLVED FURTHER, that the *Chief Executive Officer* and *Secretary* of the Corporation be and they hereby are authorized and directed to prepare and file the Certificate of Designation of Preferences, Rights and Limitations in accordance with

- Exhibit D7 – Three Stock Certificates, one issued to Plaintiff Alpha, and two issued to Plaintiff Osher; *all signed by me in my capacity as President and Secretary of Oxysure.*
- Exhibit D8 – The as-filed (with the Secretary of State in Delaware) Amended Certificate of Designations and Preferences for the Series B Preferred Stock of Oxysure; signed by me in my capacity as CEO of Oxysure on page 22 (please note also Article 1 on page 1, where I certify that I am the Chief Executive Officer of Oxysure Systems, Inc.
- Exhibit D9 – The disbursement letter drafted and submitted by Plaintiffs and their attorneys to Oxysure, requiring it for signature as a condition precedent to the closing of the transaction (Tranche 2).

**10.** Once again, these documents abundantly, overwhelmingly and categorically show that at no time was I a party in my personal capacity to the Tranche 2 or any transactions between Plaintiffs and Oxysure. I performed my duties as CEO of Oxysure only. And, at all times I was answerable to the Board of Directors of Oxysure, who governed the affairs of Oxysure, and who ultimately approved or otherwise authorized the transactions between Oxysure and Plaintiffs.

**11.** Plaintiffs Alpha and Osher have reaped significant proceeds from their investments in Oxysure. They have done so through a series of many conversions (each, a "Conversion"), whereby they converted shares of their Oxysure Series B convertible preferred stock ("Series B Preferred") into Oxysure common stock ("Common Stock") and sold that Common Stock into the market.

**12.** Following the closing of Tranche 1 on December 26, 2013 Plaintiff Alpha did a series of Conversions during 2014 and 2015. Alpha's first Conversion was dated July 16, 2014 in terms of which Alpha converted $20,000 (twenty thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Therefore, Alpha was issued 36,364 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.75 to $.80 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this first Conversion would have been approximately in the $27,000 to $29,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's first Notice of Conversion as Exhibit E1; (ii) Alpha's legal Opinion Letter supporting this first Conversion as Exhibit E2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending July 11, 2014 (indicating the approximate share price range) as Exhibit E3.

---

the foregoing resolution and the provisions of Delaware law; and RESOLVED FURTHER, that the *Chief Executive Officer* and *Secretary* of the Corporation be and they are hereby authorized, directed and empowered to execute, for and on behalf of the Corporation and in its name, any and all documents required in connection with these resolutions, such approval to be conclusively evidenced by the execution and delivery thereof; and RESOLVED FURTHER, that the *Chief Executive Officer* and *Secretary* of the Corporation are hereby authorized to do and perform any and all such acts, including execution of any and all documents and certificates, as such officer(s) shall deem necessary or advisable, to carry out the purposes and intent of the foregoing resolutions." It cannot be more clear on the face of the transaction documents that, at all times I, Julian Ross was acting as CEO (and Secretary, where applicable) of Oxysure, never in my personal capacity.

13. Alpha's second Conversion was dated November 19, 2014 in terms of which Alpha converted $55,000 (fifty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Therefore, Alpha was issued 100,000 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.95 to $1.40 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $95,000 to $140,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's second Notice of Conversion as Exhibit F1; (ii) Alpha's legal Opinion Letter supporting this second Conversion as Exhibit F2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending November 21, 2014 (indicating the approximate share price range) as Exhibit F3.

14. Alpha's third Conversion was dated December 3, 2014 in terms of which Alpha converted $55,000 (fifty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Therefore, Alpha was issued 100,000 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.82 to $.95 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $82,000 to $95,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's third Notice of Conversion as Exhibit G1; (ii) Alpha's legal Opinion Letter supporting this third Conversion as Exhibit G2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending December 5, 2014 (indicating the approximate share price range) as Exhibit G3.

15. Alpha's fourth Conversion was dated February 17, 2015 (note – after Tranche 2 closed – on December 29, 2014) in terms of which Alpha converted $55,000 (fifty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Therefore, Alpha was issued 100,000 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.72 to $.85 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $72,000 to $85,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's fourth Notice of Conversion as Exhibit H1; (ii) Alpha's legal Opinion Letter supporting this fourth Conversion as Exhibit H2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending February 20, 2015 (indicating the approximate share price range) as Exhibit H3.

16. Alpha's fifth Conversion was dated February 24, 2015 in terms of which Alpha converted $90,000 (ninety thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Therefore, Alpha was issued 163,636 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.94 to $1.12 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $154,000 to $183,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's fifth Notice of Conversion as Exhibit I1; (ii) Alpha's legal Opinion Letter supporting this fifth Conversion as Exhibit I2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock

as provided by OTC Markets for the week ending February 27, 2015 (indicating the approximate share price range) as Exhibit I3.

**17.** Alpha's sixth Conversion was dated May 21, 2015 in terms of which Alpha converted $50,000 (fifty thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Alpha was issued 143,653 shares of Common Stock, which included 39,220 so-called "refill shares." At the time, Oxysure's Common Stock was trading in approximately the $.64 to $.70 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $92,000 to $100,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's sixth Notice of Conversion as Exhibit J1; (ii) Alpha's legal Opinion Letter supporting this sixth Conversion as Exhibit J2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending May 22, 2015 (indicating the approximate share price range) as Exhibit J3.

**18.** Alpha's seventh Conversion was dated July 22, 2015 in terms of which Alpha converted $25,000 (twenty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Alpha was issued 52,216 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.43 to $.505 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $22,400 to $26,300 range. Enclosed hereto are true and correct copies of: (i) Alpha's seventh Notice of Conversion as Exhibit K1; (ii) Alpha's legal Opinion Letter supporting this seventh Conversion as Exhibit K2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending July 24, 2015 (indicating the approximate share price range) as Exhibit K3.

**19.** Alpha's eighth Conversion was dated August 13, 2015 in terms of which Alpha converted $50,000 (fifty thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Alpha was issued 104,432 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.41 to $.45 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $42,800 to $47,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's eighth Notice of Conversion as Exhibit L1; (ii) Alpha's legal Opinion Letter supporting this eighth Conversion as Exhibit L2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending July 24, 2015 (indicating the approximate share price range) as Exhibit L3.

**20.** Alpha's ninth Conversion was dated September 17, 2015 in terms of which Alpha converted $50,000 (fifty thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Alpha was issued 104,432 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.33 to $.36 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $34,400 to $37,600 range. Enclosed hereto are true and correct copies of: (i) Alpha's ninth Notice of Conversion as Exhibit M1; (ii) Alpha's

Seller's Representation Letter supporting this ninth Conversion as Exhibit M2; (iii) Alpha's Broker's Representation Letter supporting this ninth Conversion as Exhibit M3; and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending September 18, 2015 (indicating the approximate share price range) as Exhibit M4.

21. Alpha's tenth Conversion was dated October 8, 2015 in terms of which Alpha converted $50,000 (fifty thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Alpha was issued 104,432 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.21 to $.28 per share range. This means that Alpha's proceeds from the sale of the Common Stock from this Conversion would have been approximately in the $22,000 to $29,000 range. Enclosed hereto are true and correct copies of: (i) Alpha's tenth Notice of Conversion as Exhibit N1; (ii) Alpha's legal Opinion Letter supporting this tenth Conversion as Exhibit N2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending October 9, 2015 (indicating the approximate share price range) as Exhibit N3.

22. Combined, these ten Conversions by Alpha would have produced proceeds of approximately between $644,000 and $773,000, based on the approximate share price range as described in paragraphs 12 through 21 herein.

23. Following the closing of Tranche 2 on December 29, 2014 Plaintiff Osher also did a series of Conversions during 2015. Osher's first Conversion was dated February 19, 2015 in terms of which Osher converted $25,000 (twenty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.55 per share. Osher was issued 54,713 shares of Common Stock (which included 45,455 Conversion shares plus 9,258 so-called refill shares). At the time, Oxysure's Common Stock was trading in approximately the $.70 to $.85 per share range. This means that Osher's proceeds from the sale of the Common Stock from this first Conversion would have been approximately in the $38,000 to $46,500 range. Enclosed hereto are true and correct copies of: (i) Osher's first Notice of Conversion as Exhibit O1; (ii) Osher's legal Opinion Letter supporting this first Conversion as Exhibit O2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending February 20, 2015 (indicating the approximate share price range) as Exhibit O3.

24. Osher's second Conversion was dated May 8, 2015 in terms of which Osher converted $25,000 (twenty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Osher was issued 60,535 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.65 to $.78 per share range (using the date of the legal opinion in this case (May 27, 2015), not the date of the actual conversion, since the shares would only have been available to trade approximately at or soon after the date of the legal opinion). This means that Osher's proceeds from the sale of the Common Stock from this second Conversion would have been approximately in the $39,300 to $47,200 range. Enclosed hereto are true and correct copies of: (i) Osher's second Notice of Conversion as Exhibit P1; (ii) Osher's legal Opinion Letter supporting this second Conversion as Exhibit P2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the

trading activity of Oxysure's Common Stock as provided by OTC Markets for the week ending May 29, 2014 (indicating the approximate share price range) as Exhibit P3.

25. Osher's third Conversion was dated September 25, 2015 (note – this was two months *after* Osher's affiliate Alpha filed suit in this case – July 14, 2015) in terms of which Osher converted $25,000 (twenty five thousand dollars) worth of Series B Preferred into Common Stock at a conversion price of $.47878 per share. Therefore, Osher was issued 52,216 shares of Common Stock. At the time, Oxysure's Common Stock was trading in approximately the $.24 to $.30 per share range. This means that Osher's proceeds from the sale of the Common Stock from this first Conversion would have been approximately in the $12,500 to $15,700 range. Enclosed hereto are true and correct copies of: (i) Osher's third Notice of Conversion as Exhibit Q1; (ii) Osher's legal Opinion Letter supporting this first Conversion as Exhibit Q2 (provided by Grushko's firm, Grushko & Mittman, P.C.); and (iii) a copy of the trading activity of Oxysure's Common Stock as provided by OTC Markets for the week beginning September 28, 2015 (indicating the approximate share price range) as Exhibit Q3.

26. Combined, these three Conversions by Osher would have produced proceeds of approximately between $90,000 and $110,000, based on the approximate share price range as described in paragraphs 23 through 25 herein.

27. As illustrated by each and every single document related to Oxysure's post-transaction performance - the conversions and related documents, Exhibits A through Q3 (a total of 63 documents on this subject alone) – each and every document refers to Oxysure Systems, Inc. as the party involved; not a single document indicates me, Julian T. Ross as a party in my personal capacity to any of the transactions between Oxysure and Plaintiffs in any way, shape or form. I was never a party to any agreements to either of these Plaintiffs in my personal capacity. If I knew that either Plaintiff was going ever going to make any claim to the contrary I would never have signed any agreements with either of these Plaintiffs or any of their affiliates.

28. As is also amply illustrated by these documents, Oxysure performed to its obligations, until it became impossible to continue to do so. Both Alpha and Osher were reaping the rewards of their investments, and it was only after the Oxysure share price started declining to levels below their contractual exercise prices did they get upset and initiated these lawsuits. The lawsuit against me is vexatious.

29. The Plaintiffs have claimed that the decline in the Oxysure share price was precipitated by financing transactions Oxysure concluded with third parties. Instead, I believe that a large contributing factor to the decline in share price may have been related to actions taken by the Food & Drug Administration ("FDA"). For example, a product recall was issued on Oxysure's flagship product, the OxySure Model 615 portable emergency oxygen generator, on June 12, 2015. A copy of the FDA's recall notice is enclosed hereto as Exhibit R. This FDA action culminated in a safety notice being issued (combined with a "do not use" warning) on the portable emergency oxygen product on March 29, 2016, sharply curtailing the product's marketability (and constituting a significant factor leading up to Oxysure's bankruptcy filing). A copy of the FDA safety notice is enclosed hereto as Exhibit S. Third, I believe aggressive short

selling by certain unscrupulous market makers was a factor. And finally, I believe that the lawsuits filed these Plaintiffs also accelerated the decline in Oxysure's share price.

**30.** The FDA actions and these factors made it impossible for Oxysure to continue to perform on its agreements with Plaintiffs.

**31.** The Plaintiffs have claimed that Oxysure engaged in third party financing transactions in contravention of Oxysure's agreements with them (Plaintiffs). This is not correct. Any third party transactions, where applicable conducted by Oxysure were categorically allowed by the agreements among Oxysure and Plaintiffs. Second, where applicable Oxysure has given these Plaintiffs ample opportunity to participate in transactions where such participation was called for by the agreements among the parties.

**32.** I am a resident of Collin County, Texas. I never lived in New York. I do not now nor have I ever had any business dealings, property, interests or family connections to New York. The only times I ever had any meetings or discussions in New York was in my capacity as CEO of Oxysure. I have derived 100% of my income from my dealings and employment in Collin County, Texas. I have no agents in New York soliciting business or conducting business on my behalf. I have no goods that I sell that are consumed in the State of New York, and I do not expect any of my personal income to come from interstate or international commerce. Plaintiffs knew this, and knew that it would be highly burdensome and injurious to me to have to pay for and manage a litigation in New York. They also knew that I was never a party to any agreements with them in my personal capacity. Their sole goal therefore, with this litigation is to harass me and extract significant pain, suffering and financial hardship on me and my family.

**33.** I have never manipulated or stabilized, nor have I intended to manipulate or stabilize the market for Oxysure's stock or any market. Plaintiffs' claims in this regard are simply false, and they have provided with zero proof. I have never manipulated the market for Oxysure's stock, nor have I ever intended to do so. I have never engaged in any schemes or transactions designed to: (i) manipulate the prices of Oxysure stock, or (ii) induce the purchase or sale Oxysure stock; or (iii) create a false or misleading appearance [of market activity] in Oxysure stock; or (iv) engaged in any transactions that are facially legitimate in order to set prices, and manipulate prices; or otherwise generally (v) engaged in open-market manipulations (sometimes defined as schemes in which both intentional price-movement and profit capture are accomplished entirely using facially legitimate transactions.). I have never engaged in any fictitious transactions, wash sales, short sales, price moving trades or any dissemination of false reporting (presumably to affect stock prices or otherwise), nor have I requested such behavior from anyone, ever. This never happened, and Plaintiffs have not provided any proof or evidence regarding such supposed transactions that occurred, when they occurred, prices at which they occurred (what prices securities were offered for and sold at), how many securities were involved, at what frequency these transactions occurred, who were involved (buyers and sellers), and so forth. Plaintiffs' claims of market manipulation (sic) are pure unadulterated fiction, and nothing but a desperate attempt to harass me personally. Finally, I have never engaged in any trades whatsoever in Oxysure's stock that were not reported to the SEC on Forms 3, 4 or 5 or that were not strictly in accordance with securities laws and the SEC's Rule 144 in particular.

**34.** Plaintiffs have made their market manipulation claims based on what I supposedly said, but I categorically deny that I ever, in my capacity as CEO of Oxysure or in my personal capacity (or any capacity) said anything, did anything or caused anything to be done to manipulate the market for Oxysure's stock or any market. Plaintiffs have produced an out of context email to a third party, JSJ Investments ("JSJ"), in which I purportedly asked them to "stay out of the market." I categorically deny that this email was in any way, shape or form intended to manipulate the stock. I also categorically deny that I asked JSJ to manipulate any stock, and Plaintiffs did not produce a scintilla of evidence that JSJ stayed in or out of the market, bought or sold any Oxysure stock, or manipulated or stabilized any market for Oxysure stock. I was never an affiliate, partner, officer, director or control person of JSJ in any way.

**35.** If JSJ did anything pursuant to this email, where is the information about the manipulative actions they took? Did they in fact respond to or take any actions pursuant to this so-called email? How many securities did they sell, or not sell? What was the price of the securities that they supposedly sold, or did not sell? What type of securities did they sell, or did they not sell? For how long did they sell, or did they not sell? What percentage of the daily volume of securities did they sell, or did they not sell? What was the price movement? The fact is that Plaintiffs allegations raise hundreds of questions, to which there are no answers. The reason there are no answers is because their allegations are fake, false and fraudulent. It simply did not happen. There was no manipulation of any kind, let alone market manipulation. And there is no evidence of such anywhere. Plaintiffs' claims are a bizarre attempt to morph this lawsuit into something it isn't or cannot be.

**36.** Between circa November 2014 through late 2015 Oxysure had referred to Financial Industry Regulatory Authority ("FINRA"), the Securities & Exchange Commission ("SEC") and certain lawmakers for investigation, concerns regarding the possibility of manipulative trading and/or "naked shorting" occurring with Oxysure's stock, perpetrated by certain unscrupulous market makers. As CEO of Oxysure I was the one leading the effort to get this concern investigated. It is quite possible that a very short sentence out of context in one email out of many thousands or emails, could be misconstrued (in the context of a stock manipulation concern) when in reality the intent was to cooperate or assist with the (FINRA) investigations related to Oxysure's stock manipulation concerns at the time. As CEO of Oxysure I have always adhered strictly to our laws generally and to our securities laws specifically. When there were concerns about the market, the company immediately referred those to the relevant authorities, including FINRA and the SEC. Enclosed hereto are Exhibit T1, a copy of a research report that discusses the short position in Oxysure's stock (the research report in the second paragraph references "…*between November 18, 2014 and April 30, 2015, there were approximately 5.7mn shares sold short in OxySure stock.*" (the report goes on to add: "Considering that the float in OxySure Systems is just 7.65mn of the total 29.6mn shares outstanding, we find this data eye-opening."); and Exhibit T2, which is an initial response letter from Senator John Cornyn of Texas (addressed to Oxysure's attorney at the time, Mazin Sbaiti) confirming Oxysure's referral for investigation to FINRA and Senator Cornyn's office of these short selling concerns. These actions prove that, not only did I *never* engage in any so-called market manipulation as these Plaintiffs allege, I proactively referred any concerns about such activity to the relevant authorities for investigation and prosecution.

**37.** While I served as CEO of the Company, the overall affairs of Oxysure was governed (in accordance with SEC regulations for small public companies and many of the Sarbanes Oxley requirements) by a Board of Directors who were assisted by an Advisory Board comprising at least 12 business and medical leaders in total. Therefore, I did not I make decisions for Oxysure unilaterally, nor did I control all aspects of Oxysure, corporate and operational. Oxysure was never a sole proprietorship. Far from it. It was a publicly traded, Delaware corporation with as many as 2,700 stockholders at one point.

Oxysure's public filings with the SEC confirm these issues. For example, on March 31, 2015, Oxysure filed its annual report on Form 10K (the "FY2014 10K"), which can be located on the SEC's website here: https://www.sec.gov/Archives/edgar/data/1413797/000121390015002353/f10k2014_oxysuresystem.htm

In this single document, Oxysure's Board of Directors is referenced a total of 18 times. A few examples are as follows:

> On Page 26: "*Our board of directors has the authority to issue shares of "blank check" preferred stock, which may make an acquisition of our company by another company more difficult.*"
>
> On Page F-1: Our audited financial statements are addressed to our *board of directors* and shareholders.
>
> On Page F-17: "*Dividends – Series A Preferred may be entitled to receive a quarterly non-cumulative dividend in the amount of $.01 per share upon approval from the Board of Directors.*"
>
> On Page F-19: "*Our Board of Directors, which determines the number of options that will be granted, the effective dates of the grants, the option process and the vesting schedules, administers the Plan. In the absence of an established market for the common stock of the Company, the Board of Directors determines the fair market value of our common stock.*"
>
> On Page 43: The names and experience of our then Board of Directors is listed.

Over its years as a fully reporting public company Oxysure filed numerous disclosures similar to the FY2014 10K and other quarterly (on Form 10Q) and update filings (on Form 8). A complete and comprehensive listing of all OSI's public filings can be located on the SEC's website here: https://www.sec.gov/cgi-bin/browse-edgar?company=oxysure&owner=exclude&action=getcompany

It is my understanding and belief that Plaintiffs studied these filings to determine whether or not they wanted to do business with Oxysure and invest in Oxysure. Plaintiffs cannot say that they did now know about our extensive disclosures, whether regarding our Board of Directors or any

other disclosures in our SEC filings. This was public information prior to and after Oxysure and Plaintiffs entered into the Tranche 1 and Tranche 2 transactions.

38. From Oxysure's SEC filings the Plaintiffs were able to review all the risk disclosures related to Oxysure's business and prospects. The Plaintiffs knew the risks, and were determined to enter into the Tranche 1 and Tranche 2 transactions with Oxysure anyway. For example, from the FY2014 10K, in the "Risk Factors" section under ITEM 1A which starts on Page 17 of the filing, Oxysure discloses, *inter alia*:

> Under the heading "Risks Relating to the Early Stage of our Company, our Financial Position and our Need for Additional Capital," Oxysure for example discloses:
>
> – *"We are an early stage company and have a history of net losses. Currently, we have one product that we manufacture and make available for commercial sale, and to date we have not generated any significant product revenue. As a result, we expect to continue to incur substantial net losses for the foreseeable future, which raises substantial doubt about our ability to continue as a going concern."*
>
> – *"We are at a very early operational stage and our success is subject to the substantial risks inherent in the establishment of a new business venture."*
>
> – *"We have a very limited operating history and our business plan is unproven and may not be successful."*
>
> Under the heading "Risks Relating to the Regulatory Environment," Oxysure for example discloses:
>
> *"Failure to comply with applicable regulatory requirements can result in enforcement action by the FDA, which may include any of the following sanctions:*
>
> - *warning letters, untitled letters, fines, injunctions, consent decrees, and civil penalties;*
> - *repair, replacement, refunds, recall, or seizure of our products;*
> - *operating restrictions, partial suspension or total shutdown of production;…"*

39. Upon the closings of the Tranche 1 and Tranche 2 transactions, there were payments made to Plaintiff Osher and to Ari Kluger ("Kluger"), who was the sole negotiator on behalf of both Plaintiffs and also to my belief and understanding, a principal of both Plaintiffs as well as Alpha's general partner, LH Financial. Some payments were also made to associates of Kluger and Plaintiffs. These payments were described as "Due Diligence Fees" in the documents. The payments were made as to cash, warrants or shares of Series B Preferred. It was only much later that I discovered these payments to be illegal as neither Kluger nor Osher was registered as broker-dealers with FINRA. If I knew this I would never have entered into these transactions for Oxysure, and I would not have recommended the transactions to Oxysure's Board.

40. I also recently discovered the astonishingly large number of lawsuits that Plaintiff Alpha is involved in, in this Court alone (see Exhibit U). In the instant search, out of 34 cases in total

Alpha is the plaintiff in an astonishing 29 cases, representing 85.3% of the cases. It naturally raises questions regarding this litigious syndicate. Why are they involved in so many lawsuits? Are they using our legal system as a weapon to harass, oppress or otherwise ostracize anyone that they feel like harassing? Other than this vexatious lawsuit against me, how many other vexatious lawsuits have they filed?

**41.** I have never been to Liechtenstein. I have never had any dealings, business interests or property in Liechtenstein. I do not know anyone in Liechtenstein. I do not know any attorneys or agents in Liechtenstein. I do not know anything about the laws or the legal system of Liechtenstein. Conducting discovery in Liechtenstein, or related to or in connection with any entities, their management or principals, or their representatives, agents, affiliates or respondents in Liechtenstein would be unduly burdensome to me, and would require me to expend significant additional resources to conduct discovery and prepare for trial in this case, or it would significantly delay the resolution of this dispute, already well over two years in the making.

**42.** In April 2016, Oxysure filed a Form 15-12G suspending its duty to file reports under Sections l3 and 15(d) of the Securities and Exchange Act of 1934. Oxysure's filing of its Form 15 arose out of a confluence of events that Oxysure could not control. Oxysure contended with these spurious lawsuits filed by Plaintiffs, and a rogue plaintiff's lawyer in Dallas broadcast a meritless lawsuit blaming Oxysure for the death of a five-year old girl in Frisco, Texas, ostensibly in an effort to extort a settlement from the Company. In addition, Oxysure was ultimately led to believe this rogue attorney shared misinformation with the FDA office in Dallas in an effort to further place pressure on Oxysure to pay her and her client off. This in turn created a bad impression with the FDA and negative attention from the FDA and ultimately caused Oxysure to be forbidden from selling its primary product, the Oxysure Model 615 oxygen device (in spite of this product having saved many thousands of lives over the years). These events were not foreseeable and rendered any further performance by Oxysure impossible or impracticable.

**43.** This confluence of events, combined with Oxysure's consequent inability to raise adequate financing to continue its business plan, created an untenable situation. Oxysure filed for Chapter 7 bankruptcy on December 5, 2016, in the United States Bankruptcy Court for the Eastern District of Texas as Case No. 16-42224 ("Bankruptcy").

**44.** As a result of these events and the Bankruptcy, numerous North Texas employees lost their jobs, and their families lost their income. That includes me and my family. We have had to sell and vacate our family home in Texas. This vexatious lawsuit against me personally, besides being unjust and improper, has added insult to injury for me and my family, and has created immeasurable financial hardship for us.

I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and investigation.

/s/ Julian Ross                                                             October 17, 2017
Julian Ross                                                                           Date